James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Vincent N. Buttaci
John W. Leardi
BUTTACI & LEARDI, LLC
103 Carnegie Center, Suite 101
Princeton, New Jersey 08540
(609)799-5150

D. Brian Hufford
Robert J. Axelrod
Murielle Steven Walsh
Susan J. Weiswasser
Anthony F. Maul
POMERANTZ HAUDEK
  GROSSMAN & GROSS LLP
100 Park Avenue
New York, New York 10017
(212) 661-1100

*Counsel for Plaintiffs and the Putative Classes*
(Additional Counsel on Signature Page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PREMIER HEALTH CENTER, P.C., JUDSON G. SPRANDEL, II, D.C., BRIAN S. HICKS, D.C., TRI3 ENTERPRISES, LLC, BEVERLY HILLS SURGICAL CENTER, JEREMY RODGERS, D.C., and AMY O'DONNELL, D.C., on their own behalf and on behalf of all others similarly situated, and CONGRESS OF CHIROPRACTIC STATE ASSOCIATIONS, the AMERICAN CHIROPRACTIC ASSOCIATION, the OHIO STATE CHIROPRACTIC ASSOCIATION and THE MISSOURI STATE CHIROPRACTIC ASSOCIATION, in a representational capacity on behalf of their members, | Civil Action No. 11-425 (FSH) (PS) |
|                 Plaintiffs, | |
|    v. | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| UNITEDHEALTH GROUP, UNITEDHEALTHCARE SERVICES, INC., OPTUMHEALTH, INC., HEALTH NET OF THE NORTHEAST, INC., and HEALTH NET OF NEW YORK, INC., | |
|                 Defendants. | |

Plaintiffs Premier Health Center P.C. ("Premier Health"), Judson G. Sprandel, II, D.C. ("Sprandel"), Brian S. Hicks, D.C. ("Hicks"), Tri3 Enterprises, LLC ("Tri3"), Beverly Hills Surgical Center ("BHSC"), Jeremy Rodgers, D.C., A.T.C. ("Rodgers"), Amy O'Donnell ("O'Donnell"), Congress of Chiropractic State Associations ("COCSA"), the American Chiropractic Association ("ACA"), the Ohio State Chiropractic Association ("OSCA") and the Missouri State Chiropractic Association ("MSCA"), to the best of their knowledge, information and belief, formed after an inquiry reasonable under the circumstances, for their First Amended Class Action Complaint (hereinafter "Complaint"), assert the following against Defendants UnitedHealth Group, UnitedHealthCare Services, Inc., OptumHealth, Inc., Health Net of the Northeast, Inc., and Health Net of New York, Inc. (collectively, "Defendants" or "United").

## INTRODUCTION

1. Plaintiffs bring this action against Defendants under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

2. Plaintiffs Premier Health, Sprandel, Hicks, Tri3, BHCS, Rodgers and O'Donnell (collectively, the "Individual Plaintiffs") and the members of the putative Classes, as defined below, are health care providers or facilities who have provided health care service or supplies to members of health care plans insured or administered by United ("United Insureds"), and who have been paid by United for providing such services or supplies through the issuance of benefits under the terms and conditions of the United Insureds' health care plans ("United Plans"). Plaintiffs COCSA, ACA, OSCA and MSCA (collectively, the "Association Plaintiffs") are membership organizations that serve the interests of chiropractic physicians. They bring this action in a representational capacity on behalf of their members.

3. As alleged herein, United engaged in post-payment audits of the benefit payments made to the Individual Plaintiffs and other members of the Class and subsequently determined

1

that it had erroneously made overpayments that it then demanded be repaid. It subsequently took steps to coerce certain of the Individual Plaintiffs and other Class members to return the alleged overpayments, including by withholding payments from new and unrelated services and applying them to the alleged debt, or by filing invalid lawsuits seeking to compel repayment.

4.      Many of the United Plans at issue are provided through private employers. As a result, they are governed by ERISA, which establishes strict rules and procedures with which United or other entities that administer ERISA plans must comply. Among other things, ERISA sets forth specific steps that must be followed when an insurer such as United makes an "adverse benefit determination" by denying or reducing benefits, including by providing a "full and fair review" of the decision. This requirement is designed to establish an administrative record relating to any decision denying or reducing benefits so that it can be effectively challenged in court, with the court having a valid basis for reviewing the decision. By making a retroactive determination that a previously paid benefit was, in fact, paid improperly, an insurer makes an adverse benefit determination under ERISA, and any effort to recover previously paid benefits issued under ERISA plans arises under ERISA and is limited in scope to such remedies that are permitted under ERISA. As detailed herein, United has violated ERISA by its retroactive adverse benefit determinations without complying with ERISA requirements.

5.      In addition to its improper recoupment activities, United, through its wholly owned subsidiary OptumHealth, Inc. ("Optum"), also engaged in improper actions, including denials of benefits, by application of flawed, manipulated and undisclosed policies designed to discourage and limit the provision of health care services, as described herein. In so doing, United has similarly violated ERISA.

## THE PARTIES

### Plaintiffs

6.     Plaintiff Premier Health is a licensed professional corporation located at 385 Prospect Avenue, Hackensack, NJ 07601. It is wholly owned by Phillip Kim, D.C. ("Kim"). Premier Health is a health care facility that provides health care services to various patients, many of whom are United Insureds. As an out-of-network ("ONET") health care provider, Premier Health never signed an agreement with Defendants to accept discounted rates in exchange for having United Insureds directed to it. Rather, it provides services to patients who choose to come to it, and then, pursuant to assignments that are signed by its patients, bills to and receives benefit payments directly from United on behalf of the United Insured patients.

7.     The standard "Assignment of Benefits Form" that Premier Health has its patients sign states:

> I hereby instruct and direct [United or Health Net] Insurance Company to pay by check made out and mailed out to:  Premier Health Center, P.C., 385 Prospect Ave., 1Fl., Hackensack, NJ 07601, Or
>
> If my current policy prohibits direct payment to doctor, I hereby also instruct and direct you to make out the check to me and mail it as follows: [to same address]
>
> For the professional or expense benefits allowable, and otherwise payable to me under my current insurance policy as payment toward the total charges for the professional services rendered.  THIS IS A DIRECT ASSIGNMENT OF MY RIGHTS AND BENEFITS UNDER THIS POLICY. This payment will not exceed my indebtedness to the above-mentioned assignee, and I have agreed to pay, in a current manner, any balance of said professional service charges over and above this insurance payment.

Pursuant to this assignment, Plaintiff has standing to pursue claims under ERISA.

8.     Dr. Sprandel is a licensed Doctor of Chiropractic who practices at 1412 Cleveland Avenue, N.W., Canton, OH 44703, and provides services to numerous United Insureds. A member of both ACA and OSCA, Dr. Sprandel is an INET provider with United, which means that he has agreed to accepted discounted rates from United for providing Covered Services to

United Insureds (as defined in the United Plans). He has become an in-network provider in order to gain better access to United Insureds as patients.  As a matter of course, Dr. Sprandel has his patients execute written assignments in which they agree that Dr. Sprandel may bill and receive payments directly from United, thereby giving him standing to pursue ERISA claims. Further the patients affirm that they remain financially liable for any portion of the bill that is deemed not to be medically necessary or otherwise not a Covered Service.

9.      Dr. Hicks is a licensed Doctor of Chiropractic who practices at 7100 E. 151st Street, Bixby, OK 74008, and provides services to numerous United Insureds. Dr. Hicks is an in-network provider with Optum's ACN Network. "ACN" stands for "American Chiropractic Network," the name formally used by Optum. Dr. Hicks' patients execute written assignments, as a matter of course, in which they agree that he may bill and receive payments directly from United. Therefore Dr. Hicks has standing to pursue ERISA claims. Further, Dr. Hicks' patients affirm that they remain financially liable for any portion of the bill that is deemed not to be medically necessary or otherwise not a Covered Service.

10.     Plaintiff Tri3, headquartered at 950 N Rand Road, Suite 121, Wauconda, IL 60084, is a health care facility which provides durable medical equipment ("DME") through its wholly owned and controlled subsidiaries, Wabash Medical Company, LLC ("Wabash"), located at 7750 Zionsville Road, Suite 850, Indianapolis, IN 48268, and Orthoflex Inc., d/b/a Integrated Orthopedics ("Orthoflex"), located at 3717 N. Ravenswood Ave., Suite 217, Chicago, IL 60613. Operating through Wabash and Orthoflex, Tri3 has provided durable medical equipment to many United Insureds pursuant to prescriptions from the Insureds' health care providers. Wabash signed a Facility Participation Agreement with United as of August 1, 2009, but an error was made by United in implementing the agreement. United subsequently informed Wabash that it needed to fill out a new Facility Agreement, which United sent to Wabash on March 4, 2010.

Wabash, however, never completed or returned this revised Agreement and informed United that it no longer wished to be in-network ("INET") with United. Wabash was therefore only INET with United, if at all, from August 1, 2009 through March 4, 2010. Both before and after these dates, Wabash was an ONET facility with respect to United. At all times, Orthoflex has been an ONET provider with United. With regard to Wabash, Tri3 is only asserting claims for recoupments that were taken for the time in which Wabash was an ONET provider.

11.     As a health care facility, Tri3, through Wabash and Orthoflex, has its patients execute assignments, as a matter of course, which generally state:

> Assignment of Insurance Benefits: I certify that the information given by me is correct. I request that payment of authorized benefits be made on my behalf. I assign the benefits payable for covered services rendered by Tri3 to Tri3 and authorize Tri3 to submit claim to . . . commercial insurance carriers for payment. I authorize payment of my insurance benefits directly to Tri3, which payment will not exceed the balance due on my account. I hereby guarantee payment to Tri3 of any and all charges not covered by this assignment, and waive any and all notices and demands in the event of non-payment thereunder. . . . By signing I hereby appoint Tri3 Enterprises, LLC or affiliates to act on my behalf in connection with any claim for coverage of benefits under my health plan. This includes appealing a claim for benefits that has been denied (either in whole or in part). This appointment authorizes my representative to receive any and all information provided to me, and to act for me (or my covered spouse or dependent child), if named above as patient. This appointment also authorizes my representative to provide any requested information to the plan that relates to any claim [for] coverage or benefits under the plan.

This assignment establishes Tri3's legal standing to pursue the ERISA claims asserted herein.

12.     Plaintiff BHSC is a licensed surgical center with offices at 250 S. La Cienega Boulevard Suite 100, Beverly Hills, CA 90211. It provides health care services as an ONET provider to numerous United Insureds. As a matter of course, BHSC has its patients execute written assignments in which they agree that it may bill and receive payments directly from United. Thus, BHSC has standing to pursue ERISA claims. Further, BHSC's patients agree that they remain financially liable for any portion of the bill that is deemed not to be medically

5

necessary or otherwise not a Covered Service.

13.     Dr. Rodgers is a licensed Chiropractic Radiologist and board-certified athletic trainer who practices at 333 South Boulder Road, Ste. 2, Louisville, CO 80027, and provides services to numerous United Insureds. Dr. Rodgers was previously in-network with United through Optum's ACN network.  In 2005, he terminated his participation in ACN's network after ACN requested that he submit to a "Performance Improvement Agreement" that was invalid and solely designed to pressure him improperly to reduce services to his patients. Dr. Rodgers has his patients execute written assignments, as a matter of course, in which they agree that he may bill and receive payments directly from United. Therefore, Dr. Rodgers has standing to pursue ERISA claims. Further Dr. Rodgers's patients affirm that they remain financially liable for any portion of the bill that is deemed not to be medically necessary or otherwise not a Covered Service.

