**FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PREMIER HEALTH CENTER, P.C., et al., | |
| Plaintiffs, | Civ. No. 11-425 (ES) |
| v. | **O P I N I O N** |
| UNITEDHEALTH GROUP, et al., | |
| Defendants. | |

*Appearances by:*

POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP
By: D. Brian Hufford, Esq.
     Robert J. Axelrod, Esq.
600 Third Avenue, 20th Floor
New York, New York 10016

CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, P.C.
By: James E. Cecchi, Esq.
5 Becker Farm Road
Roseland, New Jersey 07068

BUTTACI & LEARDI, LLC
By: Vincent N. Buttaci, Esq.
     John W. Leardi, Esq.
103 Carnegie Center, Suite 101
Princeton, New Jersey 08540

     *Attorneys for Plaintiffs*

GRAHAM CURTIN, P.A.
By: Thomas R. Curtin, Esq.
     George C. Jones, Esq.

4 Headquarters Plaza
P.O. Box 1991
Morristown, New Jersey 07962

O'MELVENEY & MYERS LLP
By: Henry C. Thumann, Esq.
    Brian D. Boyle, Esq.
    Stephen D. Brody, Esq.
1625 Eye Street, N.W.
Washington, DC 20006

> *Attorneys for Defendants UnitedHealth Group, UnitedHealthCare Services, Inc., and OptumHealth Care Solutions, Inc.*

**DEBEVOISE, Senior District Judge**

This matter arises out of the methods by which Defendant UnitedHealth Group ("United") (1) monitors and recoups benefit overpayments from a variety of healthcare providers, and (2) regulates reimbursement of services provided by chiropractors. On January 24, 2011, Plaintiffs Premier Health Center, P.C. ("Premier"), Judson G. Sprandel, II, D.C., Brian S. Hicks, D.C., Tri3 Enterprises, LLC ("Tri3"), Beverly Hills Surgical Center ("BHSC"), and Jeremy Rogers, D.C.[1] filed a Class Action Complaint against United and several of its subsidiaries, including United HealthCare Services, Inc. ("United Healthcare"), OptumHealth Solutions, Inc. ("Optum"), Health Net of the Northeast, Inc. ("HNNE"), and Health Net of New York, Inc. ("HNNY"), asserting claims for benefits, failure to provide a full and fair review, and equitable relief under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002 et seq.

---

[1] Joining in the Complaint on behalf of their members are the Congress of Chiropractic State Associations, the American Chiropractic Association, the Ohio State Chiropractic Association, and the Missouri State Chiropractic Association.

On April 22, 2011, Plaintiffs filed an Amended Class Action Complaint ("ACAC")[2] with

additional factual allegations in support of their claims. The ACAC sets forth two proposed

classes: the ERISA Recoupment Class and the ERISA Chiropractor Class. The ERISA

Recoupment Class, whose named Plaintiffs are Tri3, BHSC, and Dr. Sprandel, is defined as:

> All healthcare providers (such as individual practitioners, durable medical equipment providers or facilities) who, from six years prior to the filing date of this action to its final termination ("ERISA Class Period"), provided healthcare services to patients insured under healthcare plans governed by ERISA and insured or administered by Defendants, and who, after having received payments from Defendants, were subjected to retroactive requests for repayment of all or a portion of such payments and/or to recoupments or coerced repayments of prior benefits.

(ACAC ¶ 135.) The ERISA Recoupment Class asks the Court "(1) to enjoin Defendants from

continuing to compel return of prior payments of plan benefits; (2) to order Defendants to return

to all Class members all funds, plus interest, that Defendants have withheld to offset the amounts

demanded or that have been paid by Class members to Defendants in response to such demands;

and (3) to declare that any future efforts to recoup payments for errors or mistakes in prior

payments must comply with the specific requirements under ERISA for adverse benefit

determinations." (Id. ¶ 137.)

---

[2] This Opinion contains a substantial number of acronyms. For ease of reference, the Court will list all of them here.
   ACAC: Amended Class Action Complaint
   ARO: Audit & Recovery Operations
   PAS: Premium Audit Services
   EOB: Explanation of Benefits
   PRA: Provider Remittance Advice
   UR: Utilization Review
   PIP: Performance Improvement Program
   DOL Document: a document published by the United States Department of Labor, entitled Compliance Assistance, Group Health and Disability Plans, Benefit Claims Procedure Regulation (29 CFR 2560.503-1)
   MTB: Maximum Therapeutic Benefit
   ABD: Adverse Benefit Determination

The ERISA Chiropractor Class, whose named Plaintiffs are Dr. Rodgers and

Dr. O'Donnell, is defined as:

> All chiropractic physicians who, from six years prior to the filing date of this action to its final termination ("ERISA Class Period"), provided healthcare services to patients insured under healthcare plans governed by ERISA and insured or administered by Defendants, and whose claims were subjected to utilization review requirements imposed by United and/or Optum.

(ACAC ¶ 136.)  The ERISA Chiropractor Class seeks "to enjoin Defendants from (1) tiering

providers based on statistical parameters, (2) denying treatment plans without regard to patients'

medical needs, (3) imposing pre-certification requirements on patient care without regard to the

terms of the ERISA health care plans, and (4) threatening providers with being placed on a lower

tier or potential loss of network participation if they do not defer to Optum's demands by

limiting care to patients, and to compel United and Optum to replace them with policies and

procedures which comply with ERISA."  (Id. ¶ 137.)

On June 21, 2011, Defendants filed a Motion to Dismiss the ACAC.  On March 30, 2012,

the Court issued an Opinion and Order denying the motion with respect to Plaintiffs' claims

against United, UnitedHealthcare, and Optum, but granting the motion with respect to all of

Plaintiffs' claims against HNNE and Plaintiffs' claim against HNNY for failure to provide a full

and fair review under ERISA.  The Court dismissed all of Plaintiffs' claims against HNNE, and

their claim against HNNY for failure to provide a full and fair review, without prejudice.

Plaintiffs now move to certify both the ERISA Recoupment Class and the ERISA

Chiropractor Class.  Defendants move for Summary Judgment against the named plaintiffs of the

ERISA Chiropractor Class on all of their claims.  For the reasons set forth below, Defendants'

Motion for Summary Judgment is GRANTED.  Consequently, Plaintiffs' Motion to Certify the

ERISA Chiropractor Class is DENIED as moot. Plaintiffs' Motion to Certify the ERISA

Recoupment Class is also DENIED.

## I.    BACKGROUND

**A.    United's Claims Processing Procedures**

United is a major health insurer that operates nationally through its wholly owned

subsidiaries, including UnitedHealthcare, Optum, HNNE, and HNNY.  As a national insurer,

United processes an enormous number of claims for benefits from a wide variety of healthcare

providers on a regular basis.[3]  These claims are submitted to United in a standardized coding

format that describes the services performed.  United processes provider claims according to this

format because of various state laws that require health insurers to pay claims quickly.

Consequently, in initially processing claims, United relies exclusively on the codes submitted by

healthcare providers.

To be sure, processing claims in this manner results in erroneous payments to healthcare

providers.  Therefore, United regularly conducts post-payment audits to ferret out coding errors

and improper claims.  In doing so, United typically requests a provider's clinical records and

compares the services indicated in the records with those noted in the provider's claim for

payment.

These post-payment audits are also intended to discern errors on United's part, such as

(1) paying the same claim twice; (2) incorrectly coordinating benefits with another insurance

---

[3] For purposes of benefits administration, providers are generally classified as either in network or out of network.  An in network provider is bound to a network agreement with United (separate and apart from the ERISA plan), under which the provider accepts reduced benefits. This results in relatively small copayment obligations for United plan members, and, in turn, a powerful incentive for United plan members to seek treatment from in network providers.  In contrast, an out of network provider is bound to no such agreement with United and therefore may seek greater benefits from United plan members, which often results in significantly greater copayment obligations.

plan; and (3) paying a claim incorrectly under the terms of a provider's contract with United. These audits may result in either a determination of underpayment, in which case United will remit further payment to a provider, or one of overpayment, in which case United will seek remittance from the provider for the amount that was overpaid.[4]

Three separate divisions within United conduct post-payment audits. Benefits Operations, which processes benefits claims, regularly performs manual quality control audits that incidentally identify both underpayments and overpayments. Audit & Recovery Operations ("ARO") employs algorithms and other auditing techniques, including review of clinical records, to identify overpayments.[5] Premium Audit Services ("PAS") uses similar techniques as ARO to identify overpayments made to institutional providers such as hospitals.

**B.    Recouping Overpayments from Providers**

United engages in a multistep process to recover benefit overpayments. First, United sends a letter to the provider identifying (1) the specific claim that was overpaid; (2) the amount that United overpaid on that claim; and (3) the reason for overpayment. These letters further (1) request a check from the provider for the amount overpaid; (2) note that the provider may appeal United's assessment[6]; and (3) state that if the provider does not remit the amount overpaid, United may deduct that amount from future claims submitted by that provider.

---

[4] To the extent United determines that an overpayment arises out of a provider's fraudulent billing practices, United will not readjudicate the provider's claims but rather enter into a formal settlement agreement with the provider.

[5] This division's work is farmed out to a company called OptumInsight that performs claims payment integrity services for United.

