**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

PREMIER HEALTH CENTER, P.C., et al.,

                     Plaintiffs,

v.

UNITEDHEALTH GROUP, et al.,

                     Defendants.

Civ. No. 11-425 (ES)

**O P I N I O N**

*Appearances by:*

ZUCKERMAN SPAEDER LLP
By:     D. Brian Hufford, Esq.
         Jason S. Cowart, Esq.
1185 Avenue of the Americas, Fl. 31
New York, New York 10036

BUTTACI & LEARDI, LLC
By:     Vincent N. Buttaci, Esq.
         John W. Leardi, Esq.
         Paul D. Werner, Esq.
103 Carnegie Center, Suite 101
Princeton, New Jersey 08540

        *Attorneys for Plaintiffs*

GRAHAM CURTIN, P.A.
By:     Thomas R. Curtin, Esq.
         George C. Jones, Esq.
         Kathleen N. Fennelly, Esq.
4 Headquarters Plaza
P.O. Box 1991
Morristown, New Jersey 07962

O'MELVENEY & MYERS LLP
By:    Brian D. Boyle, Esq.
       Gregory F. Jacob, Esq.
       William T. Buffaloe, Esq.
1625 Eye Street, N.W.
Washington, DC 20006

    *Attorneys for Defendants UnitedHealth Group, UnitedHealthCare Services, Inc., and OptumHealth Care Solutions, Inc.*

**DEBEVOISE, Senior District Judge**

    This matter arises out of the methods by which Defendant UnitedHealth Group ("United") recoups benefit overpayments from healthcare providers. On January 24, 2011, Plaintiffs Premier Health Center, P.C. ("Premier"), Judson G. Sprandel, II, D.C., Brian S. Hicks, D.C., Tri3 Enterprises, LLC ("Tri3"), Beverly Hills Surgical Center ("BHSC"), and Jeremy Rogers, D.C.[1] filed a Complaint against United and several of its subsidiaries, including Defendants United HealthCare Services, Inc. ("United Healthcare"), OptumHealth Solutions, Inc. ("Optum"), Health Net of the Northeast, Inc. ("HNNE"), and Health Net of New York, Inc. ("HNNY"), asserting claims for benefits, failure to provide a full and fair review, and equitable relief under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002 et seq.

    On April 22, 2011, Plaintiffs filed an Amended Complaint with additional factual allegations in support of their claims. The Amended Complaint sets forth two proposed classes: the ERISA Recoupment Class and the ERISA Chiropractor Class. The ERISA Recoupment Class, whose named Plaintiffs are Tri3, BHSC, and Dr. Sprandel, is defined as:

    All healthcare providers (such as individual practitioners, durable medical equipment providers or facilities) who, from six years prior to the filing date of this action to its final termination ("ERISA Class Period"), provided healthcare

---

[1] Joining in the Complaint on behalf of their members are the Congress of Chiropractic State Associations, the American Chiropractic Association, the Ohio State Chiropractic Association, and the Missouri State Chiropractic Association.

> services to patients insured under healthcare plans governed by ERISA and
> insured or administered by Defendants, and who, after having received payments
> from Defendants, were subjected to retroactive requests for repayment of all or a
> portion of such payments and/or to recoupments or coerced repayments of prior
> benefits.

(Amend. Compl. ¶ 135.)  The ERISA Recoupment Class asks the Court "(1) to enjoin

Defendants from continuing to compel return of prior payments of plan benefits; (2) to order

Defendants to return to all Class members all funds, plus interest, that Defendants have withheld

to offset the amounts demanded or that have been paid by Class members to Defendants in

response to such demands; and (3) to declare that any future efforts to recoup payments for errors

or mistakes in prior payments must comply with the specific requirements under ERISA for

adverse benefit determinations."  (Id. ¶ 137.)

The ERISA Chiropractor Class, whose named Plaintiffs are Dr. Rodgers and

Dr. O'Donnell, is defined as:

> All chiropractic physicians who, from six years prior to the filing date of this action
> to its final termination ("ERISA Class Period"), provided healthcare
> services to patients insured under healthcare plans governed by ERISA and
> insured or administered by Defendants, and whose claims were subjected to
> utilization review requirements imposed by United and/or Optum.

(Amend. Compl. ¶ 136.)  The ERISA Chiropractor Class seeks "to enjoin Defendants from (1)

tiering providers based on statistical parameters, (2) denying treatment plans without regard to

patients' medical needs, (3) imposing pre-certification requirements on patient care without

regard to the terms of the ERISA health care plans, and (4) threatening providers with being

placed on a lower tier or potential loss of network participation if they do not defer to Optum's

demands by limiting care to patients, and to compel United and Optum to replace them with

policies and procedures which comply with ERISA."  (Id. ¶ 137.)

On June 21, 2011, Defendants moved to dismiss the Amended Complaint.  On March 30, 2012, the Court issued an Opinion and Order denying the motion with respect to Plaintiffs' claims against United, UnitedHealthcare, and Optum, but granting the motion with respect to all of Plaintiffs' claims against HNNE and Plaintiffs' claim against HNNY for failure to provide a full and fair review under ERISA.  The Court dismissed all of Plaintiffs' claims against HNNE, and their claim against HNNY for failure to provide a full and fair review, without prejudice.

On June 9, 2012, Plaintiffs moved to certify both the ERISA Chiropractor Class and the ERISA Recoupment Class.  Defendants opposed the motion.  In addition, on October 12, 2012, Defendants moved for summary judgment against the named Plaintiffs of the ERISA Chiropractor Class.  On April 15, 2013, Plaintiffs filed a Second Amended Complaint ("SAC"), which set forth additional allegations in support of their claims.  The SAC proposed the same classes as those set forth in the Amended Complaint.  On August 1, 2013, the Court issued an Opinion and Order (1) granting Defendants' Motion for Summary Judgment against the ERISA Chiropractor Class; and (2) denying Plaintiffs' Motion to Certify the ERISA Recoupment Class.[2]

On August 16, 2013, Plaintiffs filed a renewed Motion for Class Certification, which set forth two new proposed classes: the ONET Repayment Demand Class and the ONET Offset Class.  The ONET Repayment Demand Class, whose named Plaintiffs are Dr. Sprandel, BHSC, and Tri3, is defined as:

> All ONET healthcare providers (such as individual practitioners, durable medical equipment providers or facilities) who, from six years prior to the original filing date of this action to its final termination ("Class Period"): (1) provided healthcare services or supplies to patients insured under healthcare plans governed by ERISA and insured or administered by United, and (2) after having received benefit payments from United, were subjected to retroactive repayment demands for all or a portion of such payments. Excluded from this class are all providers who voluntarily paid United in response to United's repayment demand or affirmatively

---

[2] The Court denied Plaintiffs' Motion to Certify the ERISA Chiropractor Class as moot.

authorized subsequent recoupments or offsets as a means to repay the alleged overpayments.

The ONET Repayment Demand Class seeks "declaratory relief establishing that Defendants' policies, procedures and practices with respect to issuance of repayment demands to out-of-network providers fail, as a matter of law, to substantially comply with" ERISA and 29 C.F.R. § 2560.503-1.  (Buffalo Decl., Ex. 24.)  The Class also "seeks a permanent injunction requiring Defendants to reform their policies, procedures and practices with respect to issuance of repayment demands to out-of-network providers."  (Id.)  Specifically, Defendants "would be required to treat as an ERISA 'Adverse Benefit Determination' any such repayment demand, arising under an ERISA plan, that results in lower remittance or reimbursement to the provider; and that Defendant[s] would be required to furnish any provider subject to a repayment demand that results in such an ERISA 'Adverse Benefit Determination' with the notice and appeal rights mandated under 29 C.F.R. § 2560.503-1(g)-(h)."  (Id.)  "While such reforms would be prospective in nature, the injunction Plaintiff[s] seek[] would apply with equal force to both new and presently pending repayment demands; the effect of which being that Defendants would be enjoined from pursuing recovery of purported overpayments from providers going forward without first complying with ERISA's due process requirements."  (Id.)

The ONET Offset Class, whose named Plaintiffs are BHSC and Tri3, is defined as:

All ONET healthcare providers (such as individual practitioners, durable medical equipment providers or facilities) who, from six years prior to the original filing date of this action to its final termination ("Class Period"): (1) submitted claims for benefits to United for services or supplies provided to patients insured under healthcare plans governed by ERISA and insured or administered by United; and (2) did not receive such benefit payments because United applied the payment otherwise due under the plan toward an alleged overpayment for a claim submitted by the provider on behalf of a different patient. Excluded from this class are all providers who affirmatively authorized subsequent recoupments or offsets as a means for United to recover the alleged overpayments.

In response, Defendants moved to strike Plaintiffs' renewed Motion for Class Certification.  In addition, on September 27, 2013, Defendants filed a Motion for Summary Judgment against Dr. Sprandel as a named Plaintiff of the ONET Repayment Demand Class.

On November 20, 2013, the Court issued an Opinion and Order granting Defendants' Motion to Strike with respect to the ONET Offset Class and denying it with respect to the ONET Repayment Demand Class.  On December 2, 2013, the Court issued an Opinion and Order denying Defendants' Motion for Summary Judgment against Dr. Sprandel.

Defendants now move for reconsideration of the Court's ruling denying summary judgment against Dr. Sprandel as a named plaintiff of the ONET Repayment Demand Class. Plaintiffs now move for certification of the ONET Repayment Demand Class.  For the reasons set forth below, Defendants' Motion for Reconsideration is GRANTED.  Plaintiffs' Motion to Certify the ONET Repayment Demand Class is GRANTED, subject to Plaintiffs' ability to cure a defect in at least one of the class's named plaintiffs.

## I.        BACKGROUND

The facts of this case are fully set forth in Premier Health Ctr. v. UnitedHealth Grp., 292 F.R.D. 204 (D.N.J. 2013).  Thus, for the sake of brevity, the Court will set forth only those facts that are necessary to the disposition of Defendants' Motion for Reconsideration and Plaintiffs' renewed Motion for Class Certification.

## A.       United's Claims Processing Procedures

United is a major health insurer that operates nationally through its wholly owned subsidiaries, including UnitedHealthcare, Optum, HNNE, and HNNY.  As a national insurer, United processes an enormous number of claims for benefits from a wide variety of healthcare

providers on a regular basis.[3]  These claims are submitted to United in a standardized coding format that describes the services performed.  United processes provider claims according to this format because of various state laws that require health insurers to pay claims quickly.  Consequently, in initially processing claims, United relies exclusively on the codes submitted by healthcare providers.

To be sure, processing claims in this manner results in erroneous payments to healthcare providers.  Therefore, United regularly conducts post-payment audits to ferret out coding errors and improper claims.  In doing so, United typically requests a provider's clinical records and compares the services indicated in the records with those noted in the provider's claim for payment.

These post-payment audits are also intended to discern errors on United's part, such as (1) paying the same claim twice; (2) incorrectly coordinating benefits with another insurance plan; and (3) paying a claim incorrectly under the terms of a provider's contract with United.  These audits may result in either a determination of underpayment, in which case United will remit further payment to a provider, or one of overpayment, in which case United will seek remittance from the provider for the amount that was overpaid.[4]

---

[3] For purposes of benefits administration, providers are generally classified as either in network or out of network.  An in network provider is bound to a network agreement with United (separate and apart from the ERISA plan), under which the provider accepts reduced benefits.  This results in relatively small copayment obligations for United plan members, and, in turn, a powerful incentive for United plan members to seek treatment from in network providers.  In contrast, an out of network provider is bound to no such agreement with United and therefore may seek greater benefits from United plan members, which often results in significantly greater copayment obligations.

[4] To the extent United determines that an overpayment arises out of a provider's fraudulent billing practices, United will not readjudicate the provider's claims but rather enter into a formal settlement agreement with the provider.