14.     Dr. O'Donnell is a licensed Chiropractic Physician who works as an Integrative Chiropractor with Greenwich Hospital's Center for Integrative Medicine, located at 35 River Road, Cos Cob, CT 06807, and has provided services to numerous United Insureds. Dr. O'Donnell was previously in-network with United through Optum's ACN network.  During her time as an INET provider, from approximately 2002 through 2007, she was continually pressured and harassed by United employees to alter her practice and reduce the level of care she provided to her patients, before she finally elected to terminate her participation in or around 2007. As a matter of course, Dr. O'Donnell has her patients execute written assignments in which they agree that he may bill and receive payments directly from United. As a result, Dr. O'Donnell has standing to pursue ERISA claims, and, further, she has her patients affirm that they remain financially liable for any portion of the bill that is deemed not to be medically necessary or otherwise not a Covered Service.

6

15.    COCSA was formed in the late 1960's and is a not-for-profit organization consisting of state chiropractic associations in all 50 states, with its headquarters based in Wichita, Kansas. The mission of the Congress is to provide an open, nonpartisan forum for the promotion and advancement of the chiropractic profession through service to member state associations. The purpose of COCSA, as stated in its Rules & Regulations, is (1) to form a coalition of official chiropractic state organizations; (2) to serve as a forum or clearing house to help solve mutual state problems on a non-partisan basis; (3) to cooperate with other organizations in the advancement of natural health and Chiropractic; (4) to assure that Chiropractic attains its rightful place in healing arts; and (5) to initiate, encourage and support programs and projects for the advancement of the Chiropractic profession.

16.    ACA, based in Arlington, Virginia, is the largest professional association in the United States representing Doctors of Chiropractic, with more than 15,000 members. The ACA promotes the highest standards of ethics and patient care, contributing to the health and well-being of millions of chiropractic patients. On behalf of its members, ACA lobbies for pro-chiropractic legislation and policies, promotes a positive public image of chiropractic, supports research, provides professional and educational opportunities for Doctors of Chiropractic, and offers leadership for the advancement of the profession. The ACA's formal Mission Statement is as follows:

> The ACA is a professional organization representing Doctors of Chiropractic. Its mission is to preserve, protect, improve and promote the chiropractic profession and the services of Doctors of Chiropractic for the benefit of patients they serve. The purpose of the ACA is to provide leadership in health care and a positive vision for the chiropractic profession and its natural approach to health and wellness. On behalf of the chiropractic profession, we accomplish our mission and purpose by affecting public policy and legislation, by promoting high standards in professional ethics and quality of treatment and by carrying out a dynamic strategic plan to help ensure the professional grown and success of Doctors of Chiropractic.

17.     The OSCA is a chiropractic association based in Columbus, Ohio, and is a member of COCSA. Dr. Sprandel is a member of the OSCA and its former President. As of the end of 2010, the OSCA's membership consisted of more than 800 chiropractic physicians residing and practicing in the State of Ohio. The OSCA's declared mission is to "empower Ohio chiropractic physicians as the preferred choice for health care needs, specializing in spinal care, neuromuscular care and/or nervous system function; and [to educate] the general public and policymakers on the importance of chiropractic in reaching one's fully human potential." Further, the OSCA's Mission Statement is as follows:

> Our mission is to promote the science, philosophy and art of the chiropractic profession by advocating the highest standard of ethics in practice; by working united to advance the profession; by developing close cooperation among the doctors within the association for the welfare of all Doctors of Chiropractic and the public we serve; and by promoting desirable relationships with other entities for the benefit of the chiropractic profession.

18.     The MSCA is a chiropractic association based in Jefferson City, Missouri. As of the end of 2010, the MSCA's membership consisted of more than 765 chiropractic physicians residing and practicing in the State of Missouri. The MSCA's declared mission statement is as follows:

> "Our mission is to promote chiropractic to the public, preserve, protect and promote the philosophy, science and art of chiropractic for the purpose of improving the health and wellbeing of Missouri citizens. The Missouri State Chiropractic Association is dedicated to promoting chiropractic through public education, legislative efforts and securing equality in the health care arena on behalf of all Missouri residents."

The MSCA brings this action in an associational capacity on behalf of its members, many of whom have suffered improper audits, repayment demands and recoupments from Defendants.

19.     The Association Plaintiffs bring this action in an associational capacity on behalf of their members to obtain appropriate injunctive relief from improper audits, repayment demands and recoupments of benefit payments from Defendants. The Association Plaintiffs

further seek relief on behalf of their members for various other practices employed by United and Optum designed to improperly limit benefits paid for patient treatment.  These practices include tiering providers based on simplistic statistical parameters, denying treatment plans without regard to patients' medical needs, and threatening providers with loss of network participation unless they improperly limit their care to patients,

20.    Pursuant to associational standing, the Association Plaintiffs have standing to pursue the ERISA claims of the chiropractic members they represent.

**Defendants**

21.    Defendant UnitedHealth Group, headquartered at 9900 Bren Road East Minnetonka, MN 55343, is a corporation organized and existing under and pursuant to the laws of Minnesota which issues and administers health care plans around the country through its various wholly owned and controlled subsidiaries, including Defendant UnitedHealthCare Services, Inc., as well as other wholly-owned and controlled subsidiaries, including Oxford Health Plans. Defendant Optum is one of UnitedHealth Group's wholly-owned and controlled subsidiaries, headquartered at 6300 Olson Memorial Highway, Golden Valley, MN 55427.

22.    Defendant Health Net of the Northeast, Inc., headquartered at 1 Far Mill Crossing, Shelton, CT 06484, provides administrative services to a number of subsidiaries of UnitedHealth Group, including Defendant Health Net of New York, Inc., Health Net Insurance of New York, Inc.; Health Net of New Jersey, Inc. and Health Net of Connecticut, Inc. Defendant Health Net of New York, Inc. is also based in Shelton, Connecticut. On December 11, 2009, UnitedHealthcare and Health Net, Inc. announced that UnitedHealthcare had completed the acquisition of Health Net of the Northeast's licensed subsidiaries and obtained the rights to renew Health Net's membership in Connecticut, New York and New Jersey. Defendants Health Net of the Northeast, Inc. and Health Net of New York, Inc. are collectively referred to herein as

9

the "Health Net Defendants."

23.     United (including Optum and the Health Net Defendants, acting in their own names) engaged in numerous post-payment audits and have improperly recouped or otherwise sought to recover payments from, or improperly denied coverage for services provided by, many Providers, including the Individual Plaintiffs, in violation of ERISA. Moreover, United and OptumHealth have imposed various policies in violation of ERISA designed to reduce or deny coverage for health care services, as detailed herein.

24.     Due to the manner in which Defendants function with respect to their United Plans, they are all functional ERISA fiduciaries and, as such, must comply with fiduciary standards. Moreover, in making coverage determinations relating to their United Insureds, Defendants must comply with the terms and conditions of the applicable health care plans and otherwise must comply with ERISA and its underlying regulations.

## JURISDICTION AND VENUE

25.     Defendants' actions in administering employer-sponsored health care plans, including determining reimbursements for Providers who supply health care services to United Insureds pursuant to the terms and conditions of the health care plans, are governed by ERISA, 29 U.S.C. § 1001, *et seq.* Plaintiffs assert subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 29 U.S.C. § 1132(e) (ERISA).

26.     Venue is appropriate in this District for Plaintiffs' claims under 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e)(2) because Plaintiff Premier Health resides and operates here, material portions of the improper repayment demands that are the subject of this lawsuit occurred here, and Defendants are authorized to do business here, either directly or through wholly owned and controlled subsidiaries.

## THE EXPERIENCE OF PLAINTIFF PREMIER HEALTH
### WITH UNITED HEALTH PLANS

### Health Net

27.     On or about January 6, 2010, Plaintiff Premier Health received a series of letters from Health Net, through Health Net of New York, Inc. Recovery Unit, notifying Premier Health of a purported overpayment of previously paid benefits. The letter stated:

> We recently determined that the claim referenced above was overpaid by [a specified amount which differed for each letter] for the reason listed at the bottom of this notice. Additionally, there may be interest if indicated above.
>
> You may elect to refund the amount paid incorrectly. If we do not receive your payment within 30 calendar days from the date of this letter, we will deduct the overpayment amount from future claim payments.
>
> Please send a refund check for [the specified amount] within 30 calendar days to the address listed below. A copy of this letter must accompany your payment.  We have included a postage paid envelope for your convenience. . . .
>
> If you believe the overpayment refund request is incorrect, you have 30 calendar days from the date of this letter to send written documentation of your dispute to: Provider Service Unit, 1 Far Mill Crossing, P.O. Box 904, Shelton, CT 06484 or call . . .

28.     At the bottom of the letter, Health Net listed the following as "Reasons" for the repayment demand:  "Adjustment made to prior payment; New information received by plan, member not eligible on the date of service." In total, Health Net demanded that Premier Health repay approximately $4,500 for services provided to a United Insured primarily in June 2009.

29.     On January 25, 2010, through its agent, Precision Billing & Consulting Services, LLC ("Precision Billing"), Premier Health submitted a first level appeal to Health Net's repayment demand in which it specifically stated:  "I am contesting this [repayment] request and the money may not be deducted without a hearing." The letter then detailed the information that was necessary to allow the appeal to proceed:

I must respectfully decline your request until the following documentation has been presented to establish your entitlement to the refund. Our records indicate, and your payment confirms, that the patient was insured under your health care plan and covered for services rendered at the time of treatment.

Therefore, I must have documentation to support your right to a reversal of payment. I will carefully review these documents to determine the appropriateness of this request. I will require:

1. A copy of the claim.

2. A copy of the canceled check.

3. A clearly stated reason for this reversal of payment.

4. An explanation as to why the claim was originally considered acceptable and is now denied.

5. The statute of limitations in regard to the refunds.

6. A copy of the appropriate section of your contract stating your entitlement of this action.

I am entitled to this information in a timely manner. However, your demand of payment within 45 days is unrealistic. You will need time to gather the information and I will equally need time to review it. Therefore your threat of deducting the monies from my future claim payments is inappropriate, unprofessional and illegal!

Upon arrival of the fore-mentioned documentation I will carefully review it and determine if I feel a refund is appropriate.

Be advised that I DO NOT authorize an extraction from future payments to cover this.

30.     In the letter, Premier Health then cited several court decisions in which it was established that the risk of loss arising from an erroneous payment by an insurer to a health care provider rests with the insurance company, such that recoupment of such payments would be improper.

31.     Health Net did not formally respond to the appeal, but in subsequent telephone calls, Health Net represented to Premier Health that Health Net would not consider the appeal and that it was therefore effectively denied. By February 26, 2010, Health Net had begun to

recoup the alleged overpayments by withholding sums from payments otherwise due and owing to Premier Health for services provided to United Insureds.

32.    In an email to Premier Health dated March 16, 2010, Health Net confirmed the recoupments had begun, stating:

> Below is a breakdown of all claims retracted, showing if recouped or still open. Again if the Member can get her coverage updated than all of these claims will be reprocessed. If she cannot get coverage retro-activated than she will be responsible for payment to you in full on these claims.

33.    The email summarized that a total of $3,084 had been recouped, by withholding payments for unrelated claims that were otherwise payment benefits, with an additional $1,382 "on hold." The email ended by stating: "There is nothing further I can do to resolve this issue." Health Net has proceeded to recoup funds from Premier Health in an amount exceeding that which it claimed to have been overpaid.

34.    Prior to recouping the funds, Health Net failed to offer or provide Premier Health with a "full and fair review" of the retroactive adverse benefit determination which served as the basis for its repayment demand. For this and other reasons, Health Net violated ERISA.

**<u>United</u>**

35.    Among the services Dr. Kim, on behalf of Premier Health, provides to his patients are Manipulation under Anesthesia ("MUA"), where a provider places a patient under anesthesia before providing spinal manipulation services, and Nerve Conduction Studies ("NRV"), which are used to find damage to the peripheral nervous system and to assist in the diagnosis of and treatment for nerve disorders. Dr. Kim has provided these treatments to United Insureds for years; these services have been reimbursed as Covered Services under the patients' health care plans throughout.

36.    At some point beginning as early as 2006 for MUA and 2008 for NRV, United

changed its policy and began to deny coverage for such services. Premier Health appealed those denials and exhausted all administrative remedies. Premier Health subsequently sued United in state court in New Jersey seeking coverage for the denied benefits.