[6] According to United, providers are given between 30 and 365 days to appeal United's assessment. (Price Decl. ¶ 3.) Certain letters provide no timeline for appeal.

United will send follow up letters to providers in an effort to secure voluntary repayment, and those letters will always note that the provider may appeal United's determination. (Price Decl. ¶ 3.) United at times outsources overpayment recovery operations to outside vendors that "employ the same basic process[.]" (Id. ¶ 13.)

To the extent United decides that an overpayment determination changes a member's paid benefits under his or her health insurance policy, United will issue a revised Explanation of Benefits ("EOB") to the member and a similar document known as a Provider Remittance Advice ("PRA") to the provider. The revised EOB notes the member's formal remedies under ERISA to contest United's reassessment. If the overpayment is identified by Benefits Operations, the revised EOB and PRA are sent at the same time as the initial letter seeking reimbursement. If the overpayment is identified by ARO, United issues the revised EOB and PRA at the time the provider makes voluntary repayment or when the time in which to make voluntary repayment expires, whichever occurs first.

In 2011, United recovered approximately $430 million in overpayments to providers. 58% of the $430 million was recovered as a result of providers' voluntarily sending a check to United, while 42% was recovered through offsets.[7] (Bescwick Decl. ¶ 10.)

## C.    United's Appeals Process

Provider appeals are considered by a group of ten to twelve members of the ARO Appeals Team.[8] In addition, an ARO quality team reviews the Appeals Team's determinations for accuracy and seeks to ensure that appeal resolution letters provide sufficient explanatory

---

[7] According to United, providers will also at times consent to remitting an overpayment to United via a future offset. (Bescwick Decl. ¶ 10.)

[8] The ARO Appeals Team is an entirely separate group from those that make an initial overpayment determination.

information.  As with the overpayment recovery process, United will at times outsource the appeal process to outside vendors.[9]  Neither the ARO Appeals Team nor the ARO quality team considers appeals pursuant to ERISA.

If a provider prevails in an appeal, United sends the provider a letter stating that United will no longer seek remittance.  If an appeal is resolved against a provider, United sends a letter to the provider stating that the provider has sixty days in which to file a subsequent appeal before United will offset a given overpayment against future benefit claims by that provider.[10]

According to United, in 2011, approximately 2.25% of its overpayment determinations were appealed.  (Price Decl. ¶ 5.)  Of that 2.25%, roughly two-thirds were resolved against the provider.  (Id.)

## D.  United's Recoupment Procedures as Applied to the Named Plaintiffs of ERISA Recoupment Class

### i.  Tri3

Tri3 is a healthcare facility that provides durable medical equipment through its subsidiaries, Wabash Medical Company, LLC ("Wabash") and Orthoflex Inc., d/b/a Integrated Orthopedics ("Orthoflex"), to many United plan members, on an out of network basis,[11] pursuant

---

[9] As of 2009, those vendors may only consider first-time and second appeals of "simple overpayment issues."  (Price Decl. ¶ 13.)

[10] According to United, there is no limit on the number of appeals that a provider may file on a particular overpayment determination.  Thus, the appeals process for a given overpayment determination may take years or even, in theory, go on forever.  (Price Decl. ¶ 8.)  In addition, providers are allowed to appeal after the designated time for appeal has expired, including at the time United offsets overpaid amounts against future claims.  (Id. ¶ 17.)

[11] From August 1, 2009 through March 4, 2010, Wabash was an in network provider with United.  At all other times, Wabash was an out of network provider.  Orthoflex was at all times an out of network provider.

to prescriptions from the members' health care providers. Tri3 seeks to contest 141 overpayment determinations for durable medical equipment on behalf of sixty United plan members.

Tri3 offers several examples where United issued notices adjusting payments for claims downward based on past overpayments. These notices fail to indicate the basis for the overpayment or how to appeal United's determination. In addition, a Tri3 corporate representative testified that in many instances Tri3 would not receive any prior letters from United notifying Tri3 of an overpayment determination. See (Boyle Decl., Ex. 33 at 123.)

United, however, offers examples of letters sent to Tri3, dated March 26, 2010 and July 2, 2009, respectively, (1) stating that Tri3 had been overpaid on one or more particular claims; (2) setting forth the nature of the claims and the reasons why United believed they overpaid on those claims; and (3) noting that Tri3 could appeal United's determination. See (id., Exs. 37, 40.) United also points to two instances where it sent an initial letter to Tri3, issued a revised EOB and PRA, and ultimately offset the requested amount in overpayment from a future claim submitted by Tri3 when it failed to respond to the initial letter. See (id. Ex. 33 at 122-124, 155.)

In addition, United notes an instance where Tri3 submitted two appeals in response to a letter from United seeking reimbursement for overpayment on a claim and in fact won the second level appeal. See (id. Ex. 33 at 156-157, 162-163; Ex. 41.) Moreover, a Tri3 corporate representative admitted in deposition that, in general, if Tri3 believed that United committed a clerical error in assessing an overpayment, Tri3 would appeal the assessment. See (id. Ex. 33 at 163.)

### ii. *BHSC*

BHSC is a licensed surgical center that offers health care services on an out of networking basis to United subscribers. BHSC is pursuing an overpayment determination on

behalf of a single patient. On May 18, 2010, BHSC submitted a claim for reimbursement on behalf of the patient, which United paid on June 21, 2010. On August 12, 2010, United issued a letter to BHSC stating that (1) United had overpaid the claim due to incorrectly calculating the patient's coverage for the service provided; (2) BHSC was to remit the overpaid amount within 45 days; (3) if BHSC did not remit the amount, United would deduct that amount from future claims; and (4) if BHSC did not agree with United's determination, it could appeal on the patient's behalf with signed authorization. (Boyle Decl., Ex. 10.)

United issued a revised EOB to the plan member on August 13, 2010, and sent a PRA to BHSC on August 16. 2010.[12] (Id., Exs. 11, 42.) On October 3, 2010, United sent a follow up letter to BHSC requesting reimbursement of the overpaid amount. (Weiswasser Decl., Ex. 9.) There is no indication that BHSC attempted to appeal the determination. Several months later, United offset the overpaid amount from future claims submitted by BHSC on behalf of other patients. On January 3, 2011, United issued a PRA to BHSC explaining the offset and stating that the member, provider, or authorized representative has the right to appeal the determination. See (Boyle Decl., Exs. 7, 15.)

### iii.    Dr. Sprandel

Dr. Sprandel, a licensed Doctor of Chiropractic, provides chiropractic services to United subscribers on an out of network basis.[13] He is contesting overpayment determinations for services provided to three patients. In August 2009, United submitted initial letters for each overpayment stating (1) the specific claims that United deemed overpaid; (2) that those claims

---

[12] United contends that both the EOB and PRA stated ERISA appeal rights. While the EOB sent to the patient sets forth ERISA appeal rights, see (Boyle Decl., Ex. 11), the PRA issued to BHSC does not, see (id, Ex. 42.)

[13] Dr. Sprandel was an in network provider to United subscribers prior to 2001.

were not payable under the relevant reimbursement policy because the codes used by Dr. Sprandel did not correspond with the services performed in the patients' medical records; and (3) that Dr. Sprandel could appeal United's determination within thirty days.  See (Boyle Decl., Exs. 20-22.)  On September 30, 2009, United sent follow up letters to Dr. Sprandel stating the same.

On November 4, 2009, Dr. Sprandel submitted a formal appeal of United's determinations.  United subsequently issued letters denying the appeal and finding the initial overpayment determinations to be valid.[14]  Dr. Sprandel submitted a second appeal, and United issued a letter denying it.  Dr. Sprandel did, however, prevail on one appeal.

## E.     United's Utilization Review Process

Utilization Review ("UR") is a process under which a health insurer requires that "specific treatment decisions are reviewed by a decisionmaker other than the treating physician[] and approval in advance (precertification) for many types of care, keyed to standards of medical necessity or the reasonableness of the proposed treatment."  Pegram v. Herdrich, 530 U.S. 211, 219 (2000).  Upon becoming a member of United's chiropractic network, a chiropractor agrees pursuant to United's network provider contract to adhere to the requirements of United's UR process.

Under the UR process, United only allows reimbursement for services that it deems to be medically necessary.  In doing so, United requires in network chiropractors to submit a summary form containing demographic and clinical information about United member patients immediately following their initial evaluation.  Trained chiropractic clinicians employed by United review this information and other data and come up with a recovery milestone—the point

---

[14] The letters submitted by Plaintiffs state that "[t]he details of the decision(s) are explained on the attached lists."  (Weiswasser Decl., Exs. 18-19.)  However, Plaintiffs fail to attach those lists.

by which the vast majority of similarly situated patients are expected to recover—for each patient. United will only cover treatment rendered by an in network chiropractor up to a given patient's recovery milestone.[15]

If an in network chiropractor wants to treat a patient beyond his or her recovery milestone, the chiropractor must submit a new patient summary form and updated clinical information to United. United then determines whether to issue a new recovery milestone for that patient. Once United determines that a patient has achieved maximum therapeutic benefit ("MTB"), it will deny in network chiropractors reimbursement for further treatment of that patient. When United makes such a determination, it advises the patient and chiropractor of their rights under ERISA.