Three separate divisions within United conduct post-payment audits: (1) Benefits Operations, which processes benefits claims, regularly performs manual quality control audits that incidentally identify both underpayments and overpayments; (2) Audit & Recovery Operations ("ARO"), which employs algorithms and other auditing techniques, including review of clinical records, to identify overpayments;[5] and (3) Premium Audit Services ("PAS"), which uses similar techniques as ARO to identify overpayments made to institutional providers such as hospitals.

## B.   Recouping Overpayments from Providers

United engages in a multistep process to recover benefit overpayments.  First, United sends a letter to the provider identifying (1) the specific claim that was overpaid; (2) the amount that United overpaid on that claim; and (3) the reason for overpayment.  These letters further (1) request a check from the provider for the amount overpaid; (2) note that the provider may appeal United's assessment[6]; and (3) state that if the provider does not remit the amount overpaid, United may deduct that amount from future claims submitted by that provider.

United will send follow up letters to providers in an effort to secure voluntary repayment, and those letters will always note that the provider may appeal United's determination.  (Price Decl. ¶ 3.)  United, at times, outsources overpayment recovery operations to outside vendors that "employ the same basic process[.]"  (Id. ¶ 13.)

To the extent United decides that an overpayment determination changes a member's paid benefits under his or her health insurance policy, United will issue a revised Explanation of

---

[5] This division's work is farmed out to a company called OptumInsight that performs claims payment integrity services for United.

[6] According to United, providers are given between 30 and 365 days to appeal United's assessment.  (Price Decl. ¶ 3.)  Certain letters provide no timeline for appeal.

Benefits ("EOB") to the member and a similar document known as a Provider Remittance Advice ("PRA") to the provider.  The revised EOB notes the member's formal remedies under ERISA to contest United's reassessment.  If the overpayment is identified by Benefits Operations, the revised EOB and PRA are sent at the same time as the initial letter seeking reimbursement.  If the overpayment is identified by ARO, United issues the revised EOB and PRA at the time the provider makes voluntary repayment or when the time in which to make voluntary repayment expires, whichever occurs first.

In 2011, United recovered approximately $430 million in overpayments to providers. 58% of the $430 million was recovered as a result of providers' voluntarily sending a check to United, while 42% was recovered through offsets.[7]  (Bescwick Decl. ¶ 10.)

## C.    United's Appeals Process

Provider appeals are considered by a group of ten to twelve members of the ARO Appeals Team.[8]  In addition, an ARO quality team reviews the Appeals Team's determinations for accuracy and seeks to ensure that appeal resolution letters provide sufficient explanatory information.  As with the overpayment recovery process, United will at times outsource the appeal process to outside vendors.[9]

If a provider prevails in an appeal, United sends the provider a letter stating that United will no longer seek remittance.  If an appeal is resolved against a provider, United sends a letter

---

[7] According to United, providers will also at times consent to remitting an overpayment to United via a future offset.  (Bescwick Decl. ¶ 10.)

[8] The ARO Appeals Team is an entirely separate group from those that make an initial overpayment determination.

[9] As of 2009, those vendors may only consider first-time and second appeals of "simple overpayment issues."  (Price Decl. ¶ 13.)

to the provider stating that the provider has sixty days in which to file a subsequent appeal before United will offset a given overpayment against future benefit claims by that provider.[10]

According to United, in 2011, approximately 2.25% of its overpayment determinations were appealed.  (Price Decl. ¶ 5.)  Of that 2.25%, roughly two-thirds were resolved against the provider.  (Id.)

**D.   United's Recoupment Procedures as Applied to the Named Plaintiffs of the ONET Repayment Demand Class**

   ***i.    Tri3***

Tri3 is a healthcare facility that provides durable medical equipment through its subsidiaries, Wabash Medical Company, LLC ("Wabash") and Orthoflex Inc., d/b/a Integrated Orthopedics ("Orthoflex"), to many United plan members, on an out of network basis,[11] pursuant to prescriptions from the members' health care providers.  Tri3 has received numerous repayment demands and incurred numerous offsets regarding claims for durable medical equipment on behalf of a number of United plan members.  See (SAC ¶ 36.)

Tri3 offers several examples where United issued notices adjusting payments for claims downward based on past overpayments.  These notices fail to indicate the basis for the overpayment or how to appeal United's determination.  In addition, a Tri3 corporate

---

[10] According to United, there is no limit on the number of appeals that a provider may file on a particular overpayment determination.  Thus, the appeals process for a given overpayment determination may take years or even, in theory, go on forever.  (Price Decl. ¶ 8.)  In addition, providers are allowed to appeal after the designated time for appeal has expired, including at the time United offsets overpaid amounts against future claims.  (Id. ¶ 17.)

[11] From August 1, 2009 through March 4, 2010, Wabash was an in network provider with United.  At all other times, Wabash was an out of network provider.  Orthoflex was at all times an out of network provider.

representative testified that in many instances Tri3 would not receive any prior letters from United notifying Tri3 of an overpayment determination.  See (Boyle Decl., Ex. 33 at 123.)

United, however, offers examples of letters sent to Tri3, dated March 26, 2010 and July 2, 2009, respectively, (1) stating that Tri3 had been overpaid on one or more particular claims; (2) setting forth the nature of the claims and the reasons why United believed they overpaid on those claims; and (3) noting that Tri3 could appeal United's determination.  See (id., Exs. 37, 40.)  United also points to two instances where it sent an initial letter to Tri3, issued a revised EOB and PRA, and ultimately offset the requested amount in overpayment from a future claim submitted by Tri3 when it failed to respond to the initial letter.  See (id. Ex. 33 at 122-124, 155.)

In addition, United notes an instance where Tri3 submitted two appeals in response to a letter from United seeking reimbursement for overpayment on a claim and in fact won the second level appeal.  See (id. Ex. 33 at 156-157, 162-163; Ex. 41.)  Moreover, a Tri3 corporate representative admitted in deposition that, in general, if Tri3 believed that United committed a clerical error in assessing an overpayment, Tri3 would appeal the assessment.  See (id. Ex. 33 at 163.)

### ii.     BHSC

BHSC is a licensed surgical center that offers health care services on an out of network basis to United subscribers.  Although BHSC has received multiple repayment demands from United, see (SAC ¶ 41), the SAC only describes a single repayment demand regarding a claim on behalf of a single patient, see (id. ¶ 45.)  Specifically, on May 18, 2010, BHSC submitted a claim for reimbursement on behalf of the patient, which United paid on June 21, 2010.  On August 12, 2010, United issued a letter to BHSC stating that (1) United had overpaid the claim due to incorrectly calculating the patient's coverage for the service provided; (2) BHSC was to remit the

overpaid amount within 45 days; (3) if BHSC did not remit the amount, United would deduct that amount from future claims; and (4) if BHSC did not agree with United's determination, it could appeal on the patient's behalf with signed authorization.  (Boyle Decl., Ex. 10.)

United issued a revised EOB to the plan member on August 13, 2010, and sent a PRA to BHSC on August 16. 2010.[12]  (Id., Exs. 11, 42.)  On October 3, 2010, United sent a follow up letter to BHSC requesting reimbursement of the overpaid amount.  (Weiswasser Decl., Ex. 9.)  There is no indication that BHSC attempted to appeal the determination.  Several months later, United offset the overpaid amount from future claims submitted by BHSC on behalf of other patients.  On January 3, 2011, United issued a PRA to BHSC explaining the offset and stating that the member, provider, or authorized representative has the right to appeal the determination.  See (Boyle Decl., Exs. 7, 15.)

### iii.     Dr. Sprandel

Dr. Sprandel, a licensed Doctor of Chiropractic, provides chiropractic services to United subscribers on an out of network basis.[13]  Dr. Sprandel received repayment demands regarding claims for services provided to three patients.  In August 2009, United submitted initial letters for each overpayment stating (1) the specific claims that United deemed overpaid; (2) that those claims were not payable under the relevant reimbursement policy because the codes used by Dr. Sprandel did not correspond with the services performed in the patients' medical records; and (3) that Dr. Sprandel could appeal United's determination within thirty days.  See (Boyle Decl., Exs. 20-22.)  On September 30, 2009, United sent follow up letters to Dr. Sprandel stating the same.

---

[12] United contends that both the EOB and PRA stated ERISA appeal rights.  While the EOB sent to the patient sets forth ERISA appeal rights, see (Boyle Decl., Ex. 11), the PRA issued to BHSC does not, see (id, Ex. 42.)

[13] Dr. Sprandel was an in network provider to United subscribers prior to 2001.

On November 4, 2009, Dr. Sprandel submitted a formal appeal of United's determinations. United subsequently issued letters denying the appeal and finding the initial overpayment determinations to be valid.[14] Dr. Sprandel submitted a second appeal, and United issued a letter denying it. Dr. Sprandel did, however, prevail on one appeal. To this day, United has not offset or otherwise recouped the amounts that it determined were overpaid to Dr. Sprandel.

## II.    DISCUSSION

Defendants now move for reconsideration of the Court's December 2, 2013 ruling denying Defendants' Motion for Summary Judgment against Dr. Sprandel as a named plaintiff of the ONET Repayment Demand Class. In doing so, Defendants argue that (1) the Court's failure to address certain material facts merits reconsideration; and (2) under controlling law, patient-assignor's cannot have standing in the absence of an actual or certainly impending injury. Plaintiffs argue that neither the facts nor the controlling law that Defendants point to warrant reconsideration of the Court's prior ruling.

In addition, Plaintiffs move for certification of the ONET Repayment Demand Class. In doing so, Plaintiffs argue that the redefined ONET Repayment Demand Class cures the defects noted by the Court, in its August 1, 2013 Opinion, in the previously proposed ERISA Recoupment Class, and otherwise satisfies the requirements of Rule 23(a). Plaintiffs further argue that the ONET Repayment Demand Class should be certified pursuant to Rule 23(b)(1)(A) and (b)(2).

---

[14] The letters submitted by Plaintiffs state that "[t]he details of the decision(s) are explained on the attached lists." (Weisswasser Decl., Exs. 18-19.) However, Plaintiffs fail to attach those lists.

Defendants argue that the proposed ONET Repayment Demand Class fails to satisfy the requirements of Rule 23 because the class (1) cannot be ascertained without extensive individualized inquires and/or in an administratively feasible manner; (2) fails to satisfy the commonality, typicality, and adequacy requirement of Rule 23(a), among others; and (3) cannot be certified under either Rule 21(b)(1)(A) or Rule 21(b)(2).

## A.  United's Motion for Reconsideration

### i.  Standard of Review

"[I]t is well-established in this district that a motion for reconsideration is an extremely limited procedural vehicle." Resorts Int'l v. Greate Bay Hotel & Casino, 830 F. Supp. 826, 831 (D.N.J. 1992).  As such, a party seeking reconsideration must satisfy a high burden, and must "rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." N. River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1218 (3d Cir. 1995).

Since the evidence relied upon in seeking reconsideration must be "newly discovered," a motion for reconsideration may not be premised on legal theories that could have been adjudicated or evidence which was available but not presented prior to the earlier ruling.  See id. Local Civil Rule 7.1(i), which governs such motions, provides that they shall be confined to "matter[s] or controlling decisions which the party believes the Judge or Magistrate Judge has 'overlooked.'"  The word "overlooked" is the dominant term, meaning that except in cases where there is a need to correct a clear error or manifest injustice, "[o]nly dispositive factual matters and controlling decisions of law which were presented to the court but not considered on the original motion may be the subject of a motion for reconsideration." Resorts Int'l, 830 F. Supp.

at 831; see also Egloff v. N.J. Air Nat'l Guard, 684 F. Supp. 1275, 1279 (D.N.J. 1988); Pelham v. United States, 661 F. Supp. 1063, 1065 (D.N.J. 1987).