37.     On November 30, 2010, United filed its Second Amended Answer to Amended Complaint, Defenses and Amended Counterclaim ("United Counterclaim") to Premier Health's state law complaint. In its counterclaim, United asserts that it "was and is the administrator and/or insurer of major medical and hospitalization plans sponsored by employers and offered to their employees throughout the United States, including New Jersey," defining them collectively as the "Health Plans," adding that "[m]any of these Health Plans . . . were and are employee welfare benefit plans governed by ERISA." United Counterclaim, ¶ 5.

38.     United proceeds to assert a right to repayment for previously paid MUA and NRV payments to Dr. Kim, on the basis that they were not Covered Services under the applicable Health Plans, stating:

> Phillip Kim, D.C. and Plaintiff have been erroneously reimbursed for MUA services, which are not covered under the [Health] Plans. Plaintiff has submitted under Phillip Kim, D.C.'s name for serial MUA procedures, that are not covered services under The Plans, and which were performed on at least nine [United] participants.

> Phillip Kim, D.C. and Plaintiff have also been erroneously reimbursed for nerve conduction studies, which were not performed in conjunction with needle electromyography, and therefore are not covered services.

United Counterclaim, ¶¶ 20-21.

39.     United then asserted that it was seeking overpayment of "no less than $498,000," representing the aggregate amount by which it purportedly had overpaid Premier Health for providing non-covered MUA and NRV services. In so doing, United made clear that it was asserting its claim as a remedy under ERISA, stating:

> Pursuant to 29 U.S.C. § 1132(a), with respect to the Health Plans governed by

ERISA, [United] may bring a civil action to obtain "appropriate equitable relief" to redress violations of ERISA or the terms of an ERISA plan, or to enforce any provisions of ERISA or the terms of the ERISA plan.

*Id.* ¶ 31.  Further, United asserted that any claims by Premier Health to challenge United's payment policies were preempted by ERISA:  "Plaintiff's remedies for any act or omission of United are limited solely to those afforded by ERISA. *Id.* ¶ 5.

40.     United is correct that ERISA governs a dispute over the alleged overpayment of health care benefits and related repayment demands made by insurers against providers. Its counterclaim, however, was improvidently filed as state courts do not have jurisdiction over the ERISA claims filed by United. Premier Health will therefore be filing a motion to dismiss the Counterclaim.

41.     In this action, Premier Health seeks to exercise its rights under ERISA, pursuant to assignments it has received from its United Insured patients, to preclude United from seeking to enforce its repayment demands. Among other things, United cannot pursue a repayment demand, which constitutes a retroactive adverse benefit determination, without complying with ERISA's detailed procedural guidelines, including the requirement that United provide a "full and fair review" of its adverse benefit determinations.

**THE EXPERIENCE OF PLAINTIFF SPRANDEL
WITH UNITED HEALTH PLANS**

42.     In mid-2009, Dr. Sprandel received various requests for medical records from Optum, a division of UnitedHealth Group, as part of an ongoing post-payment audit of benefits he had previously received for services provided to United Insureds. Dr. Sprandel complied with the requests and provided the records.

43.     In August 2009, Dr. Sprandel received a series of formal "Refund Requests" from Optum, sent under the letterhead of Johnson & Rountree, a collection agency retained by United

for work on collecting alleged overpayments from providers. In these requests, Optum identified the date of service, from 2008 or 2009, with the amount of overpayment identified. The following was listed as the "Overpayment Reason":

> Claim paid for a service not payable under OptumHealth Reimbursement Policy.

> Manual therapy (97140) must be documented as a distinct service not in the chiropractic manipulative treatment region and must meet the timed-service requirement as described in ACN Group UM Policy 474 and Reimbursement Policies 0045 & 0049. The following CPT codes are not supported by the documentation submitted. [Date of service]: 97140.

44.     This was followed by a series of letters from Optum in or around September 2009, in which it stated it had "recently performed a review of UnitedHealthcare paid claims" in which "it was determined the claim(s) . . . was/were paid incorrectly." After asking that a "refund check" be made out to UnitedHealthcare and sent to Johnson & Rountree, it added:   "If you believe these findings are in error, you have the right to appeal. If you want to appeal, you must do so within 30 days of receipt of this initial request by submitting, in writing, the reason for your appeal, any documentation, and supporting material to Johnson & Rountree . . ." Finally, it stated that "[i]f a response is not received, UnitedHealthcare may offset future payments by the refund amount requested."

45.     By letter dated November 4, 2009, Dr. Sprandel submitted a formal appeal to United's repayment demand, stating:

> The purpose of this correspondence is to furnish proof that the services rendered to your insured, my patient, were reasonable necessary, and the billing codes for same are herein discussed for clarification purposes, and to remain adamant that no overpayment exists, the UCR rates of [United] have been applied by us, a plan provider for [United].

46.     In the letter, Dr. Sprandel explained that he used CPT Code 97140 with modifier -59 to demonstrate that he was providing this service on a region unrelated to the area of chiropractic manipulative treatment that was therefore properly payable as a distinct service, as

explained in the coding books identifying proper coding protocols: "[I]f the 97140 service is at a different region, the AMA approves its usage. For such encounters, the modifier -59 is appended to the 97140, and it signifies that a distinct procedure is being performed at other than the CMT treatment region."

47.     United (through Optum and Johnson & Rountree) denied the appeal by letter dated November 19, 2009, stating:

> Johnson & Rountree Premium, on behalf of ACN Group, Inc. ("OptumHealth Care Solutions"), previously contacted you regarding this incorrect payment and requested a refund. You filed a written appeal. After reviewing the documentation submitted, we find the overpayment refund request remains valid. The details of the decision(s) are explained on the attached list.
>
> Please make your refund check payable to UnitedHealthcare and mail the check along with a copy of this letter and attached list to Johnson & Rountree Premium, P.O. Box 203921, Houston, TX 77216-3921.
>
> If you believe this decision was made in error, please submit in writing the reasons for your continuing appeal, any documentation, and supporting material to Johnson & Rountree Premium, PO Box 2625, Del Mar, CA 92014.
>
> Your prompt attention to this matter is greatly appreciated. If a response is not received, UnitedHealthcare may offset future payments by the refund amount requested.

The list attached to the letter identified the amounts that were allegedly overpaid, with the statement: "A second audit of the originally submitted medical records has been completed. The overpayment determination that CPT code 97140 is not supported by the required documentation has been upheld."

48.     Dr. Sprandel responded to this correspondence with a letter dated December 2, 2009, stating as follows:

> [S]ince the issue dispute is 97140-59 for services wherein trigger point compression was manually administered, we have consulted a billing specialist who recommended using code 97124-59, instead of 97140-59.
>
> Since the services have been paid, please note rebilling is for correction of code purposes only.

49.     After resubmitting the bills with the revised code, Dr. Sprandel continued to receive reports from Johnson & Rountree asking for repayment.  He therefore submitted further appeals, asking for back-up information supporting the pricing paid for the treatments and for the claim that the treatments provided were not Covered Services under the patients' health care plans. In one letter dated December 17, 2009, Dr. Sprandel stated:

> We have re-examined the 12-07-2009 corrected billing and find that HGFA [sic] billing was originally $51.00 for CPT code 97124. You will need to furnish the claimant/insureds SPD [summary plan description] to prove that CPT 97124 . . . is not a covered service.

50.     In another letter of the same date, referring to continued repayment demands relating to CPT code 97140, Dr. Sprandel reiterated his demand for back-up information, including the patients' SPD and the "'audit' notes" relating to the repayment demand. In requesting such information, Dr. Sprandel stated:

> We cannot simply "accept" your word – we must have proof of your assumptions and this will be the third time we have asked you for proof of price lists within this patient's SPD (Summary Plan Description), which is probably an ERISA matter, hence, there should be a printed SPD available to me as a provider. If this is an ERISA contract, you must furnish the SPD or face a fine of $100.00 per day for not furnishing the SPD on a timely basis.

51.     Without responding to Dr. Sprandel's request for back-up information, United (through Optum and Johnson & Rountree) issued new letters in January 2010, designated as "Appeal Resolution – Overpayment Still Exists," which simply repeated the same language from the November 19, 2009 letter, stating that the appeal had been denied and the overpayment remained due and owing.  Accompanying these letters were the same charts reflecting the overpayment demand, stating:

> A third audit of the originally submitted medical records has been completed. The overpayment determination that CPT code 97140 is not supported by the required documentation has been upheld.

52.     Dr. Sprandel has continued to receive repeated refund requests from Johnson &

Rountree on behalf of United, forcing Dr. Sprandel and his staff to waste valuable time and energy responding to such requests and filing repeated and futile appeals. Each and every time, United (through Johnson & Rountree) has denied the appeals, while ignoring the requests for back-up information and related documents. Through this action, Dr. Sprandel seeks to exercise his rights under ERISA, pursuant to assignments he has received from his patients insured by United, to preclude United from seeking to enforce its repayment demands. Among other things, United cannot pursue a repayment demand, which constitutes a retroactive adverse benefit determination, without complying with ERISA's detailed procedural guidelines, including the requirement that United provide a "full and fair review" of its adverse benefit determinations.

### THE EXPERIENCE OF PLAINTIFF HICKS WITH UNITED HEALTH PLANS

53.    By letter dated February 2, 2010, OptumHealth Audit and Recovery Operations requested that Dr. Hicks provide the medical records for seven patients relating to claims Dr. Hicks had submitted for these patients, which claims had already been paid by United. Dr, Hicks provided the requested records.

54.    By letter dated February 19, 2010, Optum Health reported to Dr. Hicks that it had completed its medical records audit and had determined that paid codes submitted by Dr. Hicks "were not supported by minimum documentation requirements" because the supporting documents were "illegible," and it therefore identified the amounts paid for those claims as overpayments.

55.    Dr. Hicks appealed this determination. In letters dated March 19 and March 29, 2010, Dr. Hicks' office wrote as follows:

> There have been several claims and patients that are under this [refund] request for "overpayment," the reason stating "illegible record submission." This poses some confusion due to the fact that all of our claims are filed electronically. In addition, the included patients all required notification through ACN. Approval was received from ACN with electronic notification done by our office prior to

treatment.  Please review the validity of this request due to the fact that claims were filed electronically and treatment was authorized through ACN.

56.     Dr. Hicks also attempted to provide additional records supporting the claims in order to make them legible for any auditors. However, Optum refused to consider these records because it considered these to be "modifications or revisions of the patient medical record subsequent to the audit [that] cannot be considered in the appeal process."

57.     On April 27, 2010, Johnson & Rountree sent a letter to Dr. Hicks, which stated "APPEAL RESOLUTION – Overpayment Still Exists," and noted a "total due" amount of $3,837.00 relating to overpayment of claims.  The letter further stated:

> Johnson & Rountree, on behalf of ACN Group, Inc. ("Optum Health Care Solutions"), previously contacted you regarding this incorrect payment and requested a refund.  You filed a written appeal.  After reviewing the documentation submitted, we find the overpayment refund request remains valid.

58.     The letter went on to state that if payment was not received, "United Healthcare may offset future payments by the refund amount requested."

59.     Johnson & Rountree sent Dr. Hicks similar correspondence in May and July, 2010 regarding other alleged claim overpayments, noting that the insurer had denied his appeal on these claims, and demanding that Dr. Hicks refund the insurer for the claims in question.  As with the earlier correspondence, the letters stated that if payment was not received, United Healthcare may "offset future payments by the refund amount requested."

60.     By letter dated June 28, 2010, Dr. Hicks again attempted to appeal United's determination of overpayment. Dr. Hicks' June 28th letter detailed the diagnosis for the seven patients in question, and the recommended treatment.  The letter pointed out that that for each of these patients, Dr. Hicks had submitted documentation to ACN, and ACN had approved the treatment. The letter noted that "[i]f there had been any question of whether [treatment] was appropriate, ACN would not have given approval for this level of service."