In the past, United required in network providers to participate in a Performance Improvement Program ("PIP") when their treatment patterns and practices deviated significantly from what United believed to be best practices. United discontinued the PIP program in 2009 and has no plans to reinstate it.

F.  **United's UR Procedures as Applied to the Named Plaintiffs of the ERISA Chiropractor Class**

i.  *Dr. Rodgers*

Dr. Rodgers is a licensed chiropractic radiologist who was a United in network provider of chiropractic services up until August 30, 2005, when he resigned from the network. While still a member of the network, Dr. Rodgers received a letter from United, dated April 26, 2005, requiring him submit to a Performance Improvement Agreement for having performed what

---

[15] The UR process differs somewhat for United in network providers depending on what tier they fall into. Tier 2 providers are issued recovery milestones for up to two months of treatment and number of authorized visits within those two months. Tier 1 providers receive recovery milestones for up to a year of treatment with an unlimited number of authorized visits. Tier 1A providers are exempt from the UR process altogether. All new providers are placed into Tier 2 by default for at least one year.

United believed to be an excessive amount of x-rays in 2004. Dr. Rodgers refused to sign the agreement and consequently received a letter from United, dated June 1, 2005, stating that he would be terminated from United's network as of August 29, 2005. The letter further stated that Dr. Rodgers could appeal his termination within thirty days.

On June 6, 2005, Dr. Rogers wrote a letter to United appealing his termination. The letter asked that United to rescind the termination and upgrade his provider status to Tier 1. In that letter, Dr. Rogers also noted that he performed a substantial number of x-rays because of his radiology specialty. On July 18, 2005, United issued a letter to Dr. Rogers stating that his termination was upheld because there was no new information provided by him that merited overturning its previous decision. On August 1, 2005, Dr. Rogers wrote a second letter to United with additional defenses of his practices. On August 29, 2005, Dr. Rogers sent United a fax stating that he was resigning from its chiropractor network and would provide services to United members on an out of network basis.

### ii. Dr. O'Donnell

Dr. O'Donnell is a licensed chiropractic physician who used to be an in network provider with United. According to the ACAC, at some point after 2002, United required Dr. O'Donnell to submit to frequent reviews of her practices because she was deemed to have provided excessive treatment to her patients. In addition, United representatives telephoned Dr. O'Donnell and asked her to reduce the number and types of services she was providing.

At an unspecified point, Dr. O'Donnell wrote to United to explain why her care differed from other practitioners and why her treatment was legitimate and necessary. United allegedly never responded to this letter, continued to pressure her to reduce her services, and delayed and/or refused to reimburse her claims. On July 25, 2008, Dr. O'Donnell resigned from United's

chiropractor network and currently provides services to United members on an out of network basis.

## II.     DISCUSSION

Plaintiffs now move to certify both the ERISA Recoupment Class and the ERISA Chiropractor Class pursuant to Federal Rule of Civil Procedure 23.  In doing so, they argue that both proposed classes satisfy the requirements of Rule 23.  Defendants oppose the motion, arguing that neither class satisfies the requirements of Rule 23.

In addition, Defendants move for summary judgment against the named plaintiffs of the ERISA Chiropractor Class (Dr. Rodgers and Dr. O'Donnell) on all of their claims, pursuant to Federal Rule of Civil Procedure 56(a).  In doing so, they argue that Dr. Rodgers and Dr. O'Donnell (1) lack standing to pursue declaratory and injunctive relief under ERISA; and (2) have no claim for monetary relief under ERISA.  Plaintiffs argue that (1) the Court's decision upholding Dr. Rodgers's and Dr. O'Donnell's standing to pursue injunctive relief under ERISA precludes Defendants' current challenge to standing under the law of the case doctrine; (2) Dr. Rodgers's and Dr. O'Donnell's patient assignments give them standing to pursue injunctive relief under ERISA; (3) disputed facts exist concerning the existence of valid assignments from Dr. O'Donnell's patients who are currently United members; and (4) Dr. Rodgers and Dr. O'Donnell have standing to pursue appropriate equitable relief under ERISA, which may include monetary components.

### A.     United's Motion for Summary Judgment Against the ERISA Chiropractor Class

#### i.     Standard of Review

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  For an issue to

be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In deciding whether a dispute of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. Id. at 251-52.

### ii.    *The Named Plaintiffs' Standing to Bring ERISA Claims*

"Section 502(a) of ERISA allows 'a participant or beneficiary' to bring a civil action, *inter alia,* 'to recover benefits due to him under the terms of his plan, to enforce his rights under

the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan, 388 F.3d 393, 400 (3d Cir. 2004) (quoting 29 U.S.C. § 1132(a)(1)(B)). That provision also allows "a participant, beneficiary, or fiduciary [] to enjoin any act or practice which violates [ERISA] or the terms of the plan, or [] to obtain other appropriate equitable relief [] to redress such violations or [] to enforce any provisions of [ERISA] or the terms of the plan." 29 U.S.C. § 1132(a)(3).

Here, Dr. Rodgers and Dr. O'Donnell, the named Plaintiffs of the ERISA Chiropractor Class, assert claims under Section 502(a) of ERISA to enjoin the UR procedures that United applied to their practices while they were rendering care to United member patients on an in network basis. The parties to not dispute that Dr. Rodgers and Dr. O'Donnell cannot meet the statutory requirements to assert claims under ERISA simply by virtue of being healthcare providers. However, Plaintiffs maintain that Dr. Rodgers and Dr. O'Donnell have derivative standing to assert ERISA claims for injunctive relief against United's UR procedures, as beneficiaries, based on assignment of benefits forms executed by their United member patients.

To be sure, Dr. Rodgers and Dr. O'Donnell do not assert derivative standing under ERISA based on assignments from those patients whose treatment was subject to United's UR procedures because their network agreements with United provide that any claim arising out of the time they were in United's chiropractor network is subject to arbitration.[16] They instead assert derivative standing, based on assignments from United member patients that they treated on an out of network basis, in order to enjoin United from applying its UR procedures to those patients in the future. However, because Dr. Rodgers and Dr. O'Donnell remain out of network,

---

[16] United does not apply its UR procedures to out of network providers.

those patients on behalf of whom they seek to enjoin United's UR procedures would only be subject to those procedures in the future when seeking treatment from other providers.

      1.    <u>The Court's Prior Opinion Regarding Plaintiffs' Standing at the Motion to Dismiss Stage</u>

     The Court considered the issue of derivative standing in resolving Defendants' Motion to Dismiss. In doing so, it noted that while the Court of Appeals has "not addressed the question of whether a health care provider may obtain standing to sue under § 502 by assignment from a plan participant or beneficiary," it "has acknowledged that 'almost every circuit that has addressed the issue has ruled that a health care provider can assert a claim under § 502(a) when a beneficiary or participant has assigned to the provider the individual's benefits under the plan.'" <u>Premier Health Ctr., P.C. v. UnitedHealth Grp.</u>, Civil Action No. 11–425, 2012 WL 1135608, at *5 (D.N.J. April 4, 2012) (quoting <u>Pascack Valley</u>, 388 F.3d at 401). The Court further noted that "[s]ince <u>Pascack Valley</u>, courts in this district have interpreted the [Court of Appeals'] statements as an indirect affirmation of derivative standing for health care providers." <u>Id.</u> (collecting cases). Consequently, the Court found that the standard form language set forth in the ACAC that United member patients executed in order to assign their insurance benefits to Plaintiffs was sufficient to establish derivative standing to bring ERISA claims.[17] <u>Id.</u> at *7.

     In making this determination, the Court rejected Defendants' argument that the standard form language assigning a patient's benefits to Plaintiffs merely allows Plaintiffs to seek reimbursement from United for the care rendered to that patient, not the ability to pursue litigation on behalf of the patient. Citing to <u>Wayne Surgical Ctr., LLC v. Concentra Preferred Sys., Inc.</u>, Civil Action No. 06-928, 2007 WL 2416428 (D.N.J. Aug. 29, 2007), the Court

---

[17] The standard form language specifically stated that "THIS IS A DIRECT ASSIGMENT OF MY RIGHTS AND BENEFITS UNDER THIS POLICY." (ACAC ¶ 7.)

reasoned that assignment of the right to reimbursement "must logically include the ability to seek judicial enforcement of that right." Id. at *8.

The Court also rejected Defendants' argument that Dr. Rodgers and Dr. O'Donnell lack standing to seek injunctive relief against United's UR procedures because, as out of network providers, they are no longer subject to those procedures and therefore cannot show any risk of future injury from them. In doing so, the Court found that while Dr. Rogers and Dr. O'Donnell may not experience future injuries from United's UR procedures, they are bringing their claims as assignees of their patients, who remain United members and may very well suffer injuries from United's UR procedures in the future. Id. at *14. Quoting Horvath v. Keystone Health Plan E., Inc., 333 F.3d 450, 456 (3d Cir. 2003), the Court noted that "'the actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights[;]' that ERISA created certain rights in the non-provider plaintiff[;] and that [a] plaintiff 'need not demonstrate actual harm in order to have standing to seek injunctive relief' under ERISA." Id.