A decision suffers from "clear error" only if the record cannot support the findings that led to that ruling.  United States v. Grape, 549 F.3d 591, 603-04 (3d Cir. 2008) (citations omitted).  Thus, a party must do more than allege that portions of a ruling were erroneous in order to obtain reconsideration of that ruling; it must demonstrate that (1) the holdings on which it bases its request were without support in the record, or (2) would result in "manifest injustice" if not addressed.  See Grape, 549 F.3d at 603-04; N. River Ins., 52 F.3d 1218.  Mere "disagreement with the Court's decision" will not suffice.  P. Schoenfeld Asset Mgmt., LLC v. Cendant Corp., 161 F. Supp. 2d 349, 353 (D.N.J. 2001).

### ii.       The Court's December 2, 2013 Ruling

The Court's December 2, 2013 Opinion addressed whether the fact that Dr. Sprandel's three purported patient-assignors are no longer enrolled in United-serviced ERISA plans deprives Dr. Sprandel of standing to seek prospective relief under ERISA, based on those patient assignments, on behalf of the ONET Repayment Demand Class.  The Court noted that (1) "healthcare providers may obtain derivative standing to assert ERISA claims on behalf of their patients by virtue of an assignment"; (2) "through a patient assignment, a healthcare provider has standing to assert only those claims that its patient-assignor has standing to assert"; and (3) "for a healthcare provider to maintain derivative standing to assert ERISA claims on behalf of a patient, the patient-assignor must have standing at all stages of litigation to assert those claims."  Premier Health Ctr. P.C. v. UnitedHealth Grp., 2013 WL 6230423, at *4 (D.N.J. Dec. 2, 2013) (citations omitted).  The Court therefore found that "for Dr. Sprandel to have standing to challenge United's overpayment recoupment procedures on behalf a patient-assignor, that patient must

have 'a personal stake in the outcome of the controversy.'" Id. (quoting Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009)).

The Court concluded that "[a]lthough Dr. Sprandel's three patient-assignors are no longer enrolled in United healthcare plans, they still have a personal stake in Dr. Sprandel's challenge to United's procedures to recoup overpayments on their benefit claims." Id. at *5.  In doing so, the Court noted that "United has not rescinded its [re]payment demands with respect to their claims" and therefore "United may continue to seek the overpaid amounts on those patients' claims from Dr. Sprandel, either through voluntary repayment or offsets, and those patients will then become liable to Dr. Sprandel for the amounts recouped by United." Id.

### iii.    Reconsideration

Defendants argue that "the factual predicate of the Court's ruling is incorrect because United has publicly declared that, pursuant to its long-standing policy to mirror state law limitations on overpayment recoveries, the years-old repayment demands that Sprandel now seeks to challenge have no further operative effect."  (Def.'s Br. Reconsid. 1.)  Specifically, Defendants point to a letter submitted by Defendants, on November 26, 2013, along with the Declaration of Jeff Bonneville (the "Bonneville Declaration").  See (ECF No. 260-1).  The Declaration states that Mr. Bonneville is "employed by Optum" and "familiar with United's policies regarding compliance with state law in connection with overpayment recoveries." (Bonneville Decl. ¶ 2.)  It further states that: "[c]onsistent with United's policy and Ohio law, United will not under any circumstances use the [re]payment demand letter that United sent to Sprandel more than two years ago, and that are referenced in [Plaintiffs'] . . . Opposition to United's Motion for Summary Judgment against" Dr. Sprandel, "as the basis for, precursor to, or initiation of any involuntary recovery of the identified overpayments through offsets or any other

means."  (Id. ¶ 6.)  "Accordingly, United will not be making any attempt to offset the overpayments to Sprandel that are identified in the Overpayment Letters," and "United is unaware of any other outstanding [re]payment demand letters that were sent to Sprandel."  (Id. ¶¶ 7, 8.)

Thus, according to Defendants, the Bonneville Declaration, which the Court failed to address in its prior ruling, "makes it clear that the years-stale letters that Sprandel seeks to challenge have not had and will never have any impact on his patient-assignors," (Def.'s Br. Reconsid. 2), and, in turn, Dr. Sprandel cannot satisfy the "actual or imminent" requirement of Article III standing.  Defendants are correct.

"To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 133 S.Ct. 1138, 1147 (2013) (quotation and citation omitted). The Clapper court recently reaffirmed that "[t]hreatened injury must be *certainly impending* to constitute injury in fact."  Id. (quotation and citations omitted) (emphasis in original). "[A]llegations of *possible* future injury are not sufficient."  Id. (quotation and citations omitted) (emphasis in original).

The Bonneville Declaration indeed makes clear that there is no actual or imminent injury to any of any of Dr. Sprandel's three patient-assignors.  None those patient-assignors is currently a United-insured, and United will not pursue any of the outstanding repayment demands against them.[15]  Thus, Dr. Sprandel lacks standing to challenge Defendants' overpayment recoupment procedures under ERISA.

---

[15] Plaintiffs characterize the Bonneville Declaration as "nothing more than an untested, unenforceable, and self-serving statement from one United employee, during litigation, about what United purportedly intends to do in the future."  (Pl.'s Br. Opp. Reconsid. 4.)  A company need not submit a binding court order or statement from its CEO in order to provide competent

Plaintiffs contend that Defendants' submission of the Bonneville Declaration constitutes a failed attempt to render moot Dr. Sprandel's claims through voluntary cessation.  According to Plaintiffs, the Bonneville Declaration fails to satisfy the voluntary cessation standard—which requires a showing that "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources, 532 U.S. 598, 609 (2001) (quotation omitted)—because it merely amounts to "unenforceable assertions" that "neither prevent United from enforcing [the overpayment] demands nor give Dr. Sprandel or his patients any legal protection from future deprivation of their ERISA rights."  (Pl.'s Br. Opp. Reconsid. 4.)

Plaintiffs are mistaken.  Mootness under the doctrine of voluntary cessation requires that the defendant stop engaging in "a challenged practice."  Friends of Earth Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (quotation omitted).  The Bonneville Declaration in no way indicates that Defendants have altered the practices that Plaintiffs challenge in this case, namely the way in which Defendants notify healthcare providers of overpayment determinations and demand overpaid amounts.  It merely states that United, pursuant to its policy and state law, has not pursued the repayment demands regarding Dr. Sprandel's three patient-assignors for some time and will not pursue them in the future.  Therefore, mootness under the voluntary cessation doctrine is inapplicable here.

Plaintiffs further argue that Dr. Sprandel has derivative standing under ERISA to challenge Defendants' overpayment recoupment procedures because Dr. Sprandel currently

---

evidence of that company's conduct or policies.  An affidavit of an employee with personal knowledge of the company's relevant conduct and policies, submitted by the company itself, though counsel, under penalty of perjury, is sufficient.  See Fed. R. Civ. P. 56(c)(4).

treats a number of United-insureds who may very well be subject to those procedures in the future.  Be that as it may, there is no indication whatsoever that Defendants have or will issue an overpayment notification letter to Dr. Sprandel in conjunction with a claim made on behalf of one or more of his current United-insured patients.  See Clapper, 133 S.Ct. at 1147.  Dr. Sprandel cannot assert derivative standing to challenge Defendants' overpayment recoupment procedures on behalf of patient-assignors who neither have been subject to those procedures nor certainly will be subject to them.  Consequently, Defendants' Motion for Reconsideration is granted.  Dr. Sprandel's claims in this case are dismissed.

**B.      Plaintiffs' Motion for Class Certification**

Class certification is proper if the Court finds that Plaintiffs satisfy all of the requirements of Federal Rule of Civil Procedure 23(a) and one of the provisions of Federal Rule of Civil Procedure 23(b).  In re Constar Int'l Inc. Sec. Litig., 585 F.3d 774, 780 (3d Cir. 2009).  Under Rule 23(a), Plaintiffs must show that:

> (1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy].

Fed. R. Civ. P. 23(a).

With respect to Rule 23(b), Plaintiffs seek certification under either Rule 23(b)(1)(A) or (b)(2).  Plaintiffs may satisfy Rule 23(b)(1)(A) by showing that "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  Plaintiffs may satisfy Rule 23(b)(2) by showing that "the party opposing the class has acted or refused to

act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

### i.      *Rule 23(a)(1) (Numerosity)*

Plaintiffs contend that the ONET Repayment Demand Class satisfies the numerosity requirement of Rule 23(a) because it is only somewhat less numerous than the previously proposed ERISA Recoupment Class, which the Court found to have the requisite numerosity. Defendants do not dispute this contention.  Consequently, the proposed ONET Repayment Demand Class satisfies Rule 23(a)(1).

### ii.      *Rule 23(a)(2) (Commonality)*

Plaintiffs argue that the ONET Repayment Demand Class satisfies the commonality requirement of Rule 23(a) for the same reasons that the Court found the previously proposed ERISA Recoupment Class to have commonality.  Thus, according to Plaintiffs, all members of the ONET Repayment Demand Class, like the ERISA Recoupment Class share (1) standing to pursue ERISA claims via patient assignments; (2) the contention that United's actions to recoup overpayments amount to an adverse benefit determination under ERISA; and (3) the contention that those actions are not in substantial compliance with ERISA.

Defendants argue that the ONET Repayment Demand Class fails to satisfy the commonality requirement because there is substantial variation among class members regarding the extent to which (1) they have enforceable patient assignments to challenge United's overpayment recoupment procedures;[16] (2) their patients' plans have anti-assignment provisions

---

[16] In their opposition brief, Defendants also maintain that "the question of standing based on assignments is . . . unsettled in the Third Circuit."  (Def.'s Opp. Br. Cert. 20 n. 13.)  The Court of Appeals has recently and unequivocally ruled, however, that "health care providers may obtain standing to sue by assignment from a plan participant."  CardioNet, Inc. v. Cigna Health Corp., 751 F.3d 165, 176 n.10 (3d Cir. 2014).

and/or the extent to which United waived those provisions; (3) the subscriber status of their patient-assignors affects derivative standing under ERISA; (4) an overpayment determination amounts to an adverse benefit determination under ERISA; and (5) an overpayment determination is subject to ERISA's notification requirements; (6) Defendants' full course of communications with that provider substantially complies with ERISA; and (7) a provider apprised Defendants of the scope of its patient-assignment.[17]

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury" based upon "a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2551 (2011) (quotation omitted).  Furthermore, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." Id. (quotation omitted) (emphasis in original).  Consequently, "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers." Id. (quotation omitted).

To be sure, "Rule 23(a)(2)'s commonality requirement does not require identical claims or facts among class member[s]." Marcus v. BMW of North Am. LLC, 687 F.3d 583, 597 (3d Cir. 2012) (quotation omitted).  "For purposes of Rule 23(a)(2), even a single common question will do." Id. (quoting Dukes, 131 S.Ct. at 2556).

---

[17] The vast majority of Defendants' arguments against commonality were previously asserted in their opposition to Plaintiff's Motion to Certify the ERISA Recoupment Class, and rejected by the Court in its prior ruling on that motion.  See Premier Health Ctr., 292 F.R.D. at 221-224.  Nonetheless, the Court will readdress those arguments here in light of Plaintiffs' redefined class and Defendants' contention that the Court's prior rejection of those arguments was clearly erroneous.

a.      ERISA Standing from Patient Assignments

In its prior opinion on Plaintiffs' Motion to Certify the ERISA Recoupment Class, the Court found that members of that class "have standing to pursue ERISA claims challenging United's procedures to recover overpayments of benefits that were assigned to the class members by their patients." Premier Health Ctr., 292 F.R.D. at 221.  In doing so, the Court looked to its previous ruling on Defendants' Motion to Dismiss, which held, among other things, that "assignment of the right to reimbursement 'must logically include the ability to seek judicial enforcement of that right.'"  Id. (quoting Premier Health, 2012 WL 1135608, at *8.)  The Court reasoned that "United's attempts to recover overpayments of benefits that were assigned to the class members have a significant effect on their right to receive those benefits" and "[t]herefore, the class members' challenge to the procedures used to recover overpayments of benefits assigned to them is a logical extension of their right to receive those benefits."  Id.