61.     Despite Dr. Hicks' good faith efforts to provide the necessary documentation and overturn United's overpayment determination, United has arbitrarily and unreasonably refused to consider the documentation supplied by Dr. Hicks' office, and continued with its repayment demands to Dr. Hicks, thereby effectively denying Dr. Hicks a full and fair review of its adverse benefit determination.  In fact, on September 17, 2010, OptumHealth Care Audit and Recovery Unit issued a second set of medical records requests to Dr. Hicks' office.

62.     Through this action, Dr. Hicks seeks to exercise his rights under ERISA, pursuant to assignments he has received from his patients insured by United, to preclude United from seeking to enforce its repayment demands. Among other things, United cannot pursue a repayment demand, which constitutes a retroactive adverse benefit determination, without complying with ERISA's detailed procedural guidelines, including the requirement that United provide a "full and fair review" of its adverse benefit determinations.

### THE EXPERIENCE OF PLAINTIFF TRI3
#### WITH UNITED HEALTH PLANS

63.     Tri3, operating through Wabash and Orthoflex, is a DME facility, whereby it provides durable medical equipment to United Insureds who come to it after having been prescribed such equipment by their treating health care providers. Upon providing such supplies to United Insureds, Tri3, through Wabash and Orthoflex, files claims with United for reimbursement pursuant to the terms and conditions of the underlying health care plans of the patients. United then pays the applicable benefits directly to Tri3, Wabash or Orthoflex, pursuant to assignments they have obtained from the United Insureds.

64.     On numerous occasions, United withheld payments for otherwise covered services as offsets for alleged overpayments of prior benefit payments. In such circumstances, however, United does not provide a valid explanation of the basis for its determination that there

has been an overpayment, and it fails to provide any means by which Tri3 can appeal or otherwise grieve the recoupment. In total, United has improperly recouped, through withholds of benefit payments otherwise due to Tri3, more than $25,000.

65.     As one example of an improper recoupment, United sent a Remittance Notice to Wabash dated June 3, 2010. In that notice, United reported that it had allowed $1,911.88 for certain DME provided to a United Insured. After deducting the co-payment and deductible that remained the responsibility of the patient, United reported that Wabash was "paid" $1,057.53. However, United then reported that the total check actually paid Wabash was only $696.13, with $361.13 being withheld as a "provider adjustment."  To explain that reduction, United used the code "WO" for "Overpayment Recovery." No other explanation was given for why this amount had been withheld as an overpayment, and no further opportunity to appeal or otherwise grieve the recoupment was offered by United. The following are similar examples:

| Remittance Notice | Total Recouped (WO) |
|---|---|
| Dec. 31, 2010 | $275.25 |
| June 23, 2010 | $19.88 |
| June 16, 2010 | $811.02 |
| June 16, 2010 | $11.02 |

In each case, United provided no explanation for the alleged overpayment and offered no appeal process.

66.     Orthoflex has been subjected to similar improper recoupments. As one example, United sent Orthoflex a Remittance Notice dated February 3, 2011, reporting that Orthoflex had submitted claims for various DME provided to a United Insured. A total allowed amount of $1,455.59 was identified, with a total amount "paid" to Orthoflex of $663.35 after the patient's co-payment and deductible. But United then reported that the entire amount was being withheld as an "adjustment" as an "Overpayment Recovery," using the same "WO" code. Thus, Orthoflex received no payment at all for providing these otherwise covered medical supplies. In addition,

as with Wabash, United provided no additional explanation and offered no internal appeal process.

67.     On March 23, 2011, United also sent Orthoflex an "Overpayment Notification," in which it stated, in full:

> UnitedHealthcare is unable to offset the attached list of identified claim overpayment(s) because we are unable to offset funds on this claim system at this time. For this reason, please make your refund check payable to UnitedHealthcare, and mail the check along with a copy of this letter and attached list to UnitedHealth Group Recovery Services, P.O. Box 740804, Atlanta, GA 30374-0804. Please contact us at [phone number] if you require additional information.

Attached to the letter was a "Refund Request" relating to health care services provided to a United Insured from November 23, 2010 through December 13, 2010, with the alleged overpayment amount of $1,748.98. The "Overpayment Reason" provided on the form was "HRA overpaid-Medicaid reconsidered charge," with an addition comment listed under "Notes," stating:  "This claim was reconsidered by UnitedHealthcare medical benefits."  No further information was provided, and no appeal rights were offered to Orthoflex to challenge the overpayment demand.

68.     When United withholds payments for claims submitted by Tri3 (through Wabash or Orthoflex) on behalf of United Insureds, this constitutes an adverse benefit determination under ERISA. Similarly, when United determines that previously paid benefits had been overpaid, and pursues repayments, this similarly constitutes an adverse benefit determination under ERISA. Under both circumstances, United is required to comply with ERISA, including with appropriate notice and providing a "full and fair" review, prior to withholding benefits or otherwise recoupment funds from Plaintiffs. It has failed to do so, in violation of its ERISA obligations.

## THE EXPERIENCE OF PLAINTIFF BHSC
## <u>WITH UNITED HEALTH PLANS</u>

69.     BHSC is a licensed surgical center with offices at 250 S. La Cienega Boulevard, Suite 204, Beverly Hills, California 90211.  BHSC, too, has been the subject of post-payment audits by United, which resulted in overpayment notifications and refund requests by United to BHSC.  In some cases, United offset alleged "overpayments" on certain claims to amounts currently due and owing to BHSC on other, unrelated claims.

70.     On May 18, 2010, BHSC submitted a claim for reimbursement in the amount of $23,867.01 to United for services provided to United Insureds on March 27, 2010, which United paid on June 21, 2010.

71.     On August 12, 2010, United Healthcare sent BHSC a notice of alleged overpayment with respect to this claim that it had already approved and paid.  The letter stated, in relevant part:

> Every effort is made to process claims accurately, but unfortunately errors can occur.  We overpaid you for the above claim and a refund is needed.
>
> *     *     *
>
> Please repay us $11,933.50 with a check or money order payable to UnitedHealthcare. We would appreciate receiving the refund within 45 days from the date of this letter.

72.     The stated reason for overpayment was that United had "incorrectly calculated the patient's coverage" for the services provided by BHSC.  The letter further stated: "If we do not receive the refund, we may deduct the amount due from future claim payments."

73.     On October 3, 2010, United sent BHSC a "Followup Request – Overpayment Notification," which noted an outstanding balance of $11,933.50 and stated as follows:

> UnitedHealth Group Recovery Services, on behalf of UnitedHealthcare, previously contacted you regarding the incorrect claim payment(s) on the attached list. We requested a full refund be made payable to UnitedHealthcare and mailed to UnitedHealth Group Recovery Services.

To date, we have not received the refund requested.

Please make your refund check payable to United Healthcare and mail the check along with a copy of this letter and attached list to UnitedHealth Group Recovery Services, P.O. Box 740804, Atlanta, GA 30374-0804.

*     *     *

Your prompt attention to this matter is greatly appreciated.  If a response is not received, UnitedHealthcare may offset future payments by the refund amount requested.

74.     With respect to other patients of BHSC, United proceeded to recoup the alleged overpayments it claimed it had made by offsetting the amount it claimed was owed against future benefit payments. It did so by withholding funds otherwise due and payable on behalf of two BHSC patients.

75.     Through this action, BHSC seeks to exercise its rights under ERISA, pursuant to assignments it has received from his patients insured by United, to preclude United from seeking to enforce its repayment demands and to preclude it from offsetting future alleged overpayments on certain claims against monies otherwise due its patients on unrelated claims. Among other things, United cannot pursue a repayment demand, which constitutes a retroactive adverse benefit determination, without complying with ERISA's detailed procedural guidelines, including the requirement that United provide a "full and fair review" of its adverse benefit determinations.

**THE EXPERIENCE OF PLAINTIFF RODGERS
WITH UNITED HEALTH PLANS**

76.     Dr. Rodgers is a licensed chiropractic radiologist and board-certified athletic trainer.  Because Dr. Rodgers has specialized knowledge in radiology, he frequently takes on patients who require xrays as part of their treatment from other chiropractors who lack the knowledge or equipment necessary to perform xrays. As a result, Dr. Rodgers' practice performs a volume of xray services that greatly exceeds the average among chiropractors.

25

77.     Dr. Rodgers was previously a participant in Optum's ACN network.  However, in early 2005, Optum notified Dr. Rodgers that, because the number of xrays he performed in 2004 was more than one standard deviation for the average among in-network chiropractors, he would need to submit to a Performance Improvement Agreement requiring him to perform fewer xrays.

78.     Believing Optum had merely failed to take his practice specialty into account, and loath to sign on to what he considered to be an unjust admonishment of his practice, Dr. Rodgers refused to sign the Performance Improvement Agreement.

79.     Optum responded by sending a "Termination Notice" to Dr. Rodgers.  The notice indicated that Dr. Rodgers would be terminated from the ACN network if he failed to sign the Performance Improvement Agreement by August 29, 2005.

80.     On June 6, 2005, Rodgers wrote a letter appealing the termination notice he received from Optum. In his letter, Rodgers requested that Optum either upgrade his provider status to "Tier 1" (Optum's most preferred provider rating) or provide an explanation as to why, taking into consideration his unique practice profile, that tier status would be inappropriate. Rodgers's letter also requested that Optum's termination notice be rescinded.  Rodgers requested a response by July 1, 2005.

81.     When Rodgers did not hear from Optum, he wrote another appeal letter on August 1, 2005.  In this letter, Rodgers reiterated that, given his practice specialty, disproportionate xray services were inevitable, and should not be a basis for admonishment.   The letter provided concrete information disputing Optum's evaluation of Dr. Rodgers's xray utilization:

> Regarding my x-ray utilization, I have included a sample of my radiology consultant intake forms and radiology reports in 2 consecutive months in 2004 demonstrating the fact that my clinic both takes and interprets on the average 25 studies/month diagnostic imaging studies for other chiropractors, physiatrists, and physical therapists. Additionally, I have discussed the inaccuracy in A.C.N.'s x-ray utilization data on several occasions with Gordon Heinrich and R.T. Donohue. Specifically, I surveyed Boulder County chiropractic clinics 3 years ago to

26

identify which clinics had in-house x-ray abilities for my own radiology service marketing purposes. I found that only 73% of clinics had their own x-ray tube. The remainder was sending patients to local hospitals, orthopedists, or independent diagnostic imaging centers like my own clinic. This makes those providers' utilization lower while making mine higher. Is this not the case? Is it fair to expect a provider to sign and agreement to alter his or her x-ray utilization based on this disparity in data collection and my clinic's unique referral base? Is this the type of variance you're really trying to alter? I think not.

82.     After Optum refused to consider Dr. Rodgers's attempts to appeal their determination, Dr. Rodgers decided to terminate his participation in the ACN network. Dr. Rodgers continues to provide out-of-network care to Optum and United Insureds. However, the fact that he no longer participates as an in-network provider limits his access to Optum and United Insureds and has had a negative economic impact on his practice.

### THE EXPERIENCE OF PLAINTIFF O'DONNELL
### WITH UNITED HEALTH PLANS

83.     Dr. O'Donnell is a licensed chiropractic who specializes in integrated chiropractics. She has more than 25 years of experience helping patients resolve pain issues and alleviate symptoms of medical conditions by restoring the body's proper alignment. Her areas of expertise include the Graston Technique, orthotic training, rehabilitation protocols for spinal and extremity conditions, soft tissue treatments and Kinesio Taping for athletes.

84.     Dr. O'Donnell became an INET provider with United in or around 2002. At some in time thereafter, she was identified by United as being a purported outlier due to the number and types of services she provided to her patients and was placed on a tiering level that required her to submit claims to frequent reviews by United.

85.     United called Dr. O'Donnell on a number of occasions to go through her profile and try to pressure her to reduce the numb and types of services she was providing. The United representatives would even specify that certain services should be done by the patient at home, rather than being provided by a medical provider, a conclusion with which Dr. O'Donnell

vehemently disagreed.