    2.  Defendants' Arguments against Plaintiffs' Standing at the Summary Judgment Stage

With respect to Dr. Rodgers's standing to bring ERISA claims, United now argues that (1) the patient assignments produced by Dr. Rodgers in discovery convey only the right to reimbursement, not the right to bring ERISA claims; and (2) five of the seven patients identified by Dr. Rodgers that executed an assignment are no longer enrolled in a United healthcare plan and therefore have no standing to seek prospective relief. Defendants argue that Dr. O'Donnell also lacks standing to bring ERISA claims on behalf of her patients because (1) she has only produced an assignment for one of her patients; (2) that assignment cannot convey the right to seek prospective relief because the patient is no longer a United subscriber; (3) even if that patient were currently a United subscriber, the assignment could not convey the right to seek

prospective relief because it does not relate to services that Dr. O'Donnell provided to that patient; and (4) even if it did relate to such services, it does not expressly convey the right to seek prospective relief under ERISA.

Plaintiffs counter that Defendants' arguments against Dr. Rodgers's and Dr. O'Donnell's standing to pursue ERISA claims were squarely addressed and rejected in the Court's April 4, 2012 opinion and are therefore precluded from reconsideration at this juncture under the law of the case doctrine. Plaintiffs further contend that, even if the Court were not to apply the law of the case doctrine, Defendants' arguments have no merit because (1) an assignment of health insurance benefits is, as a matter of law, an assignment of the right to pursue claims under ERISA as a beneficiary, including those for prospective relief; and (2) Dr. O'Donnell's failure to produce patient assignments does not necessarily deprive her of standing to seek ERISA claims because she sets forth independent evidence of patient assignments.

a.     Law of the Case Doctrine

Under the law of the case doctrine, a court will generally not reconsider questions previously ruled upon in the same case. In re City of Phila. Litig., 158 F.3d 711, 717 (3d Cir. 1998). "The doctrine is designed to protect traditional ideals such as finality, judicial economy and jurisprudential integrity." Id. at 717-18. However, "it does not restrict a court's power but rather governs its exercise of discretion." Id. at 718. Therefore, "the doctrine does not preclude [] reconsideration of previously decided issues in extraordinary circumstances such as where: (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." Id.

Here, the Court cannot apply the law of the case doctrine to United's arguments against Dr. Rodgers's and Dr. O'Donnell's standing to assert ERISA claims because the Court's prior

ruling that Dr. Rodgers and Dr. O'Donnell had standing was based on allegations in the ACAC of standard form language assigning to them their patients' rights and benefits under their United healthcare policies. The patient assignments produced by Dr. Rodgers and Dr. O'Donnell contain different language that must be scrutinized under the summary judgment standard. Thus, the Court will consider the nature of those assignments.

> b. Dr. Rodgers's Patient Assignments

Dr. Rodgers produced executed patient assignments stating that the patient "assign[s] directly to Dr. Rodgers all insurance benefits, if any, otherwise payable to me for the services rendered. I understand that I am financially responsible for all charges whether or not paid by insurance. I hereby authorize the doctor to release all information necessary to secure the payment of benefits."[18]  (Buffaloe Decl., Ex. D.)

Defendants argue that this language merely grants Dr. Rodgers the right to receive insurance benefits on behalf of his patients, not standing to pursue ERISA claims on their behalf. In doing so, they cite a document published by the United States Department of Labor ("DOL"), entitled Compliance Assistance, Group Health and Disability Plans, Benefit Claims Procedure Regulation (29 CFR 2560.503-1) (the "DOL Document"). The document purports to provide guidance regarding processing benefit claims in accordance with ERISA in a question and answer format.

Defendants specifically point to a question asking: "Does an 'assignment of benefits' by a claimant to a healthcare provider constitute the designation of an 'authorized representative?'" (Buffaloe Decl., Ex. G.) The DOL document answers: "No.  An assignment of benefits by a

---

[18] Dr. Rodgers produced seven such patient assignments.  However, five of the seven patients that at one time assigned their benefits to Dr. Rodgers are no longer United subscribers, which, as Plaintiffs concede, deprives Dr. Rodgers of standing to pursue prospective relief under ERISA on behalf of those patients.

claimant is generally limited to assignment of the claimant's right to receive a benefit payment under the terms of the plan. Typically, assignments are not a grant of authority to act on a claimant's behalf in pursuing and appealing a benefit determination under a plan." (Id.)

Defendants then cite to the following language:

> "[W]hen a claimant clearly designates an authorized representative to act and receive notices on his or her behalf with respect to a claim, the plan should, in the absence of a contrary direction from the claimant, direct all information and notifications to which the claimant is otherwise entitled to the representative authorized to act on the claimant's behalf with respect to that aspect of the claim (e.g., initial determination, request for documents, appeal, etc.). In this regard, it is important that both claimants and plans understand and make clear the extent to which an authorized representative will be acting on behalf of the claimant.

(Id.) Based on this language, Defendants maintain that (1) "[p]atients can designate an 'authorized representative' to pursue specific ERISA claims on their behalf, but such appointments require express language and will not be inferred from a more general assignment," and (2) "all of the assignments produced by [Dr.] Rodgers" are "strictly limited to assigning the right to receive payment for services Rodgers himself has rendered, and cannot be read to encompass the right to pursue ERISA claims seeking forward-looking declaratory and injunctive relief, particularly relief that is entirely unrelated to payment for services rendered by [Dr.] Rodgers." (United Br. Summ. J. 8, 9.)

Plaintiffs, on the other hand, argue that, as a matter of law, a medical care provider that receives an assignment of benefits from a patient is a beneficiary under ERISA with standing to seek the full array of remedies afforded by the ERISA statute, including prospective injunctive relief. In doing so, they cite language from the Seventh Circuit Court of Appeals stating that "[a] medical care provider who receives benefits from the fund at the behest of a participant is a

beneficiary" under ERISA.[19] Central States, Southeast & Southwest Areas Health & Welfare Fund v. Neurobehavioral Assocs., P.A., 53 F.3d 172, 173 (7th Cir. 1995) (citing Kennedy v. Conn. Gen. Life Ins. Co., 924 F.2d 698, 700 (7th Cir. 1991)).

Moreover, according to Plaintiffs, a healthcare provider that becomes a beneficiary via assignment has statutory standing to bring a civil action against the insurer to, among other things, "'clarify his rights to future benefits under the terms of the plan,'" (Pl.'s Br. Summ. J. 11) (quoting 29 U.S.C. § 1132(a)(1)(B), or "'to enjoin any act or practice which violates [ERISA] or the terms of the plan' or 'to obtain other appropriate equitable relief'" (Pl.'s Br. Summ. J. 12) (quoting 29 U.S.C. § 1132(a)(3)). Consequently, Plaintiffs contend that Dr. Rodgers may, under the broad language of the ERISA statute, step into the shoes of his United insured patients, via assignment, to assert claims to enjoin United's UR procedures.

The notion that an assignment to a healthcare provider of the right to reimbursement for services rendered by that provider automatically gives the provider standing as a beneficiary to assert a full array of claims under the ERISA statute is a facile one. To be sure, as the Court previously found, an assignment of benefits to a provider logically gives the provider standing to bring claims under ERISA for the benefits it was assigned. On the other hand, an assignment of benefits from a patient for services rendered by a given healthcare provider cannot logically imply the right to assert ERISA claims for injunctive relief on behalf of that patient for services that he or she may receive from other providers in the future. See Franco v. Conn. Gen. Life Ins. Co., 818 F. Supp. 2d 792, 811 (D.N.J. 2011) (finding that "assignments [] limited to a patient's

[19] Plaintiffs cite other authority for the general proposition that a healthcare provider can acquire derivative standing to assert ERISA claims as a beneficiary pursuant to a valid assignment from a subscriber. See, e.g., Eden Surgical Ctr. v. B. Braun Med., Inc., 2011 U.S. App. LEXIS 4809, at *2 (9th Cir. Mar. 9, 2011); Harris Methodist Fort Worth v. Sales Support Servs., Inc. Employee Health Care Plan, 426 F.3d 330, 333-34 (5th Cir. 2005); Cromwell v. Equicor-Equitable HCA Corp., 944 F.2d 1272, 1277 (6th Cir. 1991).

assigning his or her right to receive reimbursement from [a health insurer] for the covered portion of the service bill, [] in no way can be construed as tantamount to assigning the right enforce his or her rights under the plan.").

Moreover, to allow a healthcare provider to assert ERISA claims outside the logical scope of an assignment from a subscriber would unknowingly deprive the subscriber of standing to assert those claims in the future. See Hahnemann University Hosp. v. All Shore, Inc., 514 F.3d 300, 308 n.5 (3d Cir. 2008) ("[I]f there is a valid assignment" of benefits to a healthcare provider, the provider "becomes the only claimant because the original claimant gives up her claim by the assignment." (citing Principal Mutual Life Ins. Co. v. Charter Barclay Hosp., Inc., 81 F.3d 53, 55-56 (7th Cir. 1996)). Indeed, a United subscriber that at one time received treatment from Dr. Rodgers on an out of network basis and assigned to him the right to receive benefits for that treatment would not have standing to assert ERISA claims regarding United's UR procedures that are applied to treatment from other future providers on an in network basis, because such standing will have oddly enough already been assigned to Dr. Rodgers. Such a result would run contrary to the "principle object of the [ERISA] statute [which] is to protect plan participants and beneficiaries," such as spouses and dependents. Boggs v. Boggs, 520 U.S. 833, 845 (1997).