Defendants now argue that this conclusion was clearly erroneous.  In doing so, they cite to a document published by the United States Department of Labor ("DOL"), entitled Compliance Assistance, Group Health and Disability Plans, Benefit Claims Procedure Regulation (29 CFR 2560.503–1) (the "DOL Document").  The document purports to provide guidance regarding processing benefit claims in accordance with ERISA in a question and answer format.

Defendants specifically point to a question asking: "Does an 'assignment of benefits' by a claimant to a healthcare provider constitute the designation of an 'authorized representative?' " (Buffaloe Decl., Ex. 27.)  The DOL document answers: "No.  An assignment of benefits by a claimant is generally limited to assignment of the claimant's right to receive a benefit payment

under the terms of the plan.  Typically, assignments are not a grant of authority to act on a

claimant's behalf in pursuing and appealing a benefit determination under a plan."  (Id.)

> Defendants then cite to the following language:

> "[W]hen a claimant clearly designates an authorized representative to act and
> receive notices on his or her behalf with respect to a claim, the plan should, in the
> absence of a contrary direction from the claimant, direct all information and
> notifications to which the claimant is otherwise entitled to the representative
> authorized to act on the claimant's behalf with respect to that aspect of the claim
> (e.g., initial determination, request for documents, appeal, etc.). In this regard, it is
> important that both claimants and plans understand and make clear the extent to
> which an authorized representative will be acting on behalf of the claimant.

> Based on this language, Defendants contend that, according to the DOL, "ERISA

distinguishes between assignment of the right to receive payment for services rendered, on the

one hand, and assignment of the right to pursue ERISA remedies, on the other."  (Def.'s Br. Opp.

Mot. Cert. 22.)  Defendants further contend that "DOL guidance suggests that any assignment of

the right to sue should be limited to particular designated claims, and that their scope must be

clearly understood by both the member and the plan."  (Id.)

> While this may be an accurate characterization of the DOL's position, it is nonetheless

contrary to the Court's interpretation of the ERISA statute.[18]  The statute clearly states that an

ERISA action may be brought "by a participant, beneficiary . . . to enjoin any act or practice

which violates any provision of this subchapter or the terms of the plan[.]"  29 § U.S.C.

1132(a)(3)(A).  And because "[t]he term 'beneficiary' means a person designated by a

---

[18] To be sure, this language from the DOL Document does not carry controlling weight
because it does not serve as an interpretation of one or more DOL regulations.  See Long Island
Care at Home, Ltd. v. Coke, 155 U.S. 158, 171 (2007) ("[A]n agency's interpretation of *its own
regulations* is controlling unless plainly erroneous or inconsistent with the regulations being
interpreted.") (quotations and citations omitted) (emphasis added).  Indeed, 29 CFR § 2560.503–
1, which the DOL Document purports to interpret, does not address healthcare provider ERISA
standing via patient assignment.

participant . . . who is or may become entitled to a benefit thereunder," 29 U.S.C. § 1002(8), a healthcare provider who receives an assignment of benefits from a patient becomes a beneficiary who may bring an action under ERISA.  See Kennedy v. Connecticut Gen. Life Ins. Co., 924 F.2d 698, 700 (7th Cir. 1991) ("[D]esignat[ing]" a healthcare provider "as the person to receive" plan benefits . . . makes" the provider "a 'beneficiary'" under ERISA.); Pa. Chiropractice Ass'n v. Blue Cross Blue Shield Ass'n, No. 09 C 5619, 2014 WL 1276585, at *11 (N.D. Ill. Mar. 28, 2014) ("[T]he Seventh Circuit," in Kennedy, "has made clear that an assignment of benefits from a plan participant to a medical provider is sufficient to enable the provider to sue under ERISA.").

Defendants point to two recent decisions from this Court, Cohen v. Horizon Blue Cross Blue Shield of New Jersey, No. 13-3057, 2014 WL 268686 (D.N.J. Jan. 23, 2014) and MHA, LLC v. UnitedHealth Grp., Inc., No. 13-6130, 2014 WL 223176 (D.N.J. Jan. 21, 2014), to support their position that healthcare providers have standing to assert ERISA claims via assignment only if the assignment specifies those claims.  Cohen has little relevance because it concerned an assignment of benefits to the wrong party.  See 2014 WL 268686, at *5.  MHA, however, squarely addressed the issue at hand and held that an assignment of benefits to a healthcare provider "merely authorized an insurer to make payments directly to" that healthcare provider "and thus, is a limited assignment insufficient to confer standing" to assert ERISA claims.  2014 WL 223176, at *5.

In doing so, this Court noted "compelling reasons for requiring a more comprehensive assignment to establish ERISA jurisdiction," namely that, as a general matter, under New Jersey law, "[o]nly an assignment that clearly reflects the assignor's intent to transfer his rights will be effective," and that, "as a result of a valid assignment, the assignor loses all control over the

subject matter of the assignment and all interest in the right assigned." Id. at *4 (quotation omitted). Therefore, were a mere assignment of benefits from a patient to a healthcare provider to give that provider standing to assert ERISA claims, the patient would retain "no legal rights to pursue" the insurer "for benefits regardless of what actions it took with regard to the claims." Id. at *5 (quotation omitted). "In theory, under such a scenario, if [the insurer] fully rejected a valid claim, only [the provider] would have the legal right to pursue [the insurer], regardless of whether or not [the provider] balance billed the patient-insured." Id. (quotation omitted).

This reasoning does not persuade the Court here. It is true that, under the Court's interpretation, a patient who assigns his right to receive benefits for a given claim to a healthcare provider loses his right to press ERISA claims regarding those benefits, and that it is therefore theoretically possible that a healthcare provider that receives a repayment demand from an insurer on a given claim that was assigned to that healthcare provider would simply balance bill the patient who is then left without recourse under ERISA. However, such a scenario is unlikely, as it would only serve to poison the relationship between the patient and healthcare provider and ultimately drive patients away.

The more likely scenario, as in this case, is that providers would dispute overpayment determinations or seek relief under ERISA regarding claims assigned to them by their patients, because "providers . . . are better situated and financed to pursue an action for benefits owed for their services." Cagle v. Bruner, 112 F.3d 1510, 1515 (11th Cir. 1997) (quotation omitted). In contrast, under Defendants' desired interpretation, providers would simply balance bill their patients in the face of a repayment demand, leaving them to challenge that demand to avoid the risk of not having precise enough assignment. This would not only negatively affect the healthcare provider-patient relationship, but also run contrary to ERISA's aim of efficiently

administering benefits.  See id. ("Of course, an assignment will not facilitate a plan participant's or beneficiary's receipt of benefits if the plan does not pay the benefits it owes, and provider-assignees are not permitted to sue on the participant's or beneficiary's behalf.").   In the alternative, providers may very well avoid this risk by simply refusing to accept benefit assignments in the first place, which would also thwart ERISA's aims.  See Memorial Hosp. Sys. v. Northbrook Life Ins. Co., 904 F.2d 236, 247 (5th Cir. 1990) ("[D]iscouraging health care providers from becoming assignees would undermine Congress' goal of enhancing employees' health and welfare benefit coverage . . . .  [S]uch assignments . . . protect beneficiaries by making it unnecessary for health care providers to evaluate the solvency of patients before commencing medical treatment, and by eliminating the necessity for beneficiaries to pay potentially large medical bills and await compensation from the plan." (quotations omitted)).

  This is why, as the Court of Appeals has noted, that "[a]lmost every circuit to have considered the question has held that a health care provider can assert a claim under § 502(a) where a beneficiary or participant has assigned to the provider that individual's right to benefits under the plan."  Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan, 388 F.3d 393, 401 n.7 (3d Cir. 2004).  And this Court has, on multiple occasions, agreed.  See, e.g., N. Jersey Brain & Spine Ctr. v. Conn. Gen. Life Ins. Co., No. 10-4260, 2011 WL 4737067, at *5 (D.N.J. June 30, 2011) ("[A]n assignment of a right to reimbursement logically includes the right to judicially enforce the reimbursement rights, and thus, creates a valid assignment under ERISA." (citations omitted)); Ambulatory Surgical Ctr. of New Jersey v. Horizon Healthcare Servs. Inc., 2008 WL 8874292, at *3 (D.N.J. Feb. 21, 2008) ("[I]t would be illogical to allow" a healthcare provider "to be a valid reimbursement assignee but not allow it to judicially enforce that right."); Wayne Surgical Ctr. LLC v. Concentra Preferred Sys., Inc., Civil Action No. 06-

928, 2007 WL 2416428 (D.N.J. Aug. 20, 2007) ("[I]t is illogical to recognize that," a healthcare

provider, "as a valid assignee has a right to receive the benefit of direct reimbursement from its

patients' insurers but cannot enforce this right.").

Defendants argue that, even if an assignment of benefits allows a healthcare provider to

bring ERISA claims for the benefits that it was assigned, "that principle does not help Plaintiffs

establish standing across the proposed class because Plaintiffs seek (among other things)

declaratory and injunctive relief related to future claims for benefits that have not yet been

assigned." (Def.'s Br. Opp. Mot. Cert. 23.) In doing so, Defendants point to the Court's

previous holding that evidence of a direct payment of benefits to a healthcare provider "only

creates the inference that the patient assigned to [the provider] the right to receive reimbursement

for the care rendered [by the provider], not the right to assert a full array of ERISA claims."

Premier Health Ctr., 292 F.R.D. at 219.

This ruling, however, was specific to where providers sought injunctive relief regarding

conduct to which their patient-assignors were not subject and might encounter only when

seeking treatment from other providers in the future. See id. Consequently, the injunctive relief

sought was well-outside the logical scope of those patient assignments.

Here, however, the ONET Repayment Demand Class members' patient-assignors were

subject to Defendants' overpayment recoupment procedures. Therefore, as the Court previously

held, a "challenge to the procedures used to recover overpayments of benefits assigned to

[healthcare providers] is a logical extension of their right to receive those benefits." Id. at 221.

And a challenge to these procedures under ERISA may undoubtedly include declaratory and

prospective injunctive relief against "any act or practice which violates any provision" of

ERISA. 29 U.S.C. § 1132(a)(3)(A).

Defendants further argue that there is no commonality in provider standing because the ERISA plans of the ONET Repayment Demand Class members' patient-assignors contain anti-assignment clauses with varying language that would have to be scrutinized individually.  In its prior ruling on Plaintiffs' Motion for Class Certification, the Court found that Defendants had "waived any right to enforce [an] anti-assignment provision" because . . . there was evidence of "a course of conduct beyond direct reimbursement for medical services.  Id.  Specifically, "each member of the ERISA Recoupment Class by definition received (1) a direct payment from United in response to a claim for benefits; and (2) one or more letters from United indicating that it had overpaid that claim and demanding reimbursement of the amount that was overpaid directly to United."  Id.

Defendants now argue that, even accepting this prior ruling, one would nonetheless have to "scrutinize the language of each plan to determine whether United's conduct was actually inconsistent" with a given anti-assignment provision.  (Def.'s Opp. Mot. Cert. 24.)  In doing so, Defendants point to anti-assignment provisions that, in their view, "both expressly bar members from assigning their benefits to non-network providers, and simultaneously state that United reserves the right to pay non-network providers directly as a matter of convenience."  (Id.) Therefore, according to Defendants, "United's direct payment to a non-network provider under such a plan would not repudiate the express language of the plan's anti-assignment clause, nor would any attempt by United to recover a direct payment made erroneously to the provider." (Id.)