86.    At one point Dr. O'Donnell wrote a letter to United to explain why her practice differed from other practitioners and why she provided the types of services she did. United, however, never responded to her letter, nor did it seek further information, but continued to pressure to such an extent that Dr. O'Donnell found it to be harassing.

87.    During this time, United also delayed payments for benefits provided by Dr. O'Donnell, and frequently stopped paying altogether, even for new patient visits. The difficulties got so significant that in or around 2007, Dr. O'Donnell elected to terminate her association as an INET provider with United. While Dr. O'Donnell continues to be available to provide services as an ONET provider to Optum and United Insureds, her access to such patients is limited since she is not on the INET list, which has cost her patients and lost income.

## DEFENDANTS' ERISA VIOLATIONS RESULTING FROM THEIR POST-PAYMENT AUDIT AND RECOUPMENT PRACTICES

88.    Due to the role United (or the Health Net Defendants) played in administering the United Plans that provided the insurance to the patients whose claims were subsequently determined to be overpaid, including making coverage and benefit decisions and deciding appeals, it acted as a fiduciary under ERISA. Under ERISA, United cannot deny coverage for such services unless the applicable health care plan expressly includes an exclusion specifying that such services are not covered benefits.

89.    Under ERISA, United is required, among other things, to comply with the terms and conditions of its health care plans; to accord its United Insureds or their providers an opportunity to obtain a "full and fair review" of any denied or reduced reimbursements; and to make appropriate and non-misleading disclosures to United Insureds or their providers. Such disclosures include accurately setting forth plan terms; explaining the specific reasons why a

claim is denied and the internal rules and evidence that underlie such determinations; disclosing the basis for its interpretation of plan terms; and providing appropriate data and documentation concerning its coverage decisions.

90.     In offering and administering its health care plans, United further assumes the role of "Plan Administrator," as that term is defined under ERISA, in that it interprets and applies the plan terms, makes all coverage decisions, and provides for payment to members and/or their providers. As the acting Plan Administrator, United also assumes various obligations specified under ERISA. These obligations include providing its members with a Summary Plan Description ("SPD"), a document designed to describe in layperson's language the material terms, conditions and limitations of the health care plan. The full details of the plan, which are summarized in the SPD, are contained in the Evidence of Coverage ("EOC") that governs each member's health care plan.

91.     United is also obligated under ERISA to make its coverage determinations in a manner consistent with the disclosures contained in the SPD. To the extent there is a disparity or conflict between the SPD and the EOC, the SPD governs, so long as the member benefits from the application of the SPD. If the employer, rather than United, is deemed to be the Plan Administrator, United remains responsible for ensuring that the SPD complies with the law under its duties as a co-fiduciary as provided in ERISA, 29 U.S.C. § 1105, even if the employer prepares or disseminates the SPD.

92.     United violated ERISA and breached its fiduciary duties by failing to disclose the reimbursement rules it used to reduce members' benefits, by making retroactive benefit claim denials without proper disclosure or following required procedures, by seeking to impose new policies after-the-fact in an effort to compel payments by providers, by improperly excluding benefits for safe and effective services based on an incorrect determination that they were not

Covered Services, by improperly recouping benefits or suing for repayment of benefits that were rightfully paid to Plaintiffs, and by failing to fulfill its obligations of good faith, due care and loyalty.

93.    Under ERISA:

> The term "adverse benefit determination" means any of the following: a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, termination, or failure to provide or make payment that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan, and including, with respect to group health plans, a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit resulting from the application of any utilization review, as well as a failure to cover an item or service for which benefits are otherwise provided because it is determined to be experimental or investigational or not medically necessary or appropriate.

94.    As the definition makes clear, United's new policies as applied to Providers constitute "adverse benefit determinations" under ERISA. The requests for recoupment are based on United's determination that the services at issue were not "covered," and the forced recoupment or withholding of authorized benefits constitutes a "reduction" in benefits or "a failure to provide or make payments (in whole or in part) for a benefit," thereby satisfying the requirement for an adverse benefit determination.

95.    ERISA further establishes what steps must be followed once an "adverse benefit determination" is reached, including the following:

> [T]he plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. . . . The notification shall set forth, in a manner calculated to be understood by the claimant – (i) The specific reason or reasons for the adverse determination; (ii) Reference to the specific plan provisions on which the determination is based; (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review . . . (29 CFR 2560.503-1(g)).

96.     In addition, ERISA requires that each claimant be given "a reasonable opportunity to appeal an adverse benefit determination" and to receive a "full and fair review of the claim," (29 CFR 2560.503-1(h)(1)), all within clear and explicit timing requirements.

97.     United utterly failed and continues to fail to comply with any of the ERISA requirements. After making benefit determinations, pursuant to which it found that the specific health care services at issue were Covered Benefits of its health care plans and subsequently paid benefits to the providers, United reversed its coverage decisions. United subsequently informed these Providers that it was determining that those same services were no longer deemed to be Covered Services and demanded that the providers repay United.

98.     United's actions represent after-the-fact adverse benefit determinations under ERISA that would have the effect of creating new liabilities for the members to the providers. Yet, United failed to inform United Insureds or their providers of their actions, including by failing to provide necessary disclosures or documentation required under ERISA either to the members or the providers.

99.     Because of United's failure to comply with the steps required under ERISA to pursue an adverse benefit determination, its actions in demanding recoupment are invalid and unenforceable, and its coverage determinations should be deemed to be arbitrary and capricious.

100.    Even were United to have complied with its procedural obligations under ERISA, it has no legal right to recoup or pursue repayment of such funds paid to Providers, based on retrospective reversals of prior benefit determinations. Each recoupment demand issued by United is a claim for restitution under ERISA. Yet, ERISA does not permit restitution unless the assets at issue are easily identified and separate from other assets, which these are not. Providers obtained the funds in good faith and expended them or otherwise acted based on the assumption that such payments were proper. As there is no dispute that the services at issue were provided

31

by the Providers, and that they billed and received payment for these services in good faith, ERISA does not permit restitution, and equity demands that the providers be entitled to keep such payments. United should therefore be estopped from seeking recoupment or retaining any funds that were paid pursuant to its demands, or should otherwise be found to have waived its ability to collect.

## **OPTUM**

101.    The use of post-payment audits and repayment demands to recoup previously paid benefits is only part of the scheme undertaken by Defendants to enhance profits through denials of benefits otherwise due and payable under United health care plans. In particular, United, through Optum, has adopted a series of internal policies and procedures that are intended to – and have had the affect of – improperly denying benefits of health care services, in violation of ERISA.

102.    On behalf of UnitedHealth Group, Optum (through its Physical Health division) manages the United Healthcare networks for chiropractic providers, as well as speech, physical, occupational and massage therapists, and athletic trainers. In total, Optum has an estimated 24,000 chiropractic providers in its networks across the United States, and these providers manage care for approximately 20 million subscribers. Optum does business under a variety of names, including OptumHealth, Inc., OptumHealth Care Solutions, Inc., ACN Group IPA of New York, Inc., Managed Physical Network, Inc., and ACN Group of California, Inc.

103.    The Optum provider contract is not negotiated, but is offered as a take-it or leave-it proposition to the provider. Because of the size of the Optum network, and the large number of subscribers it controls, many providers have no real option but to accept the Optum contract if they are to remain in business. In addition, the construct of most of United's chiropractic benefits are with high copays and/or deductibles such that ONET providers find that there is virtually no

payment of benefits and few, if any, patients seek services from ONET providers.

104.    As a means to pressure its INET providers to reduce the amount of services provided to United Insureds, as well as the insureds of other insurers who use Optum's services, Optum has adopted a tiering plan that imposes burdensome and unreasonable administrative requirements on those providers who have been identified as having a higher level of utilization than the "norm" as established by Optum. The "norm" used by Optum to determine tier levels, however, are based on flawed and manipulated data that has nothing to do with appropriate levels of care, but, instead, are intended solely to pressure providers to reduce utilization rates in order to save Optum and United money.

105.    "Tier 1" is defined in Optum's "Operations Manual for Participating Providers" ("Operations Manual") as follows:

> Providers that meet a minimal patient volume and have clinical decision-making consistently aligned with current evidence and community standards. Tier 1 providers participate in a minimal utilization process. Following 2 consecutive years as a Tier 1 provider, while meeting a minimal patient volume, the provider moves to a no utilization review process (Tier 1 Advantage Program). Tier 1 Advantage providers, with minor plan exceptions, are no longer required to submit Patient Summary Forms.

106.    "Patient Summary Forms" are identified in Optum's Operations Manual as "a standardized health record including valid and reliable public domain outcomes-assessment instruments for documenting and submitting data regarding the demographic and historical attributes of all patients treated and the outcomes of treatment." While purported to be used to assess proper patient outcomes, for which the form is patently inadequate to do, Optum in fact only uses the Patient Summary Forms as a means to punish providers who do not lower their utilization rates sufficiently to be deemed Tier 1 Advantage providers. Patients also complete a cursory section with answers to subjective questions on the Patient Summary Form.  Optum directs providers within the Provider Manual to explain to patients the plan of care they will

33

undergo which includes frequency, duration, type of treatment and expected outcome. Although patients participate in the submission of information to Optum – leading to the expectation of a preauthorization of care – no appeal rights are afforded to patients when the care authorized differs from the doctor's careplan, in violation of ERISA.

107. The Operations Manual defines a "Tier 2" provider as follows:

> Providers that either are new to the network, have not met a minimum patient volume or have clinical decision-making not aligned with current evidence and community standards in one or more areas. Tier 2 providers participate in a comprehensive utilization review process.

108. The "comprehensive utilization review process," imposed by Optum on all Tier 2 providers, which means all providers that have not agreed to reduce their utilization rates to the arbitrary level established by Optum, is, in effect, a pre-certification procedure that requires all Tier 2 providers to submit clinical information pertaining to each patient so that pre-authorization by Optum can occur. Although Optum asks providers to indicate to patients the intended plan of care, it does not permit the provider to communicate the planned care to Optum as part of the pre-authorization process. Instead, the provider is only to identify the condition of and symptoms suffered by the patient, in order to allow Optum to approve certain utilization patterns while avoiding ERISA obligations.

109. In implementing its improper pre-authorization requirement, Optum requires that once Tier 2 providers see a United Subscriber, they must submit "Clinical Submission" information to Optum by way of a Patient Summary Form prior to providing any further treatment after an initial examination. Based solely on the information provided in this Form, Optum relies on a proprietary database with undisclosed utilization review criteria to set the number of treatments and duration of care that will be deemed to be covered as medically necessary. Notably, Optum expressly prohibits the treating provider from requesting a specific

number of visits as part of a treatment plan or the number of procedures that the treating provider believes are necessary as is common for preauthorization requests. Similarly, Optum refuses to take or consider any additional clinical information offered by the treating provider which would allow for making a proper clinical determination of the appropriate level of treatment to be offered to the patient. Instead, the treating provider may only submit the limited information requested by Optum to allow Optum to apply the coverage limits specified in its database. The coverage decision is therefore set by Optum based on "black box" computer policies that do not apply clinical information applicable to particular patients, contrary to acceptable standards under ERISA.

110.    Optum refuses to allow providers to request a particular number of sessions or procedures, or to submit clinical information, in a deliberate and intentional effort to avoid its obligations under ERISA. By providing its pre-determined coverage limit based on its computer model, but without actually taking and thereby "denying" a level of requested care, Optum takes the position that it is not denying a claim for benefits and thereby does not need to comply with ERISA requirements for dealing with an adverse benefit determination.

111.    Once Optum receives the Patient Summary Form from the Tier 2 provider, it provides a "Response to Submission" which dictates the approved number of visits, level of chiropractic manipulative treatment ("CMT"), number of therapeutic procedures and the timeframe within which the treatment must be given. The endpoint of this period is called the "recovery milestone." While Optum's Operations Manual states that the recovery milestone "is informational only" and "[s]ubmission of the Patient Summary Form is not linked to claims payment," that is false. In fact, in virtually all cases Optum will only pay benefits that it has specifically pre-authorized as falling within its computerized parameters for the specified recovery milestone.