In sum, the patient assignments produced by Dr. Rodgers assigning to him "all insurance benefits . . .otherwise payable to [the patient] for the services rendered" are insufficient to provide standing to assert ERISA claims to enjoin United's future application of its UR procedures, as those claims far exceed the scope of the assignments. Consequently, United's Motion for Summary Judgment against Dr. Rodgers as a named Plaintiff of the ERISA Chiropractor class is granted.

          c.        Dr. O'Donnell's Patient Assignments

Dr. O'Donnell identifies two patients on behalf of whom she asserts ERISA claims. One patient is no longer a United subscriber, which, as Plaintiffs concede, deprives Dr. O'Donnell from seeking prospective relief on behalf of that patient under ERISA. Dr. O'Donnell fails to produce a patient assignment from the patient that remains a United subscriber.

Plaintiffs argue that they can nevertheless establish that Dr. O'Donnell received an assignment of benefits from the second patient with evidence that Dr. O'Donnell made, and that United acknowledged, claims for reimbursement and appeals of United's benefits determinations on behalf of that patient. However, such evidence only creates the inference that the patient assigned to Dr. O'Donnell the right to receive reimbursement for the care rendered by her, not the right to assert a full array of ERISA claims. As previously discussed, an assignment of the right to receive reimbursement for treatment rendered by a particular healthcare provider cannot give that provider standing to seek injunctive relief relating to treatment that the patient would receive in the future from other providers.[20] Consequently, Defendants' Motion for Summary Judgment against Dr. O'Donnell as a named Plaintiff of the ERISA Chiropractor class is granted.

**B.      Plaintiffs' Motion for Class Certification**

Class certification is proper if the Court finds that Plaintiffs satisfy all of the requirements of Federal Rule of Civil Procedure 23(a) and one of the provisions of Federal Rule of Civil Procedure 23(b). In re Constar Int'l Inc. Sec. Litig., 585 F.3d 774, 780 (3d Cir. 2009). Under Rule 23(a), Plaintiffs must show that:

---

[20] Even if Dr. O'Donnell had produced an assignment form identical to that executed by her other patient that is no longer a United subscriber, she would still lack standing to seek prospective injunctive relief against United's UR procedure. That assignment clearly states that the patient assigns the right to bring ERISA claims on his or her behalf "with respect to any healthcare expense incurred as a result of the services [the patient] received from Provider." (Buffaloe Decl., Ex. F.)

> (1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy].

Fed. R. Civ. P. 23(a).

With respect to Rule 23(b), Plaintiffs seek certification under either Rule 23(b)(1)(A), (b)(2), or b(3).  Plaintiffs may satisfy Rule 23(b)(1)(A) by showing that "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  Plaintiffs may satisfy Rule 23(b)(2) by showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Finally, Plaintiffs may satisfy Rule 23(b)(3) by showing that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3)

Because the Court dismissed the named plaintiffs of the ERISA Chiropractor Class, the Court will only consider Plaintiffs' Motion to Certify the ERISA Recoupment Class.

### i.      Rule 23(a)(1) (Numerosity)

Plaintiffs contend that the ERISA Recoupment Class satisfies the numerosity requirement of Rule 23(a) based on evidence that United recovers hundreds of millions of dollars a year in overpayment determinations.  Defendants do not dispute this contention.  Consequently, the proposed ERISA Recoupment Class satisfies Rule 23(a)(1).

*ii.* ***Rule 23(a)(2) (Commonality)***

Plaintiffs argue that the ERISA Recoupment Class satisfies the commonality requirement of Rule 23(a) because all class members share (1) standing to pursue ERISA claims via patient assignments; (2) the contention that United's actions to recoup overpayments amount to an adverse benefit determination under ERISA; and (3) the contention that those actions are not in substantial compliance with ERISA.

Defendants argue that the ERISA Recoupment Class fails to satisfy the commonality requirement because there is substantial variation among class members regarding the extent to which (1) they have enforceable patient assignments to challenge United's overpayment recoupment procedures; (2) their patients' plans have anti-assignment provisions and/or the extent to which United waived those provisions; (3) they must arbitrate their ERISA claims under their network agreements; (4) an overpayment determination amounts to an adverse benefit determination under ERISA; and (5) United's recoupment procedures substantially comply with ERISA.

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury" based upon "a common contention" that "is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S.Ct. 2541, 2551 (2011) (quotation omitted). Furthermore, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." <u>Id.</u> (quotation omitted) (emphasis in original). Consequently, "[d]issimilarities within the proposed

class are what have the potential to impede the generation of common answers." Id. (quotation omitted).

To be sure, "Rule 23(a)(2)'s commonality requirement does not require identical claims or facts among class member[s]." Marcus v. BMW of North Am. LLC, 687 F.3d 583, 597 (3d Cir. 2012) (quotation omitted). "For purposes of Rule 23(a)(2), even a single common question will do." Id. (quoting Dukes, 131 S.Ct. at 2556).

a.     ERISA Standing from Patient Assignments

Members of the ERISA Recoupment Class have standing to pursue ERISA claims challenging United's procedures to recover overpayments of benefits that were assigned to the class members by their patients. As the Court previously held, assignment of the right to reimbursement "must logically include the ability to seek judicial enforcement of that right." Premier Health, 2012 WL 1135608, at *8. Here, there can be little doubt that United's attempts to recover overpayments of benefits that were assigned to the class members have a significant effect on their right to receive those benefits. Therefore, the class members' challenge to the procedures used to recover overpayments of benefits assigned to them is a logical extension of their right to receive those benefits.[21]

Furthermore, any provisions in a United subscriber's plan preventing assigning benefits under the plan to the class members cannot defeat their standing to assert ERISA claims. As the

---

[21] If healthcare providers that had already received benefit assignements ran the risk of being unable to challenge the procedures by which an insurer recovers overpayments made to those providers for lack of a precise assignment of the right to do so, they might be unwilling to accept patient assignment of benefits in the first place. See Memorial Hosp. Sys. v. Northbrook Life Ins. Co., 904 F.2d 236, 247 (5th Cir. 1990) ("[D]iscouraging health care providers from becoming assignees would undermine Congress' goal of enhancing employees' health and welfare benefit coverage . . . . [S]uch assignments . . . protect beneficiaries by making it unnecessary for health care providers to evaluate the solvency of patients before commencing medical treatment, and by eliminating the necessity for beneficiaries to pay potentially large medical bills and await compensation from the plan." (quotations omitted)).

Court previously held in this case, "Defendants have waived any right to enforce [an] anti-assignment provision" because "the Amended Complaint alleges a course of conduct beyond direct reimbursement for medical services." Id. at *10. Indeed, each member of the ERISA Recoupment Class by definition received (1) a direct payment from United in response to a claim for benefits; and (2) one or more letters from United indicating that it had overpaid that claim and demanding reimbursement of the amount that was overpaid directly to United. Thus, whether United waived its right to assert an anti-assignment provision is subject to common proof.[22] See Dukes, 131 S.Ct. at 2551.

Finally, the extent to which class members are in network providers and subject to arbitration clauses in their network agreements with United is irrelevant because the named plaintiffs of the ERISA Recoupment Class are out of network providers ostensibly representing other providers that rendered services on an out of network basis and that are therefore not subject to such arbitration clauses.[23] Thus, the ERISA Recoupment Class satisfies Rule 23(a)'s commonality requirement as to its standing to pursue ERISA claims.

        b.      Overpayment Determination as an Adverse Benefit Determination

---

[22] Defendants argue that the plans under which the class members' patients assigned their benefits are subject to the laws of at least nine different states, and that the Court would therefore have to determine the issue of waiver based on varying standards. However, Defendants only note that some states require proof of waiver by a preponderance of the evidence while others require such proof by clear and convincing evidence, and Plaintiffs have stipulated that the Court may apply the clear and convincing standard to the issue of waiver in this case.

[23] While Plaintiffs' description of the ERISA Recoupment Class does not specify whether it is limited to providers asserting claims regarding services rendered on an out of network basis, including members asserting claims related to services rendered on an in network basis that might be subject to an arbitration clause would cut heavily against commonality in standing. Consequently, the ERISA Recoupment Class satisfies Rule 23(a)'s commonality requirement to the extent it is limited to those asserting claims related to services provided on an out of network basis.

Under ERISA, an "'adverse benefit determination' means any of the following: a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit. . ." 29 C.F.R. § 2560.503-1(m)(4). If an insurer makes an adverse benefit determination ("ABD") under an ERISA plan, a member or beneficiary of that plan is entitled to certain rights under ERISA, including (1) sufficient notice of the ABD; (2) the right to an appeal the ABD; and (3) a full and fair review of the appeal. See 29 C.F.R. § 2560.503-1(g)-(h).

Plaintiffs argue that, as a matter of law, an overpayment determination amounts to an ABD under ERISA. Consequently, according to Plaintiffs, whether United's overpayment determinations against members of the ERISA Recoupment Class merit ERISA protections in challenging those determinations is a common question. United, on the other hand, contends that an overpayment determination amounts to an ABD only if the plan member (i.e. the patient) is adversely affected financially by the determination. And because both the basis of the overpayment determination and network status of the healthcare provider establish the effect on the plan member, the question of whether an overpayment determination amounts to an ABD under ERISA is not a common one.