Defendants are correct that a direct payment of benefits to a non-network provider and a subsequent repayment demand for all or some of those benefits is completely consistent with the language of United's anti-assignment provisions in this case.  Unfortunately, it adds nothing to

their position.  The relevant language of the anti-assignment provisions reads as follows: "You may not assign your Benefits under the Policy to a non-Network provider without our consent. We may, however, in our discretion, pay a non-Network provider directly for services rendered to you."  (ECF No. 146-50 at 91-92.)

This language merely makes clear that United may, in its discretion, unilaterally waive the anti-assignment provision and pay benefits directly to the provider.  Thus, whether United, in accordance with, or in spite of, an anti-assignment provision, (1) issued a direct payment to a provider in response to a claim for benefits; and (2) issued one or more subsequent repayment demands directly to the provider regarding that claim for benefits, the contention that United waived its right to assert an anti-assignment provision is subject to common proof.  See Dukes, 131 S.Ct. at 2551.

Finally, Defendants argue that the subscriber status of the ONET Repayment Demand Class members' patient-assignors creates individual standing issues because the class seeks declaratory and injunctive relief regarding future repayment demands on benefit claims that have yet to be submitted on behalf of other United-insureds in the future.  Therefore, according to Defendants, the Court would have to examine the subscriber status of the class members' patient-assignors because "[p]atients who are not currently members of plans insured or administered by United . . . do not have statutory or constitutional standing to bring claims against United seeking forward-looking relief."  (Def.'s Br. Opp. Cert. 25.)

This argument is a red herring.  While the patient-assignors who are no longer United-insureds may not submit future benefit claims to United that would be subject to future repayment demands, the fact remains that there are pending repayment demands regarding claims while they were United-insureds.  Thus, in challenging United's overpayment recoupment

procedures, those patient-assignors would necessarily seek prospective relief because the repayment demands on their claims have yet to be resolved.[19]  That such relief may also apply to benefit claims of other United-insureds is of no moment, as it would not in any way restrict those individuals' rights or ability to sue under ERISA.  Consequently, the ONET Repayment Demand Class satisfies Rule 23(a)'s commonality requirement as to its standing to pursue ERISA claims.

      b.     Overpayment Determination as an Adverse Benefit Determination

Under ERISA, an "'adverse benefit determination' means any of the following: a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit. . ."  29 C.F.R. § 2560.503-1(m)(4).  If an insurer makes an adverse benefit determination ("ABD") under an ERISA plan, a member or beneficiary of that plan is entitled to certain rights under ERISA, including (1) sufficient notice of the ABD; (2) the right to an appeal the ABD; and (3) a full and fair review of the appeal.  See 29 C.F.R. § 2560.503-1(g)-(h).

Plaintiffs argue that, as a matter of law, an overpayment determination on a claim for benefits, on an out of network basis, amounts to an ABD under ERISA.  Consequently, according to Plaintiffs, whether United's overpayment determinations against members of the ONET Repayment Demand Class merit ERISA protections in challenging those determinations is a common question.   Defendants, on the other hand, contend that an overpayment determination amounts to an ABD only if the determination requires an application of ERISA plan terms.  Thus, according to Defendants, whether an overpayment determination constitutes an ABD under ERISA is not a common question because many class members are subject to

---

[19] Indeed, the general remedy for failing to comply with ERISA's statutory and regulatory requirements "is to remand to the plan administrator so the claimant gets the benefit of a full and fair review," Syed v. Hercules Inc., 214 F.3d 155, 162 (3d Cir. 2000), which is by nature prospective.

third-party wrap or leased network contracts that determine the terms of a provider's reimbursement.

As the Court previously held, "ERISA does not extend to overpayment determinations against providers for services rendered on an in network basis because payment for those services is determined by the terms of the contract between United and the provider, not the terms of the patient's ERISA plan." Premier Health Ctr., 219 F.R.D. at 223. Thus, an overpayment determination concerning services that are subject to any network agreement indeed does not amount to an ABD under ERISA. But this does not present a commonality issue with respect to the ONET Repayment Demand Class because the class does not include ERISA claims against overpayment determinations concerning services rendered on an in network basis.

Defendants further argue that many overpayment disputes regarding whether a provider in fact performed a service for which it billed an insurer arise under state law fraud, as opposed to ERISA. The Court addressed and rejected this precise argument when it was asserted against the ERISA Recoupment Class. In doing so, the Court found that "[w]hile an insurer's cause of action against a provider in court for fraud often does not implicate ERISA . . . the administrative procedure by which an insurer attempts to recoup overpayments based on what it believes to be fraudulent activity must allow the provider the opportunity to challenge that determination in accordance with ERISA procedures, lest the determination be accepted at face value." Id.

Defendants contend that this finding was incorrect because "[i]t cannot be the case that a letter United sent to the provider prior to filing the lawsuit attempting to resolve the very same dispute would have any greater ERISA implications." (Def.'s Br. Opp. Cert. 28 n.16) (emphasis omitted). Oh, but it can! The letter alleging fraud as the basis for an overpayment determination implicates ERISA because the basis for such a demand cannot be accepted at face value, see

Aetna Health Inc. v. Davila, 542 U.S. 200, 214 (2004), and therefore the provider must be given

an opportunity to dispute the demand in accordance with ERISA.  Indeed, whether a provider is

afforded ERISA protections cannot be left entirely up to the insurer.

On the other hand, a lawsuit alleging that a provider submitted one or more fraudulent

claims to an insurer gives the provider the opportunity to challenge those allegations in court,

according to the federal or applicable state rules of civil procedure.  And in doing so, the

provider has the opportunity to show that the alleged fraud claim is, as a matter of law, an

ERISA claim that is preempted by the statute.

Defendants similarly argue that resolution of many overpayment disputes other than

fraud also do not require application of ERISA plan terms, including "where a benefit payment

was erroneously sent to the wrong provider, or where United erroneously sent a duplicate

payment for the full amount submitted on a single claim."  (Def.'s Opp. Mot. Cert., 28.)  The

Court also addressed and rejected this argument when Defendants asserted it against certification

of the ERISA Recoupment Class.

In doing so, the Court found that "requiring a threshold level of plan interpretation"

would "undermine ERISA's goal of providing a uniform source of law," and "prove unwieldy

because it is often difficult to determine early on how much plan interpretation is required to

resolve a benefits dispute."  Premier Health Ctr., 292 F.R.D. at 223 (quotations and citations

omitted).  The Court further found that virtually any overpayment determination "would . . .

require a court to analyze the terms of a given plan to find the appropriate payment for a

particular service," and "to not consider the terms of the plan, even in seemingly clear-cut

circumstances of overpayment, would be to accept the insurer's overpayment determination at

face value."  Id. (citation omitted).  Seeing as how the Court's prior reasoning applies with equal

force to the ONET Repayment Demand Class, the Court sees no reason to accept Defendants' identical argument here.

Defendants next argue that only those overpayment determinations that adversely affect a submitted claim amounts to an ABD. In doing so, they note that ERISA "claims regulation applies only to **adverse** benefit determinations." (Def.'s Br. Opp. Cert. 29) (citing 29 C.F.R. § 2560-503.1(f)(2)(iii)(B)) (emphasis in original). They further note that an ABD must be tied to a specific claim for benefits that was submitted to the insurer. (Id.) (citing 29 C.F.R. § 2560-503.1(m)(2), (3)). Therefore, according to Defendants, "where United seeks to recover an overpayment because no claim was ever submitted by the provider who received the payment, or where United paid a single submitted claim in full, but accidentally did so twice, that effort can in no sense be considered to involve an adverse determination of a submitted claim for benefits." (Id.) (citation omitted).

As Plaintiff's point out, "[t]his argument is just a different version of Defendants' 'overpayment reason' argument and fails for the same reason, i.e., it would require accept[ing] the insurer's overpayment determination at face value." (Pl.'s Rep. Br. Cert. 21) (quotation omitted). Furthermore, the Court finds Defendants' interpretation of the provisions they reference to be strained. 29 C.F.R. § 2560-503.1(m)(2) and (3) merely define pre and post-service claims, respectively. In no way do those provisions suggest that an adverse benefit determination must be tied to a pre or post-service claim. Indeed, an ABD is defined as "a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit," 29 C.F.R. § 2560-503.1(m)(4), not a denial, reduction, or termination of a claim for benefits. Therefore, while a repayment demand based on a mistaken payment for a claim that

was never submitted may not technically be in response to a claim for benefits, it is nonetheless a denial or termination of a previously paid benefit.

Finally, Defendants argue that ERISA does not apply to overpayment determinations that do not have an adverse financial impact on the plan member.  Defendants cite to a section of the aforementioned DOL Document stating that ERISA claims procedures do "not apply to requests by health care providers for payments due them—rather than due the claimant—in accordance with contractual arrangements between the provider and an insurer or managed care organization, where the provider has no recourse against the claimant for amounts, in whole or in part, not paid by the insurer or managed care organization."  (Buffaloe Decl., Ex. G.) Consequently, "[a]ny request by the doctor to the managed care organization for payment or reimbursement for services rendered to a participant is a request made under the contract with the managed care organization, not the group health plan; accordingly, the doctor's request is not a claim for benefits governed by the regulation.  On the other hand, where a claimant may request payments for medical services from a plan, but the medical provider will continue to have recourse against the claimant for amounts unpaid by the plan, the request, whether made by the claimant or by the medical provider (e.g., in the case of an assignment of benefits by the claimant) would constitute a claim for benefits by the claimant."  (Id.)

Defendants suggest that the Court previously found this language to be "misguided." (Def.'s Br. Opp. Cert. 30.)  But this is not so.  What the Court found misguided was Defendants' contention that this language made clear that the reason for an overpayment determination, stated by an insurer in a repayment demand letter, determines whether the patient will ultimately be financially liable to the provider.  The Court rejected this contention, as previously discussed, because it would result in an unwieldy and illogical standard that ultimately requires the Court to

accept the insurer's stated reason for an overpayment at face value.  See Premier Health Ctr., 292 F.R.D. at 223.

Defendants provide no reason why this ruling would not apply with equal force to the ONET Repayment Demand Class, nor does the Court see any such reason.  Furthermore, this ruling is wholly consistent with the aforementioned language from the DOL document, which, in the Court's view, makes clear that ERISA claims procedures do not apply to payment disputes that are determined by the terms of a separate agreement between the provider and the insurer, and under which the provider is barred from balance billing the insurer.  As previously discussed, overpayment disputes concerning services performed on an in network basis are not subject to ERISA because they are resolved under terms of the provider's network contract.  The ONET Repayment Demand Class, however, consists only of providers that are asserting claims concerning services that are not subject to any separate payment agreements with United, including third-party network agreements.  Therefore, the ONET Repayment Demand Class satisfies Rule 23(a)'s commonality requirement with respect to whether an overpayment determination against a provider for out of network services amounts to an ABD under ERISA.

    c.    United's Compliance with ERISA Requirements

As previously discussed, if an insurer makes an ABD under an ERISA plan, a member or beneficiary of that plan is entitled to certain rights under ERISA, including (1) sufficient notice of the ABD; (2) the right to appeal the ABD; and (3) a full and fair review of the appeal.  See 29 C.F.R. § 2560.503-1(g)-(h).  "An administrator need only 'substantially comply' with the foregoing regulation."  Kao v. Aetna Life Ins. Co., 647 F. Supp. 2d 397, 412 (D.N.J. 2009) (citations omitted).