112.    Once the recovery milestone is met, the provider must submit new materials to Optum and seek another pre-authorized treatment plan.  Optum consistently denies payment for any care a provider renders without pre-authorization beyond the recovery milestone.

113.    Optum also uses the recovery milestone as a means to limit coverage for chiropractic services and to punish Tier 2 providers so as to pressure them to reduce the amount of care they provide to the patients.  For example, the favored Tier 1 chiropractors may receive approval for up 12 months of care, whereas chiropractors who receive the standard "Tier 2" rating may receive approval for only up to two months of care.

114.    Without offering any means to appeal a denial of benefits, Optum requires a Tier 2 provider to submit updated paperwork and request pre-authorization for any care beyond that level originally authorized. Optum then repeats the process by reauthorizing or denying care, a process that is not only burdensome, but also creates an improper break in the proper treatment plan, requiring the provider either to forego treatment, or to provide it without assurance of coverage since it is not pre-authorized. When Optum receives the renewed requests it continues to apply its proprietary computerized model, without considering clinical records. Aside from placing burdensome administrative requirements on the Tier 2 providers, Optum also has used the utilization data from the providers to place undue pressure on them to reduce their utilization rates, including threatening to reduce them to a lower tier, to not renew them into the network, or to terminate them from the INET provider list if they did not reduce the amount of care they provide to their patients. Significantly, even though providers are only providing the services that have been pre-authorized by Optum, it continues to declare that the averages derived from those authorizations are inappropriate and pressures them to reduce care even further.

115.    In addition to punishing Tier 2 providers improperly merely for providing treatment to their patients, it also does so without taking into account variations in patient

patterns. For example, providers who happen to treat a cohort of patients who require disproportionate care (for example, providers who treat an elderly population) are nevertheless placed in the higher tier with no rational basis for doing so. It also harms providers with a practice specialty or emphasis that causes them to perform particular services disproportionately.

116.    Optum's system ignores not only the specific needs of a particular provider's patients, but also the terms of the health plans under which those patients are covered.   On information and belief, Optum does not review members' health plan documents prior to pre-authorizing a particular treatment plan.   In other words, Optum effectively determines the level of coverage for patients without so much as consulting the health plans that cover those patients.

117.    Frequently, providers who have been identified as outliers are subjected to "Provider Outreach Activities," which means that they are subjected to threatening telephone calls and letters in an effort to pressure them to reduce utilization rates.

118.    Prior to 2009, providers who exceeded Optum's statistical parameters could be placed in "Tier 3" status.   Tier 3 providers were subjected to a Performance Improvement Program ("PIP") that encouraged them to bring their practice statistics back below Optum's parameters, and were required to sign PIP agreements to reduce the number of services provided. Optum threatened these providers with termination from Optum's network if they failed to meet Optum's parameters or refused to sign the PIP agreements, and has terminated many providers on that basis.

119.    Today, providers are intimidated in the same manner.   Among other things, Optum reportedly targets providers who are "on the top ten percent of the bell curve" in terms of utilization for particular types of treatment and are told to reduce care or they will be subjected to additional administrative burdens (reduced to a lower tier) or removed from the network. The threat of termination was particularly significant because not only would it create a material

adverse impact on providers who would have lost access to United subscribers, but any termination would also be reported to the National Provider Databank ("NPD"), which placed the provider into jeopardy with other insurers as well.  Termination also caused providers to be forced to report on future credentialing applications that they had been terminated from a managed care organization, effectively barring them from all future acceptance into other networks. Even Optum, which states they allow terminated providers to apply to rejoin their network after a period of two years, disallows providers previously terminated by them, after the two-year waiting period, from rejoining their network on the basis that they have once been terminated by a managed care organization.  Optum's previous practice of routine termination of providers was somewhat curtailed due to this practice being brought to the attention of state regulators.  Now, equally egregious, the non-renewal of providers causing interruption of care plans and interference in the doctor-patient relationship diminishes providers' ability to provide access to care for Subscribers in their communities.

120.    By imposing artificially and unsupported limits on approved services, Optum also has created an adverse impact on patient care. Because Optum's pre-authorization and provider tiering practices make no effort to take patients' particular medical needs into account, they have the obvious effect of, in many cases, denying medically necessary care to patients.  They also encourage, and indeed require, providers to either ignore their ethical obligations to treat patients based on those patients' medical needs, or face the economic consequences of being terminated from Optum's network.

121.    Moreover, when patients receive notice that Optum has limited the number of authorized services, they frequently do not follow through with their recommended care plans from their health care providers due to cost concerns. This greatly lessens the benefit of the treatment that is authorized and could lead to more expensive and less effective treatments for

the condition, putting greater strain on the health care plans.

122.    In creating profiles for purposes of determining whether providers exceed "community standards," Optum relies on statistically invalid data, sometimes using as few as four patients to determine average utilization rates. This is so even though internal Optum information acknowledges that no fewer than 18 patients permit for a statistically valid analysis. Moreover, by pressuring providers to reduce care, they are manipulating the data so that it continues to reduce what is reported as the "community standard" for proper levels of care, even though these standards are inconsistent with what is generally recognized as appropriate levels of care in the chiropractic community. Prior to 2005, for example, when Optum began implementing its aggressive utilization review procedure, the mean number of visits for an Optum patient was 7.0-7.5. After the restrictive utilization review procedures were imposed, the mean number of visits per patient has dropped to approximately 5, representing a decrease of approximately 30%. This decrease does not result from application of proper clinical guidelines, as Optum suggests, but through the invalid computer model and the pressure it continues to place on providers. To avoid the adverse consequences resulting from exceeding Optum approved utilization rates, many Optum providers are forced to reduce care below the levels they otherwise would recommend or to provide such treatments without reporting them to Optum. As a result, not only are the providers being unfairly reimbursed, but the data Optum relies upon for reporting standard levels of care is understated.

123.    In establishing "community standards," Optum also ignores variability among providers in terms of the types of patients they see, as well as material variations among different regions in the country based on age, economic status, weather, types of work and other variables that will influence the level of chiropractic care that is needed. Rather than using appropriate geographical-based community standards, for example, Optum has, in the past, used manipulated

data from one region – Minnesota. To justify its approved level of utilization rates, Optum has cited two levels provided in Minnesota, claiming – falsely – that "[t]he characteristics of patients presenting for chiropractic care are virtually identical in every market across the country." In fact, Minnesota is a highly homogeneous region that cannot be compared to other geographic areas with many different variables. In any event, the Minnesota data itself was arbitrarily reduced as a result of Optum's improper practices designed to lower utilization rates.

124.    These "community standards" are imposed on ONET providers as well.  ONET providers' profiles are analyzed, often resulting in threatening calls with demands that certain patients be discharged.  Reimbursement is reduced to Medicare rates, reimbursement checks are sent to the insured despite designations assigning benefits to the provider, and patients are sent letters directing them away from their present provider to an in-network provider.  These practices serve to coerce providers into joining the Optum network.  As a fiduciary of plans offering insureds the option to choose ONET providers, United failed to act fairly by attempting to coerce patients to use INET providers, and ONET providers to become INET, so it could retain greater profits.  The flaws and inadequacies in the data relied upon by Optum to establish its standards for care are evidenced by the fact that they conflict with generally accepted standards of care in the chiropractic community. In August 2005, the ACA requested the New York Chiropractic College ("NYCC"), which is accredited by the Council on Chiropractic Education, to analyze the protocols utilized by Optum in light of what is taught in the NYCC curriculum. Noting that "[t]he minimum and maximum amount of care available [under Optum's policies] is consistently less than what is in NYCC's Educational and Clinical Care Protocols," it then concluded: "If NYCC were to use ACN material above as a cornerstone for our educational process, we would need to significantly alter our curriculum, protocols and practices and *would expect to see a significant decline in positive patient outcomes.*"  (emphasis added)

125.     Optum's improper practices have been recognized by various state regulators, although nothing significant has been done to halt the misconduct. In an October 19, 2006 report, for example, the Kentucky Department of Insurance ("KOI") evaluated Optum's conduct after a lengthy investigation. At that time, Optum was operating under the name "American Chiropractic Network," or "ACN," but its practices have remained largely the same, or worsened since then. The report included the following findings:

> After investigating the issues advanced by the complaints [by chiropractic providers], and after discussing the issues with ACN and its parent company, UnitedHealthcare Group, the KOI makes findings as expressed below.

> Documents propounded to the office evidence that ACN has been non-responsive to chiropractic providers' requests for approval of certain procedures. ACN maintains that preauthorization of procedures is not required or implemented. However, the providers in the ACN network are under the impression that ACN must approve treatments prior to the initiation of such treatments. Whether or not preauthorization of services is required is an issue properly decided based on the terms of the insurance contract between the insurer and the insured. ACN shall only require preauthorization if the applicable insurance contracts so require. Should preauthorization be required, ACN shall be responsive to the procedure requested by either affirming the requested procedure or denying the requested procedure. Should the procedure be denied, ACN shall grant and give notice to the provider/insured of the insured's statutory appeal rights in accordance with [Kentucky law]. . . . The failure to acknowledge a requested procedure shall be considered and treated as a denial. If preauthorization is not required according to the insurance contract, ACN shall treat the requested procedure as a claim and acknowledge the claim within the time frames established by [Kentucky law]. . . .

> With respect to the handling of claims, ACN shall consider the claim in light of the benefits provided in the insurance contract. Acting as a TPA for insurers, ACN is responsible for handling claims in accordance with the relevant claims' payment statutes. Further, ACN is responsible for administering the benefits in accordance with the insurance contract. Consequently, ACN shall either affirm or deny claims in accordance with [Kentucky law]. For any adverse determination as defined in [Kentucky law], ACN shall afford the insured appeal rights granted by [Kentucky law].

> Lastly, the KOI recognizes the need for insurers to manage provider networks and to implement processes and procedures that ensure that policy benefits are not misused but are delivered in a manner that is in the best interests of both the insured and the insurer. Despite this recognition, the KOI has

determined that ACN's Performance Improvement Program, as implemented, is in violation of the Kentucky insurance code.

ACN has indicated to the KOI that the Performance Improvement Program is a mechanism that is used to guard against unnecessary services to the insured. Further, through extensive data collection efforts, ACN has developed "best practices" standards that providers in the ACN network are required to follow. While the premise and concept may be considered noble, the best practice standards are developed and administered in a manner that is contrary to Kentucky law. The position of the KOI regarding the Performance Improvement Program is specifically noted to be as follows:

- The Performance Improvement Plan requires providers to meet artificially established best standards. ACN's best standards are developed based on data compiled from chiropractors that are subject to the Performance Improvement Plan rather than from a universal group of chiropractors both in and outside of the ACN network. Given this, the "best practices" standards will always be biased toward ACN's standards. The KOI finds that ACN's data collection techniques to be in violation of [Kentucky law.]

- Services deemed by ACN to be medically unnecessary should be treated as such through the claims process. That is, ACN should deny claims that it deems to be medically unnecessary rather than employ punitive measures against the chiropractors for delivering the services that, in the chiropractor's professional opinion, are necessary. The Performance Improvement Programs serves to limit treatment available through the insured's contract and permits ACN and the insurers it represents to circumvent an insured's right to either be treated or appeal the adverse claim determination. . . .

- The chiropractic providers in the ACN network have indicated that the Performance Improvement Plan has a chilling effect on the delivery of services. Due to the threat of punitive measures associated with being subject to the Performance Improvement Program, chiropractors are reluctant to treat a patient in a manner that the chiropractor deems necessary. Consequently, the chiropractors are forced to either place their patient on a cash for service plan, change treatment options, retreat from the network, or refuse to treat patients. The Performance Improvement Program forces the chiropractor to make a decision that pits the patients' treatment needs against the chiropractor's reputation should the provider be subject to corrective action. This practice is in violation of [Kentucky law.]