Defendants cites to a section of the aforementioned DOL Document stating that ERISA claims procedures do "not apply to requests by health care providers for payments due them—rather than due the claimant—in accordance with contractual arrangements between the provider and an insurer or managed care organization, where the provider has no recourse against the claimant for amounts, in whole or in part, not paid by the insurer or managed care organization." (Buffaloe Decl., Ex. G.) Consequently, "[a]ny request by the doctor to the managed care organization for payment or reimbursement for services rendered to a participant is a request made under the contract with the managed care organization, not the group health plan;

accordingly, the doctor's request is not a claim for benefits governed by the regulation. On the other hand, where a claimant may request payments for medical services from a plan, but the medical provider will continue to have recourse against the claimant for amounts unpaid by the plan, the request, whether made by the claimant or by the medical provider (e.g., in the case of an assignment of benefits by the claimant) would constitute a claim for benefits by the claimant." (Id.)

Defendants further cites to Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n, which interpreted this language and found that "the regulations and the notice of appeal process" provided by ERISA "apply only when a claimant stands to be financially liable, not merely when a provider and an insurance company dispute payment." 286 F.R.D. 355, 364-65 (N.D. Ill. 2012). In turn, the court concluded that "many payment disputes between providers and insurance companies in which plan participants will not be liable do not constitute adverse benefit determinations." Id. at 365. The court noted that, for example, a health insurance company's attempt to recoup a duplicate payment made to a provider is not "a denial, reduction, termination, or failure to provide a benefit" and therefore is not an adverse benefit determination under ERISA, because it did not amount to a "substantive decision[] regarding a plaintiff's rights under a particular plan." Id. (quotation omitted).

The Court finds this reasoning to be misguided. The notion of what, as a matter of law, relates to a benefit plan under ERISA has always been a broad one. See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47 (1987) ("The phrase 'relate to' was given its broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan in the normal sense of the phrase, if it has a connection with or reference to such a plan." (quotations omitted)); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 98 (1983) ("Congress used the words 'relate to' . . . in their broad

sense.")  Indeed, the Court of Appeals has flatly held that ERISA applies to "claim[s] challeng[ing] the administration of, or eligibility for, benefits."  Levine v. United Healthcare Corp., 402 F.3d 156, 162 (3d Cir. 2005).

Notably, other than Pa. Chiropractic Ass'n, Defendants fail to point to any case law suggesting that a threshold level of plan interpretation is required for ERISA to apply to a claim regarding the administration of benefits.  This is because such a standard would undermine ERISA's goal of providing "a uniform source of law."  H.R. Rep. No. 93-553, 93th Cong., 2nd Sess. 1974.  Moreover, as other courts have recognized, such a standard would also prove unwieldy because it is often difficult to determine early on how much plan interpretation is required to resolve a benefits dispute.  See Central States, SE and SW Areas Health & Welfare Fund v. Neurobehavioral Assocs., P.A., 53 F.3d 172, 175 (7th Cir. 1995) ("No matter how straightforward a claim may, at first glance, appear, Congress' desire to provide uniformity in this area would be undermined were we to allow claims to be brought in state court based on a preliminary determination of their federal worth."); Kentucky Laborers Dist. Council Health and Welfare Fund v. Hope, 861 F.2d 1003, 1005 (6th Cir. 1988) ("[T]he extent of interpretation required in an action involving a plan will often not be apparent" at the outset.).  For example, an insurer might seek to recover from a provider what its claims processing department has labeled a simple mistaken duplicate payment for a particular service.  Upon further inquiry, however, it may become clear that the provider in fact performed that service twice and was therefore entitled to the payment under the terms of the ERISA plan.  Such an inquiry would undoubtedly require a court to analyze the terms of the plan.

Even if the insurer had in fact mistakenly issued a duplicate payment for a single service, issued a gross overpayment based on a clerical error, or failed to properly coordinate benefits

with a co-insurer, those determinations would still require a court to analyze the terms of a given plan to find the appropriate payment for a particular service.[24]  Indeed, to not consider the terms of the plan, even in seemingly clear-cut circumstances of overpayment, would be to accept the insurer's overpayment determination at face value.  See Aetna Health Inc. v. Davila, 542 U.S. 200, 214 (2004) ("[D]istinguishing between pre-empted and non-pre-empted claims based on the particular label affixed to them would elevate form over substance and allow parties to evade the pre-emptive scope of ERISA[.]" (quotation omitted)).

Similarly, overpayment determinations based on fraud cannot defeat commonality. While an insurer's cause of action against a provider in court for fraud often does not implicate ERISA, see, e.g., Aetna Health Inc. v. Health Goals Chiropractic Ctr., No. 10-5216, 2011 WL 1343047, at *6 (D.N.J. Apr. 7, 2011), the administrative procedure by which an insurer attempts to recoup overpayments based on what it believes to be fraudulent activity must allow the provider the opportunity to challenge that determination in accordance with ERISA procedures, lest the determination be accepted at face value.  See Davila, 542 U.S. at 214.

Finally, Defendants' argument that ERISA does not extend to overpayment determinations against providers for services rendered on an in network basis because payment for those services is determined by the terms of the contract between United and the provider, not the terms of the patient's ERISA plan, is persuasive.  However, it is irrelevant here since, as previously discussed, the ERISA Recoupment Class is limited to those that provided services to

---

[24] Indeed, a number of courts have found that, as a matter of law, ERISA applies to claims by health insurers to recover mistaken overpayments made to providers.  See, e.g., Central States, SE and SW Areas Health & Welfare Fund v. Neurobehavioral Assocs., P.A., 53 F.3d 172, 173 (7th Cir. 1995); Blue Cross & Blue Shield of Alabama v. Weitz, 913 F.2d 1544, 1549 (11th Cir. 1990); Provident Life & Accident Ins. Co. v. Waller, 906 F.2d 985, 993 (4th Cir. 1990), cert. denied, 498 U.S. 982 (1990).  The Court sees no reason why health insurers' attempts to recover mistaken overpayments outside of court do not similarly arise under ERISA.

United members on an out of network basis. Thus, the ERISA Recoupment Class satisfies Rule 23(a)'s commonality requirement with respect to whether an overpayment determination against a provider for out of network services amounts to an ABD under ERISA.

            c.       United's Compliance with ERISA Requirements

As previously discussed, if an insurer makes an adverse benefit determination ("ABD") under an ERISA plan, a member or beneficiary of that plan is entitled to certain rights under ERISA, including (1) sufficient notice of the ABD; (2) the right to appeal the ABD; and (3) a full and fair review of the appeal. See 29 C.F.R. § 2560.503-1(g)-(h). "An administrator need only 'substantially comply' with the foregoing regulation." Kao v. Aetna Life Ins. Co., 647 F. Supp. 2d 397, 412 (D.N.J. 2009) (citations omitted).

Defendants argue that its compliance with these requirements is not subject to common proof because (1) there was substantial variation in the form and substance of notice to providers of overpayment recoupments; and (2) whether United's review of provider appeals was full and fair is a claim-specific inquiry. Plaintiffs contend that United follows a standard policy in recouping overpayments, and therefore the Court need only consider whether that policy complies with ERISA.

The content of United's recoupment notification letters does, in fact, vary substantially. The letters in the record provide widely varying levels of detail regarding (1) the basis of the overpayment determination; and (2) the provider's ability to appeal and how to do so. See (Hufford Decl., Ex. 5); (Boyle Decl., Exs. 37, 40, 79-86). However, they all violate ERISA in three respects. First, they fail to provide "[a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of [ERISA] following an adverse benefit determination on

review." 29 C.F.R. § 2650.503-1(g)(1)(iv).[25]  Second, they fail to indicate that the provider,

"upon request and free of charge, [will have] reasonable access to, and copies of, all documents,

records, and other information relevant to the" overpayment determination.  29 C.F.R. §

2650.503-1(h)(2)(ii).  Third, they fail to "[p]rovide claimants at least 180 days following receipt

of a notification of an adverse benefit determination within which to appeal the determination."

29 C.F.R. § 2650.503-1(h)(3)(i).[26]

The fact that certain class members appealed one or more of United's overpayment

determinations does not defeat commonality in this regard.  United's notice and appeal process

stands in violation of ERISA as a matter of law, whether or not a provider appeals.

Consequently, Plaintiffs have satisfied Rule 23(a)'s commonality requirement with respect to

whether United's notification letters comply with ERISA.[27]

---

[25] The PRAs sent to providers also fail to provide an adequate description of United's appeal procedures.  Instead of providing a description, they merely refer the provider to the appeals procedures set forth in the member's benefit plan document.  See, e.g., (Boyle Decl., Ex. 15.)  In contrast, the EOB sent to the plan member sets forth (1) how to appeal; (2) the time frame in which to appeal; (3) the time frame in which United will decide the appeal; and (4) that the member may have the right to file a civil action under ERISA following completion of an appeal.  See, e.g., (Boyle Decl., Ex. 11.)

[26] The PRAs similarly refer providers to the member's plan document, see, e.g., (Boyle Decl., Ex. 15), while the corresponding EOBs sent to the plan member specifically states that he or she has 180 days in which to appeal, see, e.g., (Boyle Decl., Ex. 11).