Defendants argue that assessing substantial compliance with these requirements is not subject to common proof because it would require examining the full course of communications between United and a given provider.  In its prior ruling regarding certification of the ERISA Recoupment Class, the Court found that:

> The content of United's recoupment notification letters does, in fact, vary substantially.  The letters in the record provide widely varying levels of detail regarding (1) the basis of the overpayment determination; and (2) the provider's ability to appeal and how to do so.  However, they all violate ERISA in three respects.  First, they fail to provide "[a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of [ERISA] following an adverse benefit determination on review."  29 C.F.R. § 2560.503–1(g)(1)(iv).  Second, they fail to indicate that the provider, "upon request and free of charge, [will have] reasonable access to, and copies of, all documents, records, and other information relevant to the" overpayment determination.  29 C.F.R. § 2560.503–1(h)(2)(ii).  Third, they fail to "[p]rovide claimants at least 180 days following receipt of a notification of an adverse benefit determination within which to appeal the determination."  29 C.F.R. § 2560.503–1(h)(3)(i).

Premier Health Ctr., 292 F.R.D. at 224 (citations omitted).

Defendants fail to provide any evidence whatsoever that United substantially complied with the three aforementioned ERISA regulations—that the Court found United to have violated across all overpayment notifications—during the course of their communications with one or more members of the ONET Repayment Demand Class.[20]

---

[20] Defendants argue that the Court's previous ruling "determined that the extent of United's compliance with ABD requirements in its overpayment communications is inherently claim-specific and individualized." (Def.'s Br. Cert. 32.)  In doing so, they point to language stating that "the nature of United's compliance with ERISA's notice and appeal regulations [is] a predominantly individual inquiry," and "assessing United's overpayment recoupment procedures across the class would indicate varying levels of compliance with ERISA." Premier Health Ctr., 292 F.R.D. at 229.  That language, however, was made in the context of assessing whether common questions would predominate over individual questions of ERISA compliance, in accordance with Rule 23(b)(3).  Surely Defendants are aware of the critical differences between a commonality inquiry, pursuant to Rule 23(a), and a predominance inquiry, pursuant to Rule 23(b)(3).

Defendants also point out that certain members of the ONET Repayment Demand Class, including Tri3 and BHSC, pursued successful appeals in the face of repayment demands.  As the

Thus, the Court's prior ruling applies with equal force to the ONET Repayment Demand Class.

Defendants further argue that ERISA compliance is an individual inquiry because United is required to substantially comply with ERISA regulations only when a class member apprises United of an assignment so that United knows that the class member is entitled to ERISA-compliant notice.  Therefore, Defendants maintain that they have "a unique defense that [United] provided fully ERISA-compliant notice to the only party it had reason to know was entitled to it—the member."  (Def.'s Br. Opp. Cert. 33.)

This argument follows the same logic as Defendants' anti-assignment argument and fails for precisely the same reasons.  As previously discussed, United issued to each class member (1) a direct payment of benefits; and (2) one or more demands seeking a direct repayment of some or all of those benefits from that class member.  Thus, just as United has waived any defense based on a provision barring an assignment of those benefits to a class member, United has similarly waived any defense asserting that it had no notice of an assignment of those benefits to a class member.  Consequently, the ONET Repayment Demand Class satisfies Rule 23(a)'s commonality requirement with respect to whether United's notification letters comply with ERISA.

### iii.    *Rule 23(a)(3) (Typicality)*

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  This requirement "ensure[s] that

---

Court previously held, however, "[t]he fact that certain class members appealed one or more of United's overpayment determinations does not defeat commonality in this regard.  United's notice and appeal process stands in violation of ERISA as a matter of law, whether or not a provider appeals."  Premier Health Ctr., 292 F.R.D. at 224.

the class representatives are sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class." In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 598 (3d Cir. 2009) (citations omitted).

In ascertaining typicality, the Court must consider three factors. First, it must consider "the similarity of the legal theory and legal claims[.]" Id. "The similarity between claims or defenses of the representative and those of the class does not have to be perfect." Id. at 599. However, "the incentives of the plaintiffs [must be] aligned with those of the class." Id.

Second, the Court must consider "the similarity of the individual circumstances on which those theories and claims are based." Id. at 598. This "requires the claims and defenses of the representative to be sufficiently similar not just in terms of their legal form, but also in terms of their factual basis and support." Id. at 599. "However, factual differences between the proposed representative and other members of the class do not render the representative atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members." Id. (quotation omitted). "Complete factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of the other class members will be fairly and adequately protected in their absence." Id. (citation omitted).

Third, the Court must consider "the extent to which the proposed representative may face significant unique or atypical defenses to her claims." Id. at 598-99 (citation omitted). "It is well established that a proposed class representative is not 'typical' under Rule 23(a)(3) if the representative is subject to a unique defense that is likely to become a major focus of the litigation." Id. at 599 (quotation omitted). "[T]he challenge presented by a defense unique to a

class representative is that the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class." Id. (quotation omitted).

In its previous ruling denying certification of the ERISA Recoupment Class, the Court found that that class failed to satisfy Rule 23(a)'s typicality requirement because "United recovers a substantial portion of repayment dollars through voluntary repayments, while none of the named plaintiffs submitted a voluntary repayment in response an overpayment determination." Premier Health, 292 F.R.D. at 226. Therefore, the claims of the named plaintiffs were "atypical of the class as a whole because resolution of those claims will not address a defense that may well apply to a significant portion of the class, thus unfairly depriving Defendants of the opportunity to raise it." Id. at 226-27.

Plaintiffs argue that the ONET Repayment Demand Class cures this deficiency by excising those members of the ERISA Recoupment Class that submitted any repayment or incurred any offset. Therefore, according to Plaintiffs, the voluntary repayment defense will not apply to any member of the ONET Repayment Demand Class.

Defendants argue that the ONET Repayment Demand Class does not satisfy Rule 23(a)'s typicality requirement because excising all providers that submitted any repayment or incurred any offset renders the named Plaintiffs atypical of the class and/or outside the class definition.[21] Specifically, Defendants note that the single repayment demand noted in the SAC against which BHSC seeks to assert an ERISA claim in this case was resolved through an involuntary offset. Therefore, Defendants are correct that BHSC cannot serve as a named plaintiff of the ONET

---

[21] The Court will address typicality as to BHSC and Tri3, but not Dr. Sprandel because, as previously discussed, Defendants are entitled to summary judgment against Dr. Sprandel as a named Plaintiff of the ONET Repayment Demand Class.

Repayment Demand Class on the basis of that repayment demand, because BHSC's single claim would be atypical of the class as a whole and indeed falls outside the class definition.

Defendants also contend, correctly, that the repayment demands against Tri3 specified in the SAC resulted either in involuntary offsets, <u>see</u> SAC ¶¶ 37, 38, which fall outside the class definition, or in United unilaterally terminating the repayment demand due to the passage of time, in accordance with state law and its internal policies, <u>see</u> (Dorr. Decl. ¶ 4, 5), which renders Tri3 without standing to assert ERISA claims against those repayment demands.  Therefore, Tri3 similarly cannot serve as a named plaintiff of the ONET Repayment Demand Class on the basis of those repayment demands.

To be sure, the SAC makes clear that both BHSC and Tri3 received other repayment demands from United against which they seek to assert ERISA claims.  It may very well be that one or more of those repayment demands are active and unresolved.  However, Plaintiffs fail to provide any evidence of any such demands, and the Court cannot simply assume that one or more exists in order to find that BHSC's and/or Tri3's ERISA claims are typical of the class as a whole.

In general, this defect would result in an outright denial of Plaintiffs' Motion for Class Certification.  However, because the ONET Repayment Demand Class otherwise satisfies the requirements of class certification, the Court will afford Plaintiffs the opportunity to present evidence that BHSC and/or Tri3 seeks an ERISA claim against one or more active, unresolved repayment demands that fit within the definition of the ONET Repayment Demand Class.  If Plaintiffs fail do so, they will not satisfy Rule 23(a)'s typicality requirement and certification will be denied.

   *iv.*  ***Rule 23(a)(4) (Adequacy)***

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry has two components designed to ensure that absentees' interests are fully pursued." In re Schering Plough, 589 F.3d at 601-02 (quotation omitted). "First, the adequacy inquiry tests the qualifications of the counsel to represent the class." Id. at 602 (quotation omitted).

"The second component of the adequacy inquiry seeks to uncover conflicts of interest between named parties and the class they seek to represent." Id. (quotation omitted). "There are clear similarities between the components of the typicality inquiry relating to the absence of unique defenses and alignment of interests, and this second part of the adequacy inquiry that focuses on possible conflicts of interest." Id. "Because of the similarity of [the typicality and adequacy] inquiries, certain questions—like whether a unique defense should defeat class certification—are relevant under both." Id. (quotation omitted).

Here, as with typicality, that none of the named plaintiffs of the ONET Repayment Demand Class asserts an ERISA claim against one or more specified active, unresolved repayment demands—while class membership, by definition, requires one or more active, unresolved repayment demands—defeats adequacy because the named plaintiffs will not adequately represent the interests of the class as a whole, one of which is to avoid entirely the issue of voluntary repayment or offset.

However, because the same evidence will satisfy both the typicality and adequacy requirements of Rule 23(a), the Court will afford Plaintiffs the opportunity to present evidence that BHSC and/or Tri3 seeks an ERISA claim against one or more active, unresolved repayment

demands that fit within the definition of the ONET Repayment Demand Class.  If Plaintiffs fail

do so, they will not satisfy Rule 23(a)'s typicality requirement and certification will be denied.[22]

### v.    Rule 23's Ascertainability Requirement

In addition to Rule 23's explicit requirements, "courts have grafted on to it two additional

criteria, often referred to as the 'implicit requirements' of class certification: that the class be

'definite' or 'ascertainable' and that the class representative be a member of the class."[23]

Newberg on Class Actions § 3:1 (5th ed.); see also Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d

Cir. 2013) ("Class ascertainability is an essential prerequisite of a class action, at least with

---

[22] Defendants also argue that Plaintiffs' counsel is unqualified to represent the ONET Repayment Demand Class due to the nature of a Class Action Complaint recently filed by Plaintiffs' counsel in Peterson et al. v. UnitedHealth Group, Inc. et al., No. 14-cv-02101 (D. Minn. June 23, 2014).  The Peterson Complaint, in effect, sets forth the identical claims asserted by the ONET Offset Class that the Court previously struck in this case, namely that an involuntary offset amounts to an ABD that is separate and distinct from the corresponding repayment demand.

According to Defendants, the respective legal theories set forth in this case and the Peterson case are mutually exclusive.  Therefore, Defendants contend that Plaintiffs' counsel cannot adequately represent the interests of both classes because to advocate for one class is to detract from the other.  Defendants further contend that Plaintiffs' counsel will in all likelihood advocate more for the class in the Peterson case because that class seeks monetary relief whereas the ONET Repayment Demand Class does not.

While the Court questioned whether these two classes could pragmatically co-exist in the same action, see Premier Health Ctr. P.C. v. UnitedHealth Grp., No. 11-425, 2013 WL 6145652, at *4 n.6 (D.N.J. Nov. 20, 2013), it fails to see how their respective legal theories are, as a matter of law, diametrically opposed to the point where pressing one theory in a lawsuit detracts from the other theory in an entirely separate lawsuit.  And while it is true that the Peterson class seeks monetary relief while the ONET Repayment Demand Class does not, there is no indication whatsoever that Plaintiffs' counsel has not advocated vigorously and admirably in favor of the ONET Repayment Demand Class.