- The Performance Improvement Plan has not been appropriately divulged in the provider contracts. The contracts reviewed by the Office refer generally to required compliance with operation manuals, policies and procedures. Providers who have been terminated from the ACN network were not appropriately warned of the Performance Improvement Program and the consequences for failing to meet the "best practices" standards

42

established by ACN. This failure is in violation of [Kentucky law.]

It is the opinion of the Kentucky Office of Insurance that ACN is in violation of various provisions of [Kentucky law] based on the reasons outlined in this letter. The Office finds that the practices employed by ACN circumvent the laws regarding the payment and denial of claims. Further, while ACN claims that the Performance Improvement Plan is beneficial to the insured, the Office finds that this claim is not supported. Rather, the Performance Improvement Plan seemingly limits insureds' treatment options. Further, insureds are unable to use benefit afforded by their insurance contract and may be forced to refrain from seeking necessary care.

ACN's practices are being reviewed by other states that have received complaints similar to those received by Kentucky. Insurers that acquiesce in the practices employed by ACN are ultimately responsible for the actions of ACN and will be held responsible for harm suffered by insureds and providers. The Office offers this letter to advise of its position and to request a cease and desist with respect to (1) the improper denial of claims, (2) failure to acknowledge and act upon requests for treatment, (3) failure to afford appeal rights to insureds in the event of an adverse determination, (4) the implementation of the Performance Improvement Program, and (5) the termination of providers from the network based on the terms of the Performance Improvement Program. . .

126.    While the findings of the KOI apply to Kentucky law, they are equally applicable

to ERISA and each and every finding by the KOI that Optum was in violation of Kentucky law

also supports a finding that Optum is in violation of ERISA. For example, as the KOI found, the

extent to which pre-certification of services may be permitted must be determined "based on the

terms of the insurance contract between the insurer and the insured," and, in handling claims,

Optum must do so "in accordance with the insurance contract," which requires application of

ERISA. To the extent Optum applies its pre-certification requirements to authorize a number of

treatments below the level that the providers believe to be necessary, that must be treated as a

denial of benefits, with appropriate "notice to the provider/insured of the insured's statutory

appeal rights" under ERISA. Further, the Clinical Support Program (which has now replaced

Optum's Performance Improvement Program) and similar policies adopted by Optum to control

and oversee the utilization of services by its INET providers are "biased" and "serve[] to limit

treatment available through the insured's contract and permits [Optum] and the insurers it represents to circumvent an insured's right to either be treated or appeal the adverse benefit determination," as required under ERISA. Just as the KOI ordered Optum to "cease and desist" its statutory violations of Kentucky law, so too should this Court order United and Optum to "cease and desist" their statutory violations of ERISA.

127.   Optum utilized the Performance Improvement Program that was the subject of the KOI findings until 2009. At that point it modified its procedures, moving to the two tier approach described herein. The same failures and inadequacies of the Performance Improvement Program, however, continue with the revised approach. Moreover, Optum's policies continue to violate ERISA for the same reasons.

128.   Optum's pre-certification requirement which it imposes on Tier 2 providers is inconsistent with many of United's ERISA plan documents which do not require pre-authorization before a subscriber receives chiropractic services. Because the plan terms govern the benefits to be provided by United, its imposition of pre-authorization requirements on the providers is therefore in violation of ERISA.

129.   This conclusion is demonstrated by an appeal letter that was sent by one United Insured to the "United Healthcare Central Escalation Unit," located in Salt Lake City, Utah, in May 2007. It states, in part:

> In April of this year I was denied chiropractic benefits by my insurance company, United Healthcare (UHC). In the benefits book it states that I'm "limited to 24 visits per calendar year" . . . It also states that no prior notification is required.
> * * * *
> [The American Chiropractic Network ("ACN"), now Optum,] started interfering by requiring four pages of paperwork periodically throughout the year, annoying but doable. Then they required 3 pages of paperwork every time I went in for an adjustment. When I called to question this I was told by the ACN that I could continue to go to the chiropractor as long as the paperwork was filled out. Then they started to determine how many visits I could have and what time frame I was allowed to use the visits. The benefits book clearly states that no notification is

required . . ., but I have to get permission from the ACN for visits. Then if I can't complete all visits in their timeline I'm out of luck.

I can't remember when the ACN started to interfere with my health care just that my quality of life has significantly declined since then. . . . I never receive any Explanation of Benefits (EOB) so I did not know that this was not reflected until I went to myuhc.com and looked up my claims. We pay over $2600 a year for health insurance. My husband's company pays over $10,600 a year, together that's over $13,000 a year for our healthcare.

The ACN told me there is not an appeal process. It seems to me that they need a copy of the benefits book or better yet UHC needs to "trim the fat" by cutting out unnecessary organizations instead of my healthcare. . . . I find this decision [to deny me coverage for my care] to be in breach of contract.

130.    As this letter demonstrates, the pre-certification requirement imposed by Optum on Tier 2 providers is directly contrary with the health care plans of United Insureds that do not require pre-authorization. As such, by imposing pre-certification, Optum and United are violating ERISA. Similarly, as reflected in the letter, by using the pre-certification requirement to deny coverage for services, but then failing to treat such decisions as an adverse benefit determination, and then providing the proper disclosures and "full and fair" review under ERISA, Optum and United are similarly violating federal law. Moreover, Optum's policies violate generally accepted standards of care in the insurance and utilization review industries, including those established through the Utilization Review Accreditation Commission ("URAC") and its Health Utilization Management (UM) Standards.

131.    Defendants are fully aware that their policies are misleading and violate the terms of their health care plans. For example, the former Senior Director for Consumer Health at Optum, Stephen Bolles, DC, revealed United's agenda toward shifting more cost to consumers during an interview for an online journal on May 12, 2006, entitled, *Forum with United Healthcare/ACN - Consumerism Leader Bolles on the Inexorable Retailizing of Health Care.* He stated:

Healthcare providers are going to have to learn how to be retailers. They will have to learn to speak in new ways and communicate new value propositions to consumers. . . . The brave new world is this. . . . [P]lans will have to begin communicating more clearly and honestly about what's covered. Instead of saying, for instance, that they have an "open-ended" chiropractic benefit that starts with a certain number of visits and can be adjusted upward, depending, the plan will say: If it's acute chiropractic condition, you get six visits." Period. The plan will not get involved in the documentation tug-of-war with the provider to increase the number of covered visits. For providers and patients/consumers, this transparency will facilitate the transition to more retail, self-pay, cash-based purchasing decisions.

132.    Shortly after the interview was published, Dr. Bolles emailed the author to plead that he pull it from the site, stating:  "John, I have run into a huge brick wall here with my comments and the interview.  I have been informed that the interview 'needs to come down'.  I understand the journalistic implications on this.  I am in very hot water.  Please let me know your thoughts.  Stephen." Dr. Bolles' job was at stake as a result of speaking the truth about United's policies. He has since left his position with United.

133.    The Bolles' interview reflects the disparity between what United (through Optum) is doing and what its plans provide.  While its ERISA plans purport to give its subscribers an open-ended level of chiropractic services, based on medical necessity, or perhaps up to a specified number of visits (from 20 to 30 sessions), Optum's undisclosed policies and procedures in fact limit care to "acute" conditions and for a limited number of sessions. These policies are therefore in clear violation of United's obligations under ERISA, which require it to comply with plan terms.

134.    As detailed herein, United's utilization procedures, as implemented through Optum, violate ERISA. They are used to allow United to avoid its ERISA obligations, including by denying health care benefits without complying with ERISA's "full and fair" review requirement, and they serve to pressure providers improperly to reduce care that they would otherwise provide pursuant to United's ERISA plans.

## CLASS DEFINITIONS

135.     The Individual Plaintiffs bring this action on their own behalf and on behalf of an

"ERISA Class," defined as:

> All healthcare providers (such as individual practitioners, durable medical
> equipment providers or facilities) who, from six years prior to the filing date of
> this action to its final termination ("ERISA Class Period"), provided healthcare
> services to patients insured under healthcare plans governed by ERISA and
> insured or administered by Defendants, and who, after having received payments
> from Defendants, were subjected to retroactive requests for repayment of all or a
> portion of such payments and/or to recoupments or coerced repayments of prior
> benefits.

136.     Premier Health and Drs. Sprandel, Hicks, Rodgers and O'Donnell (the

"Individual Chiropractor Plaintiffs") further bring this action on their own behalf and on behalf

of an "ERISA Chiropractor Class," defined as:

> All chiropractic physicians who, from six years prior to the filing date of this
> action to its final termination ("ERISA Class Period"), provided healthcare
> services to patients insured under healthcare plans governed by ERISA and
> insured or administered by Defendants, and whose claims were subjected to
> utilization review requirements imposed by United and/or Optum.

137.     The Individual Plaintiffs bring claims against Defendants on their own behalf and

on behalf of the ERISA Class, and the Association Plaintiffs brings claims against Defendants in

a representational capacity on behalf of their members, (1) to enjoin Defendants from continuing

to compel return of prior payments of plan benefits; (2) to order Defendants to return to all Class

members all funds, plus interest, that Defendants have withheld to offset the amounts demanded

or that have been paid by Class members to Defendants in response to such demands; and (3) to

declare that any future efforts to recoup payments for errors or mistakes in prior payments must

comply with the specific requirements under ERISA for adverse benefit determinations. Further,

the Individual Chiropractor Plaintiffs bring claims against United on their own behalf and on

behalf of the ERISA Class, and the Association Plaintiffs brings claims against United in a

representational capacity on behalf of its members, to enjoin Defendants from (1) tiering providers based on statistical parameters, (2) denying treatment plans without regard to patients' medical needs, (3) imposing pre-certification requirements on patient care without regard to the terms of the ERISA health care plans, and (4) threatening providers with being placed on a lower tier or potential loss of network participation if they do not defer to Optum's demands by limiting care to patients, and to compel United and Optum to replace them with policies and procedures which comply with ERISA.

## COMMON CLASS CLAIMS, ISSUES AND DEFENSES FOR THE CLASS

138. The following common class claims, issues and defenses for the Plaintiffs and the ERISA Class arise for the defined Class Period:

(1) Whether ERISA applies to Defendants' efforts to compel repayment of previously paid benefits;

(2) Whether Defendants' recoupment of previously paid benefits based on offsets of new and unrelated claims violate ERISA;

(3) Whether ERISA requires each Class member to prove exhaustion or other legal reason excusing exhaustion;

(4) Whether Defendants' actions with regard to Class members result in a waiver of any objection to the validity of any assignments that may have been given by United Insureds, or whether Defendants are otherwise estopped from asserting such an objection;

(5) Whether Class members may recover amounts repaid to Defendants or unpaid benefits and if so, the amounts they should receive;

(6) Whether Defendants' failure to provide accurate plan documents, EOCs, SPDs and other information upon request entitles Class members to any relief;

(7) Whether, in addition to unpaid benefits, interest should be added to the payment of unpaid benefits under ERISA;

(8) Whether Defendants' claims review procedures comply with ERISA; and

(9) The standard of review applicable to evaluate Defendants' benefit determinations under ERISA.

139. The following common class claims, issues and defenses for the Plaintiffs and the

ERISA Chiropractor Class arise for the defined Class Period:

(1)     Whether Optum's imposition of pre-certification requirements on doctors of chiropractic should be treated as pre-service claims and denials of benefit under ERISA;

(2)     Whether Optum's imposition of pre-certification requirements on doctors of chiropractic violate ERISA where such requirements are not expressly incorporated into ERISA Plan documents;

(3)     Whether Defendants' recoupment of previously paid benefits based on offsets of new and unrelated claims violate ERISA;

(4)     Whether ERISA requires each Class member to prove exhaustion or other legal reason excusing exhaustion;

(5)     Whether Defendants' actions with regard to Class members result in a waiver of any objection to the validity of any assignments that may have been given by United Insureds, or whether Defendants are otherwise estopped from asserting such an objection;

(6)     What equitable relief is appropriate for Optum's ERISA violations;

(7)     The standard of review applicable to evaluate Defendants' benefit determinations.