[27] On reply, Plaintiffs contend that another common question is whether ERISA bars United from deducting overpaid amounts from future benefits without satisfying the elements of equitable restitution.  This is not so.  Plaintiffs cite to authority stating that a claim to recoup previously paid benefits under ERISA is an equitable one and therefore must satisfy the elements of equitable restitution.  See DiGiacomo v. Prudential Ins. Co. of Am., 501 F. Supp. 2d 626, 634-35 (D.N.J. 2007); Aetna Life Ins. Co. v. DFW Sleep Diagnostics Ctr., No. Civ. A. 02-1335, 2004 WL 1922033, at *4 (E.D.La. Aug. 25, 2004).  Here, however, the ERISA plan specifically allows United to recoup overpayments made "in excess of the amount [United] should have paid under the Policy" and to deduct overpaid amounts from future benefits if the payee "does not promptly refund the full amount."  (UHC-0030748).  Consequently, United need not file a lawsuit under ERISA for equitable restitution each time it seeks to recoup overpayments under the ERISA plan.

### iii. Rule 23(a)(3) (Typicality)

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement "ensure[es] that the class representatives are sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class." In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 598 (3d Cir. 2009) (citations omitted).

In ascertaining typicality, the Court must consider three factors. First, it must consider "the similarity of the legal theory and legal claims[.]" Id. "The similarity between claims or defenses of the representative and those of the class does not have to be perfect." Id. at 599. However, "the incentives of the plaintiffs [must be] aligned with those of the class." Id.

Second, the Court must consider "the similarity of the individual circumstances on which those theories and claims are based." Id. at 598. This "requires the claims and defenses of the representative to be sufficiently similar not just in terms of their legal form, but also in terms of

_____

Plaintiffs also point to language from the Seventh Circuit Court of Appeals stating that "merely because a payment is made by mistake doesn't give the payor an automatic right to the return of the payment, and so doesn't conclude the issue of offset. The payor's rights are governed by the principles of the law of restitution." Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp., 258 F.3d 645, 651 (7th Cir. 2001). That language, however, arises in the context of mistaken overpayments into an employee pension and benefit fund, which is governed by entirely separate provisions of ERISA.

To be sure, offsetting overpaid amounts from future benefits may be subject to equitable principles to the extent the offset results in undue hardship. See, e.g., Wells v. U.S. Steel & Carnegie Pension Fund, Inc., 950 F.2d 1244, 1251 (6th Cir. 1991); Butler v. Aetna U.S. Healthcare, Inc., 109 F. Supp. 2d 856, 862 (S.D. Ohio 2000). However, Plaintiffs make no allegations of undue hardship as a result of United's deducting unrefunded overpayments from future benefits.

Finally, while offsetting an overpaid amount from future benefits before the 180 days in which to appeal the overpayment determination may amount to a violation of ERISA, the parties do not dispute that there is significant variation across the ERISA Recoupment Class regarding how long United waited after sending an overpayment notification letter before offsetting the overpaid amount from future benefits.

their factual basis and support." Id. at 599. "However, factual differences between the proposed representative and other members of the class do not render the representative atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members." Id. (quotation omitted). "Complete factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of the other class members will be fairly and adequately protected in their absence." Id. (citation omitted).

Third, the Court must consider "the extent to which the proposed representative may face significant unique or atypical defenses to her claims." Id. at 598-99 (citation omitted). "It is well established that a proposed class representative is not 'typical' under Rule 23(a)(3) if the representative is subject to a unique defense that is likely to become a major focus of the litigation." Id. at 599 (quotation omitted). "[T]he challenge presented by a defense unique to a class representative is that the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class." Id. (quotation omitted).

Plaintiffs argue that they have satisfied Rule 23(a)(3)'s typicality requirement because (1) all members of the ERISA Recoupment Class press the same claim: that United's overpayment recoupment procedures violate ERISA; and (2) United enforces its overpayment recoupment procedures in a uniform manner. Defendants contend that Plaintiffs have failed to satisfy Rule 23(a)(3)'s typicality requirement because the class members' economic interests are in direct conflict with those of many of the plan members whose claims they purport to assert by assignment.

This contention is a red herring. The plan members are not members of the ERISA Recoupment Class. Thus, their incentives are irrelevant to the typicality inquiry under Rule 23(a)(3). Furthermore, the ERISA Recoupment Class does not seek to prevent United from correcting provider billing errors that may have otherwise resulted in excessive copayments by plan members. Rather, the class seeks to ensure that, in correcting such errors, United affords providers sufficient notice and appeal rights under ERISA.

Defendants further contend that the named plaintiffs of the ERISA Recoupment Class are subject to unique defenses that render them unfit to represent the class as a whole. With respect to BHSC, Defendants note that (1) BHSC failed to exhaust its administrative remedies because it did not appeal United's overpayment determination even after receiving full notice of its ERISA appeal rights when United issued an EOB and PRA explaining an offset for the overpayment determination. With respect to Tri3, Defendants point out that (1) Tri3 similarly failed to exhaust its administrative remedies regarding many of United's overpayment determinations; and (2) Tri3 in fact succeeded on a number of overpayment-related appeals, which would bar Tri3 from contending that United's administrative appeal process is futile.

With respect to Dr. Sprandel, Defendants note that he submitted improper billing codes for which he lacks "any credible explanation" and therefore "is a poor candidate to champion the interests of other providers." (Def.'s Br. Class Cert., 24.) Finally, Defendants point out that none of the named plaintiffs voluntarily returned an overpayment to United, whereas the majority of recouped overpayments were submitted voluntarily. Thus, a substantial number of class members, but not the named plaintiffs, would be subject to to the defense of voluntary payment.

The notion that Defendants would only raise a defense of failure to exhaust administrative remedies against BHSC and Tri3 is a specious one. The record makes clear that a small percentage of the ERISA Recoupment Class appealed one or more of United's overpayment determinations. Consequently, the defense of failure to exhaust administrative remedies is hardly unique to BHSC and Tri3.

Moreover, that Tri3 succeeded on one or more appeals of United's overpayment determinations similarly does not create a unique defense. Evidence of a successful appeal may clearly serve to defend against the overarching ERISA Recoupment Class claim that United's overpayment recoupment notification and appeal procedures amount to an insufficient administrative remedy under ERISA.[28]

Also unpersuasive is Defendants' contention that Dr. Sprandel is subject to a unique defense because he lacks any credible explanation for the billing codes that he submitted to United. The record is clear that United determined that Dr. Sprandel had submitted inaccurate billing codes, and that Dr. Sprandel had attempted to appeal that determination by submitting additional documentation to justify use of those billing codes. See (Boyle Decl., Ex. 18 at 81:5-81:8).

However, cutting deeply against typicality is the fact that United recovers a substantial portion of repayment dollars through voluntary repayments, while none of the named plaintiffs submitted a voluntary repayment in response an overpayment determination. While this does not subject the named plaintiffs to a unique defense, per se, it nonetheless renders their claims

---

[28] Defendants style the ERISA Recoupment Class claim against United's overpayment recoupment procedures as one alleging futility. However, it is clear that the class instead alleges that those procedures amount to an insufficient administrative remedy. See Reindl v. Hartford Life and Acc. Ins. Co., 705 F.3d 784, 788 n.4 (8th Cir. 2013) ("There are two exceptions to [ERISA's] exhaustion requirement: (1) when there is no administrative remedy; or (2) when pursuing the administrative remedy would be futile." (citation omitted)).

atypical of the class as a whole because resolution of those claims will not address a defense that may well apply to a significant portion of the class,[29] thus unfairly depriving Defendants of the opportunity to raise it. Accordingly, the ERISA Recoupment Class fails to satisfy Rule 23(a)(3)'s typicality requirement.

### iv. *Rule 23(a)(4) (Adequacy)*

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry has two components designed to ensure that absentees' interests are fully pursued." In re Schering Plough, 589 F.3d at 601-02 (quotation omitted). "First, the adequacy inquiry tests the qualifications of the counsel to represent the class." Id. at 602 (quotation omitted). No issue has been raised regarding the qualifications of Plaintiffs' counsel to represent the ERISA Recoupment Class.

"The second component of the adequacy inquiry seeks to uncover conflicts of interest between named parties and the class they seek to represent." Id. (quotation omitted). "There are clear similarities between the components of the typicality inquiry relating to the absence of unique defenses and alignment of interests, and this second part of the adequacy inquiry that focuses on possible conflicts of interest." Id. "Because of the similarity of [the typicality and

---

[29] Citing to Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n, No. 09 C 5619, 2010 WL 1979569, (N.D. Ill. May 17, 2010), Plaintiffs contend that the defense of voluntary repayment is irrelevant because all class members were "pressured to pay sums to United." (Pl.'s Br. Class Cert., 17 n.33.) That opinion addressed a motion to dismiss concerning allegations similar to those in this case, namely that defendant health insurers issued repayment demands without sufficient notice or opportunity to appeal. See Pa. Chiropractic, 2010 WL 1979569, at *3-*4. The opinion ruled against the defendants' affirmative defense that the plaintiffs had voluntarily settled the defendant's overpayment claims, noting that "they did so under duress because they were not able to effectively appeal due to defendants' improper actions." Id. at *22. Here, however, the Court cannot find that a voluntary repayment in response to each of United's overpayment notification letters would amount to payment under duress. As previously discussed, there is substantial variation in the level of notice and appeal rights contained in United's overpayment notification letters. And while all of the notification letters violate certain ERISA requirements, the Court cannot find that a voluntary repayment in the face of those violations alone amounts to one performed under duress.

adequacy] inquiries, certain questions—like whether a unique defense should defeat class certification—are relevant under both." Id. (quotation omitted).