[23] As previously discussed, the named plaintiffs of the ONET Repayment Demand Class will have failed to satisfy Rule 23(a)'s typicality and adequacy requirements unless they provide specific evidence that either BHSC or Tri3 seeks ERISA claims against one or more active, outstanding repayment demands.  Similarly, absent that same evidence, the class will have failed to satisfy the second prong of the ascertainability requirement—that the class representatives be member of the class—because the repayment demands specified in SAC regarding BHSC and Tri3 do not fall within the scope of the class definition.

respect to actions under Rule 23(b)(3)." (quotation omitted)).[24]  Ascertainability means that "the class must be currently and readily ascertainable based on objective criteria."  Marcus v. BMW of North Am., LLC, 687 F.3d 583, 593 (3d Cir. 2012) (citations omitted).  "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate."  Id.

"The ascertainability requirement serves several important objectives."  Id.  For example, "it eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members."  Id. (quotation omitted).  It also "protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable."  Id. (citation omitted).

Defendants argue that the ONET Repayment Demand Class is not readily ascertainable. In doing so, they contend that (1) complex, individualized, factual inquiries are required to determine which class members are subject to a voluntary payment defense; (2) limiting the class to out of network providers would not excise all providers that are subject to arbitration provisions; and (3) out of network providers cannot be determined through administratively feasible means.

    a.      Determining who is subject to a voluntary payment defense

"It long has been the general common-law rule that where a party, without mistake of fact, fraud, duress, or extortion, voluntarily pays money on a demand that is not enforceable against him, he may not recover it."  Continental Trailaways, Inc. v. Director, Div. of Motor

---

[24] Although Plaintiffs do not seek certification of a Rule 23(b)(3) class here, the Court finds the ascertainability inquiry to be applicable to certification of the ONET Repayment Demand Class, because part of the relief sought—a remand of all outstanding repayment demands and reissuing those demands in accordance with ERISA—would require identifying individual class members that have active, unresolved repayment demands.

Vehicles, 102 N.J. 526, 548 (1986) (citations omitted); see also King v. First Capital Fin. Servs. Corp., 828 N.E.2d 155, 1170 (Ill. 2005) ("It has been a universally recognized rule that money voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment cannot be recovered back on the ground that the claim was illegal.").

Defendants argue that (1) determining whether a provider had knowledge of the facts surrounding a repayment demand requires an individualized examination of United's repayment demand letters; (2) determining which providers affirmatively authorized offsets requires an individualized examination of provider letters, United's internal records of provider telephone calls, and the records kept by providers; and (3) determining which providers voluntarily paid United by check requires an individualized examination of all correspondence accompanying refunds.

These arguments are red herrings. The ONET Repayment Demand Class excludes not only those repayment demands from the previously proposed ERISA Recoupment Class that were resolved through voluntary payments or voluntarily authorized offsets; it excludes those that were resolved through any payment or offset, whether voluntary or involuntary.[25]

---

[25] It is true that Plaintiffs' initial definition of the ONET Repayment Demand Class, in its opening brief, by itself, strongly suggests that it includes overpayment determinations that were resolved through involuntary payments or offsets. See (Pl.'s Br. Cert. 3.) ("Excluded from this class are all providers who voluntarily paid United in response to United's repayment demand or affirmatively authorized subsequent recoupments or offsets as a means to repay the alleged overpayments."). However, when assessed in conjunction with the simultaneously proposed ONET Offset Class, it is clear that Plaintiffs did not intend to include repayment demands that were resolved through involuntary payments or offsets. Moreover, in responding to Defendants' previous interrogatory seeking clarification on the precise definition of the ONET Repayment Demand Class, Plaintiffs responded that the relief sought would apply only to "new and presently pending repayment demands," (Meyer Decl., Ex. A), further confirming that the ONET Repayment Demand Class intended to exclude repayment demands that were resolved through any repayment or offset, not just those that were voluntary. Nonetheless, it is paramount that classes are defined explicitly and precisely. Therefore, the Court will accept the Plaintiffs' clarified definition of the ONET Repayment Demand Class set forth in their reply brief, which

Therefore, in identifying members of the ONET Repayment Demand Class, there is no need to determine the particular circumstances surrounding a repayment or offset.[26]

Plaintiffs provide evidence that pending, unresolved repayment demands are readily identifiable.  As previously noted, three separate divisions within United conduct post-payment audits and pursue overpayment recoveries: Benefits Operations, ARO, and PAS.  "All overpayments pursued by ARO are loaded into the ODAR database."  (Beswick Decl. ¶ 3.) "Overpayments that are identified by Benefit Operations but not loaded into ODAR are not actively pursued by any recovery personnel."  (Id. ¶ 6.)  "Overpayments that are identified by Benefit Operations or by ARO that are loaded into ODAR are actively pursued by ARO's recovery team."  (Id. ¶ 7.)  "When Benefits Operations identifies an overpayment, it contemporaneously adjusts the claim, creates a line for the overpayment in the claims system that feeds to the Overpayment Tracking System ("OTS")," and "issues a letter to the provider requesting a refund[.]"  (Id. ¶ 5.)  Similarly, if "the overpayment is one that was initially identified by ARO, the CRT team readjudicates the claim, creates a line for the overpayment in the claims system that feeds to the OTS."  (Id. ¶ 7.)  Premium Audit Services ("PAS") uses similar techniques as ARO to identify overpayments made to institutional providers such as hospitals.

Thus, it is clear that United keeps track of its overpayment determinations and repayment demands in certain databases and a simple search or review of these databases used by ARO and

_____

states that the class does not include repayment demands that were "resolved by payment, offset, or otherwise."  (Pl.'s Rep. Br. Cert. 5.)

[26] To be sure, a provider may have received multiple repayment demands and submitted payments or incurred offsets in response to certain demands, but not others.  In such cases, the provider may serve as a class member only with respect to the outstanding repayment demands.

Benefits Operations, and the analogous ones used by PAS, would reveal those repayment demands that have been satisfied and those that are outstanding.  Indeed, it would be hard to fathom that a health insurance company that puts significant resources into identifying and recouping benefit overpayments would be unable to readily identify repayment demands have been resolved through either payment, offset, or otherwise, and those that are outstanding.[27]

In their sur-reply, Defendants do not dispute that their databases may readily identify and distinguish outstanding repayment demands.  However, they argue that a class definition that excludes all repayments and offsets, whether voluntary or not, does not render the voluntary repayment defense inapplicable because United receives numerous repayments and executes both voluntary and involuntary offsets on a daily basis.  As a result, "every day between the date of certification"—Plaintiffs' suggested date for determining whether a repayment demand is outstanding—"and the date of trial, more and more of the claims included in the revised class would be resolved outside the litigation through voluntary payments."  (Def.'s Br. Sur-Rep. Cert. 3.)  According to Defendants, the ONET Repayment Demand Class would therefore not be readily ascertainable because identifying the class members will necessarily require an individualized inquiry to determine which of those repayments and offsets between the date of certification and trial are, as a matter of law, voluntary.

This is a problem.  However, there is a solution, and it lies in a modification of the scope of injunctive relief sought by the ONET Repayment Demand Class.  In order to properly

---

[27] Moreover, in reviewing its databases, United is able to readily identify the percentage of overpayment dollars in a given year that came from in network and out of network providers, respectively, see (Beswick Decl. ¶ 9); individual and institutional providers, respectively, see (id.); and voluntary payments via check and offsets, respectively, see (id. ¶ 10.)  Identifying which repayment demands have been satisfied and which are outstanding would seem a lesser task.

implement the injunction sought by Plaintiffs compelling United to reissue outstanding repayment demands that comply with ERISA, there must be a point at which United is barred from accepting a repayment or executing an offset with respect to its outstanding repayment demands.  Otherwise it will be impossible to apply the injunction across the class at any point due to the high risk of contemporaneous repayments or offsets.  Thus, any future injunction against United in this case will include a provision barring United from accepting any repayment or executing any offset with respect to any repayment demand, as of the date of final judgment.[28] Accordingly, the ONET Repayment Demand Class will be ascertainable at that time.  See Newberg on Class Actions § 3:3 (5th ed.) ("[T]he court need not know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding.").

> b.    Determining who is subject to arbitration provisions

Defendants argue that determining which members of the ONET Repayment Demand Class are subject to arbitration provisions that would bar their claims here is an individualized inquiry because many providers that United issues payment to on an out of network basis are also participants in certain "wrap networks" that often contain arbitration provisions covering payment disputes with United.  As a result, according to Defendants, "[i]f a claim was submitted by a provider pursuant to a wrap network agreement, the provider's contract with the wrap

---

[28] While Plaintiffs did not specifically request this provision, "[a] district court enjoys ample latitude to fashion an injunction appropriate to the facts before it."  19 Fed. Proc., L. Ed. § 47:5; see also Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc., 646 F.2d 800, 806 (2d Cir. 1981) ("It is well settled that the district court's equity jurisdiction empowers it 'to mold each decree to the necessities of the particular case.'" (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944)).

network would need to be individually examined to determine whether it contains an arbitration clause that applies to the provider's putative ERISA claim."  (Def.'s Br. Opp. Cert. 16.)

This argument is irrelevant because, as previously discussed, the ONET Repayment Demand Class excludes all overpayment determinations regarding claims subject to any network agreement.  But even if it were relevant, the Court of Appeals has recently ruled that an arbitration clause in an agreement between a provider and an insurer that might bind a provider's direct claim does not bind that provider's derivative claim via patient assignment.  See CardioNet, 751 F.3d at 178 ("[W]e fail to see how bringing an assignee's claim derivatively nullifies an assignor's promise to bring its own direct claim through arbitration—at least where, as here, the Agreement does not explicitly require the arbitration of assigned claims.").  And because there is no indication that the patient-assignors in this case are bound by the arbitration clauses in the wrap networks, their "right does not dissipate simply because the claim is brought by assignees who have promised to arbitrate certain *direct* claims they might bring against the defendant."  Id. (citation omitted) (emphasis in original).

Moreover, were the Court "to prevent providers that have promised to arbitrate their own claims against an insurer from bringing patients' claims in court, these providers would be less likely to accept patients' claims in exchange for services."  Id.  "This, in turn, would make it more difficult for patients to receive necessary services where their insurers have denied coverage."  Id.  Consequently, the arbitration provisions in the wrap network agreements between United and certain providers do not apply to the ONET Repayment Demand Class.

        c.      Determining Provider Status as In Network or out of Network

Defendants argue that "there is no simple and reliable way to identify" out of network healthcare providers in United's databases.  (Def.'s Br. Opp. Cert. 17.)  In doing so, they note

that (1) a provider may be in network with respect to certain United benefit plans, such as Medicare, but out of network for others; and (2) a provider may be in network for certain services, such as transplant services, but out of network for others.

This is beside the point.  It may very well be that a given provider treats certain United-insureds or performs certain services on an in network basis and others on an out of network basis.  But this just means that the provider is a member of the ONET Repayment Demand Class with respect to repayment demands regarding those services performed and/or those United-insureds treated on an out of network basis.  There is no dispute that United has records of those claims that are processed on an in network basis and those on an out of network basis.[29]  Indeed, it would be inconceivable that a health insurer would not maintain such records.  Otherwise it would be virtually impossible to process claims with any accuracy.

Defendants further contend that a provider's network status is often unclear and is often the subject of dispute between the provider and United.  To support this contention, Defendants point to evidence that (1) Dr. Sprandel was for a time mistakenly treated as an in network provider; and (2) Tri3 was for a time confused about its network status.  While United may from time to time mistake a provider's network designation, this does not change the fact that, through its business records, United can readily ascertain, with reasonable certainty, those provider claims that are processed on an in network basis and those that are processed on an out of

---

[29] Plaintiffs point to evidence that United, through its records, has the ability to ascertain (1) the amount of overpayment dollars recouped from in network providers and out of network providers, respectively, <u>see</u> (Beswick Decl. ¶ 9); (2) whether a provider has an operative network contract regarding a given claim and whether the provider was paid at an in network rate, <u>see</u> (Bugiel Decl. ¶¶ 4, 5); (3) those overpayments made to in network providers using data mining algorithms, <u>see</u> (Reckleberg Decl. ¶¶ 8, 9 10); and (4) which providers its insureds can see on an in or out of network basis, respectively, <u>see</u> (Pl.'s Rep. Br. Cert. 7.)  This evidence strongly suggests that United can readily determine whether a given claim was processed on an in network basis or an out of network basis.

network basis.  Consequently, the ONET Repayment Demand Class satisfies Rule 23's

ascertainability requirement.