## ADDITIONAL CLASS ACTION ALLEGATIONS

140.    The members of the Classes are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of, at a minimum, hundreds if not thousands of health care providers for the ERISA Class and doctors of chiropractic for the ERISA Chiropractor Class who provided services to United Insureds covered by commercial group health plans insured, offered, or administered by Defendants. The precise number of members in the Class is within Defendants' custody and control. Based on reasonable estimates, the numerosity requirement of Rule 23 is easily satisfied for the Class. Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual members of the Class, including the class action claims, issues and defenses listed above.

141.    The Individual Plaintiffs' claims are typical of the claims of the Class members

because, as a result of the conduct alleged herein, Defendants have breached their statutory and contractual obligations to the Individual Plaintiffs and the Class through and by uniform patterns or practices as described above, including but not limited to their efforts to compel repayment of prior paid benefits and their forced recoupment through conversion or withholding of unrelated benefit payments.

142.    The Individual Plaintiffs will fairly and adequately protect the interests of the members of the Class, are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class action litigation and in the prosecution of ERISA claims and have no interests antagonistic to or in conflict with those of the Class. For these reasons, the Individual Plaintiffs are adequate class representatives under Fed. R. Civ. P. 23.

143.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications that could establish incompatible standards of conduct for Defendants.

144.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Further, because the unpaid benefits denied Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the harm done to them. Defendants maintain computerized claims information that enables them to calculate unpaid amounts resulting from their benefit determinations for Class members. Given the uniform policy and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

## COUNT I

## CLAIM FOR BENEFITS UNDER GROUP PLANS GOVERNED BY ERISA
### (on behalf of Plaintiffs and the ERISA Class)

145.    The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth therein. Count I is brought under 29 U.S.C. § 1132(a)(1)(B).

146.    United must pay benefits to United Insureds, or to their providers pursuant to assignments, that are insured, funded or administered by United pursuant to the terms of their United Plans.

147.    To the extent United has determined that charges submitted for reimbursement on behalf of Plaintiffs and the members of the ERISA Class are no longer Covered Services under its health care plans, and to the extent United offsets benefits otherwise due and payable under an ERISA plan as a means to recoup funds that it deems to have been overpaid in the past, such a findings constitute "adverse benefit determinations" under ERISA.

148.    United sought to compel the Individual Plaintiffs and the members of the ERISA Class to repay previously paid benefits without complying with terms and conditions required by ERISA for dealing with adverse benefit determinations.

149.    United violated its legal obligations under ERISA and federal common law each time it denied benefits through the practices detailed herein without complying with ERISA's requirements for dealing with adverse benefit determinations.

150.    United's lack of disclosure to the United Insureds and Providers relating to adverse benefit determinations, as required under ERISA, violated its legal obligations.

151.    Due to United's failure to comply with ERISA in pursuing recoupment efforts, it is estopped from pursuing such efforts and, further, is required to repay members of the ERISA Class any amounts: 1) paid to United in response to its recoupment demands; or 2) unilaterally

withheld by United in order to apply them to sums United demanded be repaid.

152. ERISA precludes United's recoupment efforts, as they do not satisfy the requirements for equitable restitution.

153. Due to United's failure to comply with ERISA in making the above-detailed adverse benefit determinations, United is estopped from making such findings and precluded from denying coverage without complying with ERISA.

154. The Individual Plaintiffs, on their own behalf and on behalf of the members of the Class, seek unpaid benefits, interest back to the date their claims were originally submitted to United, withdrawal of all claims for rescission or other relief against Providers or members of the ERISA Class, and repayment of any amounts paid by or withheld from members of the ERISA Class in response to any such letters or demands. Plaintiffs, including the Association Plaintiffs, also sue for declaratory and injunctive relief related to enforcement of plan terms, and to clarify their rights to future benefits. Plaintiffs further request attorneys' fees, costs, prejudgment interest and other appropriate relief against United.

## COUNT II

### CLAIM FOR BENEFITS UNDER GROUP PLANS GOVERNED BY ERISA
**(on behalf of All Plaintiffs, except Tri3 and BHSC,
and the ERISA Chiropractor Class)**

155. The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth therein. Count II is brought under 29 U.S.C. § 1132(a)(1)(B).

156. United must pay benefits to United Insureds, or to their providers pursuant to assignments, that are insured, funded or administered by United pursuant to the terms of their United Plans.

157. To the extent United, through Optum, has refused to authorize services following pre-certification requirements and based on the application of flawed and improper policies

governing coverage for chiropractic services, such a determination constitutes an "adverse benefit determinations" under ERISA.

158.    United violated its legal obligations under ERISA and federal common law each time it denied benefits as detailed herein without complying with ERISA's requirements for dealing with adverse benefit determinations.

159.    United's lack of disclosure to the United Insureds and Providers relating to adverse benefit determinations, as required under ERISA, violated its legal obligations.

160.    Due to United's failure to comply with ERISA in applying its pre-certification requirements, and in relying on invalid and improper policies governing coverage for chiropractic services, it is estopped from applying such policies and is precluded from denying coverage without complying with ERISA. Further, United should be ordered to disgorge the profits or fees it has earned by denying chiropractic services through the policies that were in violation of ERISA.

161.    Plaintiffs further request attorneys' fees, costs, prejudgment interest and other appropriate relief against United.

## COUNT III

## FAILURE TO PROVIDE FULL AND FAIR REVIEW AS REQUIRED BY ERISA
### (on behalf of All Plaintiffs and the Classes)

162.    The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth herein.

163.    United functioned and continues to function as the "plan administrator" within the meaning of such term under ERISA, both directly and through its control over Optum. During the Class Period, Subscribers were entitled to receive a "full and fair review" of all claims denied by United, and entitled to assert a claim under 29 U.S.C. § 1132(a)(3) for failure to comply with

these requirements.

164.    Although United was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to 29 U.S.C. § 1133 (and the regulations promulgated thereunder) for Plaintiffs and the Classes by making claims denials that are inconsistent with or unauthorized by the terms of Members' EOCs and SPDs, as well as by failing to disclose its methodology and other critical information relating to such claims denials.

165.    By engaging in the conduct described herein, including using improper, invalid and undisclosed policies relating to the specified health care services, making baseless threats regarding overpayments and the pursuit of litigation, withholding payments for properly submitted claims to apply toward the demanded amount, and for effecting other systematic benefit reductions without disclosure or authority under the plans, United failed to comply with ERISA, its regulations and federal common law.

166.    As a result, United failed to provide a "full and fair review," failed to provide reasonable claims procedures, and failed to make necessary disclosures to its Insureds.

167.    Appeals of Providers and members of the Classes should be deemed exhausted or excused by virtue, *inter alia*, of United's numerous procedural and substantive violations.

168.    The failed appeals of the Individual Plaintiffs show the futility of exhausting appeals to United. Exhaustion of internal appeals under ERISA should, therefore, be deemed to be futile.

169.    During the Class Period, the Individual Plaintiffs and the members of the Classes have been harmed by United's failure to provide a "full and fair review" of appeals under 29 U.S.C. § 1133, and by its failure to disclose relevant information in violation of ERISA and the federal common law. All Plaintiffs and the members of the Classes are also entitled to injunctive and declaratory relief to remedy United's continuing violation of these provisions.

## COUNT IV

### EQUITABLE RELIEF UNDER ERISA
**(on behalf of All Plaintiffs and the Classes)**

170.    The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth herein.

171.    United issued demand letters to Providers seeking to compel repayment of previously paid benefits, and forcibly recouped benefits from unrelated claims to apply toward the alleged overpayment, without any authority or validation, or sought to compel payment through lawsuits or other actions. Similarly, United, acting through Optum, imposed pre-authorization requirements in contravention of ERISA plan terms, pressured providers to reduce benefits to United Insureds, and denied benefits without proper disclosures or provide a full and fair review of such denials. In so doing, United failed to comply with the terms and conditions of its healthcare plans, both those under ERISA and otherwise, with regard to making adverse benefit determinations.

172.    United has no legal basis upon which to pursue recoupment from Providers, the Individual Plaintiffs and other Class members, but is merely seeking to coerce payments for retrospective adverse benefits determinations. In addition, United also has no valid basis for imposing limits on chiropractic treatments based on flawed and invalid methodologies, or for using invalid pre-certification requirements based on invalid computer databases to deny coverage.

173.    Plaintiffs seek appropriate declaratory and injunctive relief (1) to enjoin United from pursuing its efforts to coerce recoupment or otherwise compel payment and, further, to order United to return any funds it has received or withheld from the Individual Plaintiffs and members of the Class as a result of its recoupment efforts, and (2) to enjoin United from

applying the Optum policies which violate ERISA and disgorge profits it has earned through improper benefit denials.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants as follows:

A.      Certifying the Classes, as set forth in this Complaint, and appointing the Individual Plaintiffs as Class representatives.

B.      Declaring that United has breached the terms of its EOCs and SPDs and awarding unpaid benefits to the Individual Plaintiffs and the members of the Class, as well as awarding injunctive and declaratory relief to prevent United's continuing actions detailed herein that are undisclosed and unauthorized by EOCs and SPDs;

C.      Declaring that United failed to provide a "full and fair review" to the Individual Plaintiffs and ERISA Class members under 29 U.S.C. § 1133, and awarding injunctive, declaratory and other equitable relief to ensure compliance with ERISA and its regulations;

D.      Declaring that United violated its disclosure and related obligations under ERISA and federal common law, for which all Plaintiffs and Class members are entitled to injunctive, declaratory and other equitable relief;

E.      Declaring that United violated federal claims procedures, and awarding declaratory and injunctive relief to remedy such violations;

F.      Ordering United to recalculate and issue unpaid benefits to Providers that were unpaid or underpaid as a result of United's actions, as detailed herein, with interest;

G.      Enjoining United from continuing to pursue its recoupment efforts as detailed herein, and ordering it to pay proper benefits in the form of a return of any sums previously paid by or withheld from the Individual Plaintiffs and other Class members in response to United's recoupment efforts, plus interest;

H.      Enjoining United from continuing to apply the Optum policies that are applied to improperly reduce coverage for chiropractic services, and ordering to disgorge the profits it has earned by denying such coverage through its actions taken in violation of ERISA, plus interest;

I.      Awarding Plaintiffs disbursements and expenses of this action, including reasonable counsel fees, in amounts to be determined by the Court; and

J.      Granting such other and further relief as is just and proper.


CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiffs


By:____/s/ James E. Cecchi_____
          JAMES E. CECCHI

Dated: April 22, 2011


D. Brian Hufford
Robert J. Axelrod
Murielle Steven Walsh
Susan J. Weiswasser
Anthony F. Maul
POMERANTZ HAUDEK
  GROSSMAN & GROSS LLP
100 Park Avenue
New York, NY 10017
212.661.1100

Vincent N. Buttaci
John W. Leardi
BUTTACI & LEARDI, LLC
103 Carnegie Center, Ste. 101
Princeton, NJ 08540
609.799.5150

Kim Driggers
BROOKS, LeBOEUF, BENNETT,
FOSTER & GWARTNEY, P.A.
909 East Park Avenue
Tallahassee, FL 32301
850.222.2000

Jeffrey A. Leon
Paul Y. Cho
FREED & WEISS LLC
111 West Washington Street, Suite 1331
Chicago, IL 60602
312.220.0000

Geordie Mcgonagle
Dave Spencer
McGONAGLE SPENCER, P.C.
1533 Locust Street
Kansas City, MO 64108
816.221.2222

Bradford D. Barron
GIBBON, BARRON & BARRON, P.L.L.C.
20 East 5th Street, Suite 1000
Tulsa, OK 74103
918.745.0687

*Counsel for Plaintiffs and the Putative Classes*