Here, as with typicality, the fact that none of the named plaintiffs of the ERISA Recoupment Class will be subject to the defense of voluntary payment—while a substantial portion of the class may well be—defeats adequacy because the named plaintiffs will not adequately represent the interests of the class as a whole, one of which is to address the issue of voluntary payment.[30] Consequently, the ERISA Recoupment Class fails to satisfy Rule 23(a)(4)'s adequacy requirement.

### v. Rule 23(b)(1)(A)

Plaintiffs correctly argue that the ERISA Recoupment Class satisfies the requirements of Rule 23(b)(1)(A). Rule 23(b)(1)(A) permits certification if "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). "Rule 23(b)(1)(A) takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 614 (1997) (quotations omitted).

Here, prosecution of individual actions by members of the ERISA Recoupment Class would create a risk of imposing inconsistent obligations on United with respect to its overpayment recoupment procedures. The ERISA Recoupment Class seeks a ruling that

---

[30] Plaintiffs cannot deprive Defendants of the opportunity to raise the defense of voluntary payment to the claims of the ERISA Recoupment Class by naming class representatives that did not submit voluntary repayments.

United's overpayment recoupment procedures stand in violation of ERISA and an order, among other things, (1) enjoining United from continuing to enforce its overpayment recoupment procedures; and (2) requiring United to comply with ERISA in recouping overpayments in the future.[31]  There can be little doubt that individual lawsuits asking for such relief presents a real risk of establishing inconsistent standards of conduct for United.  Indeed, one lawsuit could result in a ruling that United's overpayment recoupment procedures violate ERISA's notice and appeal requirements and an order enjoining enforcement of those procedures.  Another lawsuit might result in a ruling that United's overpayment recoupment procedures as a matter of law are in substantial compliance with ERISA's notice and appeal rights.  Yet another lawsuit could result in a ruling that ERISA does not even govern a given overpayment determination.  Consequently, the ERISA Recoupment Class satisfies Rule 23(b)(1)(A).

### vi.    *Rule 23(b)(2)*

Rule 23(b)(2) permits certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."  Dukes, 131 S.Ct. at 2557.

The ERISA Recoupment Class seeks injunctive relief under Rule 23(b)(2) in the form of equitable restitution.  Specifically, it "seek[s] injunctive relief to reverse United's repayment demands made in violation of ERISA, reversion to the *status quo*" (i.e. compel United to return all recouped overpayments to the class members), "and a remand to United to provide the required appellate procedures under ERISA."  (United Class Cert. Reply Br. 20.)  As Defendants

---

[31] The ERISA Recoupment Class also seeks reinstatement of all benefits that United recovered through its overpayment recoupment procedures.  As discussed below, however, the class is not entitled to reinstatement on a class-wide basis.

point out, however, this relief would require an individualized inquiry into the merits of each and every repayment demand that would defeat certification under Rule 23(b)(2).

Where a letter denying or terminating benefits "does not comply with [ERISA's] statutory and regulatory requirements, the time limits for bringing an administrative appeal are not enforced against the claimant." Syed v. Hercules Inc., 214 F.3d 155, 162 (3d Cir. 2000) (citation omitted). "Thus, the remedy . . . is to remand to the plan administrator so the claimant gets the benefit of a full and fair review." Id. (citation omitted). In contrast, in the case of "a termination of benefits after they were already awarded[,] . . . . a finding that [the termination] was arbitrary and capricious means that the administrator terminated the claimant's benefits unlawfully." Miller v. American Airlines, Inc., 632 F.3d 837, 856-57 (3d Cir. 2011). "Accordingly, benefits should be reinstated to restore the status quo." Id. at 857.

The ERISA Recoupment Class seeks injunctive relief based on inadequate notice of and opportunity to appeal United's overpayment determinations under ERISA, not a finding that that United's overpayment determinations were themselves arbitrary and capricious. Therefore, reinstating previously recouped benefits is not the proper remedy in this case. Indeed, affording a provider the opportunity to appeal a benefit recoupment in no way requires reinstatement of that benefit. Moreover, to reinstate previously recouped benefits would amount to effecting equitable restitution without a showing that those benefits rightly belong to the class members. See Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213 (2002) (a plaintiff can seek equitable restitution under ERISA only "where money . . . belong[s] in good conscience to the plaintiff[.]").

Notwithstanding the claim for reinstatement of benefits, a single injunction would not provide appropriate relief to each member of the ERISA Recoupment Class. As previously

discussed, in its notification letters, United provided wildly varying levels of detail regarding the basis of an overpayment determination. Thus, even an injunction allowing class members to appeal United's overpayment determinations will not provide relief to those class members that received insufficient notice of the basis of a given overpayment determination. Consequently, the ERISA Recoupment Class fails to satisfy the requirements of Rule 23(b)(2).

### vii.    *Rule 23(b)(3)*

Certification under Rule 23(b)(3) requires that the Court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., 521 U.S. at 623. "Thus, the predominance test involves an attempt to achieve a balance between the value of allowing separate actions to be instituted so that individuals can protect their own interests and the economy that can be achieved by allowing a multiple party dispute to be resolved on a class-action basis." 7AA Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1777 (3d ed.)

The superiority inquiry tests whether "another available method of handling the controversy seems to be better suited than the class-action device." Id. To aid the Court in determining whether class-action treatment would be superior, Rule 23(b)(3) lists four non-exhaustive factors that the Court should consider. They are: (A) the interest of the individual class members in controlling the litigation; (B) the extent and nature of any ongoing litigation involving the same matters; (C) the desirability of concentrating the adjudication of all the

members' claims in the forum in which the class action is lodged; and (D) the management difficulty that may be encountered in a class action.

The ERISA Recoupment Class fails the predominance prong of Rule 23(b)(3). While the questions of whether the class members have standing to assert ERISA claims and whether an overpayment determination amounts to an adverse benefit determination under ERISA are certainly common ones, the key question in this litigation is whether United's recoupment procedures substantially comply with ERISA, and there are simply too many individuating factors with respect to how those recoupment procedures were applied across the class to merit certification under Rule 23(b)(3).

To be sure, as previously discussed, United's recoupment procedures violate three specific ERISA regulations across the class. However, the widely varying level of detail across United's overpayment notification letters regarding both the basis of an overpayment determination and the provider's ability to appeal and how to do so, in addition to the significant disparity regarding (1) whether class members received revised PRAs notifying them of an overpayment and stating the right to appeal in accordance with the ERISA plan procedures; and (2) how long United waited after sending an overpayment notification letter before offsetting the overpaid amount from future benefits, renders the nature of United's compliance with ERISA's notice and appeal regulations a predominantly individual inquiry. Indeed, assessing United's overpayment recoupment procedures across the class would indicate varying levels of compliance with ERISA.

The ERISA Recoupment Class also fails to satisfy the superiority prong of Rule 23(b)(3). In addition to the individuating factors regarding United's overpayment recoupment procedures, that certain class members would be subject to the defense of voluntary payment would only

make the class that much more difficult to manage, particularly since the elements of the

voluntary payment doctrine vary across states.[32]  Moreover, as discussed with respect to Rule

23(b)(2) certification, the injunctive relief sought in form of reinstatement of benefits can only be

granted on an individual basis by assessing the merits of each and every overpayment

determination.  Consequently, the varying circumstances surrounding the ERISA Recoupment

Class's claims render them ill-suited for class-wide adjudication.

## III.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment against the named

plaintiffs of the ERISA Chiropractor Class is GRANTED on all of their claims.  Dr. Rodgers'

and Dr. O'Donnell's claims are dismissed with prejudice.  Consequently, Plaintiffs' Motion to

Certify the ERISA Chiropractor Class is DENIED as moot.  Plaintiffs' Motion to Certify the

ERISA Recoupment Class is also DENIED.

The Court will enter an order implementing this opinion.


                       **/s/ Dickinson R. Debevoise**
                       DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: August 1, 2013

---

[32] Compare, e.g., Gimbel Bros., Inc. v. Brook Shopping Centers, Inc., 118 A.D.2d 532, 535 (N.Y. App. Div. 1986) ("relief shall not be denied merely because the mistake is one of law rather than one of fact") with, e.g., Skyland Metro. Dist. v. Mountain West Enterprise, LLC, 184 P.3d 106, 127 (Colo. App. 2007) ("[T]he payor can defeat application of the rule by showing payment under protest or duress or a mistake as to all relevant facts." (emphasis added)), and whether a unilateral protest or "reservation" of rights at time of payment can vitiate the doctrine. Compare, e.g., Rector v. City & County of Denver, 122 P.3d 1010, 1015 (Colo. App. 2005) (yes) with, e.g., Mitchell v. Residential Funding Corp., 334 S.W.3d 477, 499 (Mo. App. 2010) (no)).