### vi.        *Rule 23(b)(1)(A)*

Plaintiffs seek certification of the ONET Repayment Demand Class under Rule

23(b)(1)(A).  Rule 23(b)(1)(A) permits certification if "prosecuting separate actions by or against

individual class members would create a risk of . . . inconsistent or varying adjudications with

respect to individual class members that would establish incompatible standards of conduct for

the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A); see also Wal-Mart Stores, 131 S.Ct.

at 2558 (Rule 23(b)(1)(A) classes require "that individual adjudications would be impossible or

unworkable.").   Thus, "[i]n order to fall within Rule 23(b)(1)(A), there obviously must be a risk

that separate actions will in fact be brought if a class action is not permitted."  Wright, Miller,

Kane, et al., 7AA Fed. Prac. & Proc. Civ. § 1773 (3d ed.)  "Once the court determines that there

is a risk of separate individual actions, it must consider whether allowing the members to

proceed on their own will expose the party to a serious risk of being put into a 'conflicted

position.'"  Id.

"This requires more than a risk that separate judgments would oblige the opposing party

to pay damages to some class members but not to others or to pay them different amounts."  Id.;

see also Newberg on Class Actions § 4:7 (5th ed.) ("[C]ourts generally will *not* certify a class

under Rule 23(b)(1)(A) simply because separate damage actions may reach different results—

inconsistent verdicts on liability or damages do not alone give rise to incompatible standards of

conduct.") (emphasis in original).  Indeed, "if the mere threat of inconsistent jury verdicts

enabled certification under 23(b)(1)(A), every case involving multiple plaintiffs could fall into

this category.  This would cast too broad a net."  Newberg § 4:7.

Thus, "the phrase 'incompatible standards of conduct' is deemed to refer to the situation in which different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct."  Wright, Miller & Kane § 1773.  This often manifests "in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)."  Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 614 (1997) (quotations omitted).

In its prior opinion, with respect to certification of the ERISA Recoupment Class, the Court ruled that:

> [P]rosecution of individual actions by members of the ERISA Recoupment Class would create a risk of imposing inconsistent obligations on United with respect to its overpayment recoupment procedures.  The ERISA Recoupment Class seeks a ruling that United's overpayment recoupment procedures stand in violation of ERISA and an order, among other things, (1) enjoining United from continuing to enforce its overpayment recoupment procedures; and (2) requiring United to comply with ERISA in recouping overpayments in the future.  There can be little doubt that individual lawsuits asking for such relief present a real risk of establishing inconsistent standards of conduct for United.  Indeed, one lawsuit could result in a ruling that United's overpayment recoupment procedures violate ERISA's notice and appeal requirements and an order enjoining enforcement of those procedures. Another lawsuit might result in a ruling that United's overpayment recoupment procedures as a matter of law are in substantial compliance with ERISA's notice and appeal rights.  Yet another lawsuit could result in a ruling that ERISA does not even govern a given overpayment determination.  Consequently, the ERISA Recoupment Class satisfies Rule 23(b)(1)(A).

Premier Health Ctr., 292 F.R.D. at 227-28 (footnote omitted).

Defendants take issue with this ruling, arguing that "the mere possibility that individual adjudications could produce inconsistent results does not satisfy the requirements of Rule 23(b)(1)(A), so long as the defendant would be *capable* of simultaneously complying with any resulting inconsistent orders."  (Def.'s Br. Opp. Cert. 35) (emphasis in original).  Defendants cite to various case law directly supporting this proposition.  See, e.g., McDonnell-Douglas Corp. v.

United States Dist. Court, 523 F.2d 1083, 1086 (9th Cir. 1975) ("[S]ubdivision (b)(1)(A) was not

intended to permit class actions simply when separate actions would raise the same question of

law. . . .   Instead, the 'incompatible standards of conduct' of subdivision (b)(1)(A) must be

interpreted to be incompatible standards of conduct required of the defendant in fulfilling

judgments in separate actions." (citation omitted)); Pipefitters Local 636 Ins. Fund v. Blue Cross

Blue Shield of Mich., 654 F.3d 618, 633 (6th Cir. 2011) ("[T]he fact that the district court found

[defendant] liable to the Fund for a fiduciary breach, while another court might find [defendant]

owes no duty to a different [] client, does not create the risk required under this subsection.");

Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n, 624 F.3d 185, 197-98 (5th Cir. 2010)

("[I]f one court failed to require [defendant] to cease its relationship with [another party],

[defendant] could still end this relationship in order to comply with a different court order.  Such

action would not be 'incompatible' with the first court's order, but rather might exceed what that

court demanded.  An incompatible judgment would arise if one court *required* [defendant] to

continue its relationship with [the other party] while another court *prevented* [defendant] from

working with [the other party]." (footnote omitted) (emphasis in original)); Edwards v. First Am.

Corp., 251 F.R.D. 449, 452 (C.D. Cal. 2007) ("[T]he 'incompatible standards of conduct'

language must be interpreted to mean that separate judgments in separate actions could impose

requirements on the defendants that are impossible to simultaneously fulfill."), rev'd in part on

other grounds, 385 Fed. App'x 629 (9th Cir. 2010).

   The Court agrees that inconsistent adjudications as to liability or damages, by themselves,

do not amount to incompatible standards of conduct.  However, the Court cannot find that Rule

23(b)(1)(A) is so stringent and technical that incompatible standards of conduct can only be

established through the risk of multiple court orders requiring a defendant to engage in

diametrically opposed conduct.  Rather, as previously discussed, the incompatible standards of conduct requirement may be satisfied by showing that separate actions risk more generally impairing the opposing party's ability to pursue a uniform course of conduct.

Indeed, courts have certified classes under 23(b)(1)(A) where inconsistent individual adjudications would hinder a defendant from structuring a legally compliant, uniform policy or program, should the defendant be required to do so, in order to limit its exposure to future claims against a particular course of conduct.  See, e.g., Berry v. Baca, 226 F.R.D. 398, 406 (C.D. Cal. 2005) (certifying Rule 23(b)(1)(A) class of individuals asserting Section 1983 claims against Los Angeles County Sherriff, where class members had been unlawfully detained in jail after a court had authorized their release, because individual claims "could lead to different and conflicting judgments, a result that would make it difficult for Sheriff Baca to fashion a consistent release policy, should he have to, that would limit the County's exposure to claims."); In re Tectronics Pacing Sys. Inc., 172 F.R.D. 271, 284 (S.D. Ohio 1997) (certifying Rule 23(b)(1)(A) class of individuals asserting claims against defendant's scheme to monitor the use of pace makers in patients "because separate adjudications would impair [defendant's] ability to pursue a single uniform medical monitoring program.").  This is because "varying results" in individual actions "could lead to incompatible standards of conduct for [d]efendants, such that [d]efendants would not know if it were legally permissible to pursue a particular conduct" or policy.  Mel v. Anthem, Inc., 264 F.R.D. 312, 319 (S.D. Ohio 2009).

Here, the ONET Repayment Demand Class asserts ERISA claims against United's policies and procedures concerning notice to healthcare providers of overpayment determinations regarding services performed on an out of network basis.  As previously discussed, a central issue surrounding these claims is whether any overpayment determination whatsoever regarding

services performed on an out of network basis constitutes an ABD under ERISA, thereby

requiring that any and all of United's repayment demands comply with ERISA's notice and

appeal regulations.  As a result, individual actions could very well result in divergent rulings on

this issue that would, in turn, impair United's ability to pursue uniform policies and practices

regarding overpayment notification.

For example, a provider that treats United-insureds on an out of network basis might file

an action against United claiming that a multitude of repayment demands, received by the

provider, and stating varying reasons for the corresponding overpayment determinations, failed

to comply with ERISA's notice and appeal regulations.   In doing so, the provider might argue,

as Plaintiffs did in this case, that any repayment demand, as a matter of law, no matter the stated

reason for the corresponding overpayment determination, amounts to an ABD, and therefore

must comply with ERISA.  United, on the other hand, might argue, as it did this case, that

whether an overpayment determination amounts to an ABD depends on the basis for the

determination, and therefore certain repayment demands need comply with ERISA while others

need not.

One court might agree with the provider, as the Court agreed with Plaintiffs in this case,

that any and all repayment demands constitute ABDs under ERISA and therefore must comply

with ERISA's notice and appeal requirements.  In a second identical lawsuit brought by another

provider, however, a court might agree with United and find that certain repayment demands

issued to the provider are ABDs and need comply with ERISA, while others are not ABDs and

therefore do not need to comply with ERISA.  In a third identical lawsuit, a court might agree

with United in principal but differ from the ruling in the second lawsuit as to which bases for an

overpayment determination amount to an ABD and, in turn, those corresponding repayment

demands that need comply with ERISA.  Thus, although United could technically comply with each court order with respect to the appropriate individual provider, United would nonetheless have quite a difficult time deciding how to fashion its overpayment recoupment procedures.  Consequently, the ONET Repayment Demand Class may be certified under Rule 23(b)(1)(A).

      *vii.*      ***Rule 23(b)(2)***

Rule 23(b)(2) permits certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."  <u>Dukes</u>, 131 S.Ct. at 2557.

In the its prior opinion, the Court found that the ERISA Recoupment Class failed to satisfy the requirements of Rule 23(b)(2) because "a single injunction would not provide appropriate relief to each member of the ERISA Recoupment Class."  <u>Premier Health Ctr.</u>, 292 F.R.D. at 228.[30]  Specifically, "in its notification letters, United provided wildly varying levels of detail regarding the basis of an overpayment determination.  Thus, even an injunction allowing class members to appeal United's overpayment determinations will not provide relief to those class members that received insufficient notice of the basis of a given overpayment determination."  <u>Id.</u>

Here, the ONET Repayment Demand Class seeks (1) injunctive relief under Rule 23(b)(2) in the form declaratory relief establishing that Defendants' policies, procedures and practices with respect to issuance of repayment demands to providers regarding claims processed

---

[30] The Court also ruled that the ERISA Recoupment Class could not seek equitable restitution under Rule 23(b)(2).  However, the ONET Repayment Demand Class does not seek equitable restitution.

on an out of network basis fail, as a matter of law, to substantially comply with ERISA; and (2) a permanent injunction requiring Defendants to reform their policies, procedures and practices, going forward, with respect to issuance of repayment demands regarding claims processed on an out of network basis, to comply with ERISA.  The proposed permanent injunction cures the defect noted by the Court in its prior opinion.  Specifically, requiring Defendants to reform their policies, procedures and practices, going forward, with respect to issuance of repayment demands regarding claims processed on an out of network basis, in accordance with ERISA, necessarily includes providing ERISA complaint notice of the underlying overpayment determination.  Consequently, the ONET Repayment Demand Class may be certified under Rule 23(b)(2).

## III.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Reconsideration is GRANTED.  Dr. Sprandel cannot serve as a named Plaintiff of the ONET Repayment Demand Class.  Plaintiffs' Motion to Certify the ONET Repayment Demand Class is GRANTED, subject to Plaintiffs' providing evidence that named plaintiffs BHSC and/or Tri3 seeks an ERISA claim against one or more active, unresolved repayment demands that fit within the definition of the ONET Repayment Demand Class.

The Court will enter an order implementing this opinion.


  **/s/ Dickinson R. Debevoise_____**
  DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: August 28, 2014

56